1  LAW OFFICES OF BRADLEY N. WEBB
   Bradley N. Webb, Esq. SBN 084112, ,.
2  455 Capitol Mall, Suite 320
   Sacramento, California 95814
3  Telephone: (916) 812-0099 [C]

4  Attorney for Plaintiff
   WESTERN DUPLICATING, INC.

**ORIGINAL**
**FILED**

**JAN 30** 1998

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
          DEPUTY CLERK

8              UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10              **CIV. S-9 8 - 0 2 0 8 EJG GGH**

11  WESTERN DUPLICATING, INC.,      )   No.
                                    )
12              Plaintiff,          )   Complaint for Damages, Injunctive,
                                    )   Equitable and Declaratory Relief for:
13          vs.                     )   (1) Violation of Section 1 of the Sherman
                                    )   Act -- Contract, Combination or Conspiracy
14  RISO Kagaku Corporation, a Japanese )   in Violation of Rule of Reason;
    corporation, RISO, INC., a Massachusetts ) (2) Violation of Section 1 of the Sherman
15  corporation,  RISO PRODUCTS OF  )   Act -- Per Se illegal Tying Arrangement;
    SACRAMENTO, JAMES DOWNS, GREG   )   (3) Violation of Section 2 of the Sherman
16  HELLER, and JON BARTON, IKON    )   Act  -- Monopolization, Attempt to
    OFFICE SOLUTIONS, INC., a       )   Monopolize and Conspiracy to Monopolize;
17  Pennsylvania corporation, PACIFIC )   (4) Violation of California's **Cartwright** Act
    DUPLICATOR SYSTEMS, INC. a      )   (Business & Professions Code- section
18  California Corporation          )   16700);
                                    )   (5) Violation of California's Cartwright Act
19              Defendants.         )   (Business & Professions Code section
                                    )   16727);
20  ─────────────────────────────── )   (6) Violation of California's Prohibition of
                                        Contracts in Restraint of Trade (Business &
21                                      Professions Code section 16600);
                                        (7) Violation of California's Prohibition of
22                                      Unfair Competition (Business & Professions
                                        Code section 17200);
23                                      (8) Violation of California's Prohibition of
                                        Deceptive Advertising (Business &
24                                      Professions Code section 17500);
                                        (9) Intentional Interference with Contractual
25                                      Relations:
                                        (10) Interference with Prospective Economic
26                                      Advantage; and
                                        (11) Trade Libel/Product Disparagement
27                                      (**Restatement.2d** Torts, Section 623A).

28                                      **JURY TRIAL DEMANDED**

Complaint                    -1-

PL00005

Plaintiff WESTERN DUPLICATING INC. complaining of the above-named defendants and demanding a trial by jury, alleges the following:

## JURISDICTION AND VENUE

### I.

Counts 1 and 2 of this complaint are filed under the provisions of Title 15 of the United States Code sections 15 and 26, commonly known as sections 4 and 16 of the Clayton Act, to secure damages and injunctive relief from defendants for violations of Title 15 of the United States Code section 1, commonly known as section 1 of the Sherman Act, and section 8, commonly known as the Wilson Tariff Act. Count 1 alleges a rule of reason violation of section 1 of the Sherman Act. Since the goods in issue are imported from Japan, the same conduct is a violation of section 8. Count 2 alleges a per se illegal tying arrangement in violation of section 1 of the Sherman Act. The activities of defendants and their co-conspirators that are the subject of this complaint are within the flow of and substantially affect interstate commerce. A not insubstantial volume of trade and commerce is involved and affected by the violations alleged in this complaint.

### II.

Count 3 of this complaint is filed under the provisions of Title 15 of the United States Code sections 15 and 26, commonly known as sections 4 and 16 of the Clayton Act, to secure damages and injunctive relief from defendants for violations of Title 15 of the United States Code section 2, commonly known as section 2 of the Sherman Act. Count 3 alleges monopolization, an attempt to monopolize and conspiracy to monopolize. The activities of defendants and their co-conspirators that are the subject of this complaint are within the flow of and substantially affect interstate commerce. A not insubstantial volume of trade and commerce is involved and affected by the violations alleged in this complaint.

### III.

This court has original jurisdiction over Counts 4, 5, 6, 7, 8, 9, 10 and 11 by reason of diversity of citizenship in that the amount in controversy exceeds the jurisdictional limits

PL00006

1  for diversity jurisdiction and Plaintiff and each of the defendants are citizens of different states.

2  IV.

3  This court has pendant jurisdiction over Counts 4, 5, 6, 7, 8, 9, 10 and 11 in that

4  the subject matter is directly related to the subject matter of those claims that arise under the

5  Sherman Act and Clayton Act.

6  V.

7  Venue is proper in this district under section 12 of the Clayton Act, Title 15 of the

8  United States Code section 22 and Title 28 of the United States Code section 1391 because

9  defendants RISO KAGAKU CORPORATION, RISO, Inc. and RISO PRODUCTS OF

10 SACRAMENTO transact business and are found within this district.  Acts in restraint of trade in

11 violation of section 1 of the Sherman Act and acts which constitute monopolization, an attempt

12 to monopolize and a conspiracy to monopolize in violation of section 2 of the Sherman Act, have

13 taken place within the Eastern District of California.   At least one of the defendants, RISO

14 PRODUCTS OF SACRAMENTO, resides within the Eastern District of California.

15

16 **THE PARTIES**

17 VI.

18 Plaintiff is informed and believes that defendant **RISO** KAGAKU CORPORATION

19 is a Japanese company founded in 1946 which is traded over the counter in Japan.   Plaintiff is

20 informed and believes that RISO KAGAKU CORPORATION has a capital value of approximately

21 $1.2 billion, has yearly sales of approximately $753 million, with a growth rate of approximately

22 17%.  RISO KAGAKU CORPORATION is the developer and world leader in high speed digital

23 duplicators, which RISO KAGAKU CORPORATION markets under the name of Risographs.

24 RISO **KAGAKU** CORPORATION's main product lines are the Risograph Digital Duplicating

25 Systems, accessories and aftermarket supplies for sale to educational and commercial

26 organizations. RISO KAGAKU CORPORATION also has a secondary product line, the Print

27 Gocco compact personal'color printers and accessories, based upon the same technology, but with

28 scaled down features, for the home market.

Complaint                                    -3-

VII.

Risographs are produced by RISO KAGAKU CORPORATION in Japan and are sold in this country through its wholly owned subsidiary, **RISO, INC.**, a Massachusetts corporation. RISO, INC. was founded in 1986 and has its corporate headquarters in Danvers, Massachusetts.   Because **RISO, INC.** is a wholly owned subsidiary of **RISO KAGAKU CORPORATION**, the two corporations are for purposes of this action, considered a single entity incapable of conspiring amongst themselves and hereafter will collectively be referred to as RISO.

VIII.

**RISO** has an extensive dealer network with assigned territories and customers throughout the United States.   **RISO** also sells its products through a number of "branch offices" around the United States, which are essentially in-house dealers which are owned and operated by **RISO.** For example, there is no independant dealer in the San Diego area for RISO. RISO maintains a branch office which sells to and services the San Diego area.   RISO also has a branch office in the Houston area.

IX.

RISO's dealers are co-conspirators to the restraints of trade, monopolization and attempt to monopolize alleged in this complaint.   Plaintiff is ignorant of the names of most **RISO** dealers and will seek leave to amend this complaint to allege the names of those RISO dealers who's names and liability are learned through discovery.   RISO's dealers are provided extensive technical training by RISO to enable them to service Risographs.   Ordinarily, only **RISO** dealers can purchase spare parts at wholesale for Risographs.   RISO's dealers use the spare parts to fulfill 'maintenance agreements or sell the spare parts to those unusual customers who are large enough that it is economical for that customer to service their own Risographs.   Ordinarily, only RISO dealers can purchase **RISO-manufactured** supplies at wholesale for use in Risographs.   Customers then purchase these supplies from the **RISO** dealers at retail cost.

X.

Defendant **RISO** PRODUCTS OF SACRAMENTO is located in **Rancho Cordova,** which is within the Eastern District of California, and is the RISO dealer for the Sacramento,

**PL00008**

1  Stockton and Modesto areas of California.    Plaintiff is informed and believes that RISO

2  PRODUCTS OF SACRAMENTO is a partnership owned and operated by JAMES DOWNS,

3  GREG HELLER, and JON BARTON.    Acts in restraint of trade have been committed by RISO

4  PRODUCTS OF SACRAMENTO within the Eastern District of California.   RISO PRODUCTS

5  OF SACRAMENTO is a co-conspirator participating in the common scheme to suppress

6  competition from supply pirates.

7                                               XI.

8            Defendant IKON OFFICE SOLUTIONS, INC. (hereafter, IKON) is a Pennsylvania

9  corporation, formerly known as Alco Standard Corporation. Plaintiff is informed and believes

10  that IKON is in the process of transforming itself from 80 individually operating photocopier and

11  business equipment dealers with total revenues of about $3 billion to an integrated $10 billion

12  company.   This transformation is is to be completed by the year 2,000.   IKON currently has more

13  than 900 worldwide locations with 35,000 employees.   Plaintiff is further informed and believes

14  that IKON had revenues of $5.1 billion during fiscal year 1997 and is an industry leader in office

15  technologies, including business document and business imaging services.    MON has an

16  aggressive program of business acquisition, having acquired 89 companies during fiscal 1997.

17  Many of the business equipment offices acquired by IKON function semi-autonomously.  As part

18  of its program of acquiring formerly independant business equipment offices, IKON has acquired

19  a number of RISO dealerships.   IKON has a RISO dealership in the San Francisco Bay Area

20  formerly known as Better Office.  The actions of IKON directed against Plaintiff which are here

21  in issue were primarily committed by the dealership formerly known as Better Office.  IKON also

22  has the RISO dealership in the Des Moines, Iowa, area, against whom Plaintiff has directly

23  competed for sales.   IKON, by virtue of its outlets which are RISO dealers, is a co-conspirator

24  participating in the common scheme to suppress competition from supply pirates.

25                                              XII.

26            Defendant PACIFIC DUPLICATOR SYSTEMS, INC. (hereafter, PACIFIC

27  DUPLICATOR) is the RISO dealer for the greater Los Angeles area, and is located in Santa AM,

28  California. PACIFIC DUPLICATOR is a co-conspirator participating in the common scheme to

Complaint                                        -5-

1    suppress competition from supply pirates.

2                                XIII.

3            RISO sells aftermarket supplies consisting of masters and ink cartridges for use in

4    Risographs. RISO sells aftermarket masters and ink on both a wholesale basis, to its dealers, and

5    on a retail basis, through several branch offices. As more fully set forth below, RISO and its

6    local dealers consider any entity selling aftermarket masters or ink supplies for use in Risographs

7    to be "supply pirates" and have combined, conspired and contracted amongst themselves to

8    develop a strategic plan to suppress competition from such "supply pirates".

9                                XIV.

10           Plaintiff WESTERN DUPLICATING INC. is a Colorado corporation with its

11   offices in Colorado Springs. Plaintiff WESTERN DUPLICATING INC. sells aftermarket supplies

12   consisting of masters and ink cartridges, for use in high- speed digital duplicating machines,

13   including Risographs.   RISO and its dealers consider Plaintiff to be a "supply pirate".

14

15                       THE RELEVANT MARKETS

16                                XV.

17           The relevant markets are (1) the market for high speed digital duplicating machines

18   (original equipment market), (2) the aftermarket for warranty and maintenance services for those

19   machines (the maintenance and repair aftermarket) and (3) the aftermarket for supplies consisting

20   of ink and masters for those machines (supplies aftermarket), within the United States.   Within

21   the United States, regional and local submarkets exist by virtue of the fact that RISO and its

22   dealers have combined, conspired and agreed to restrain competition between RISO dealers and

23   with RISO's branch offices, have allocated territories and customers amongst the various RISO

24   dealers and with RISO's branch offices, which combination, conspiracy and agreement is enforced

25   vertically by RISO's threats to cancel any dealer which fails to abide by the agreement.

26                                XVI.

27           While the defendants' market power and anticompetitive conduct in the original

28   equipment market and maintenance and repair aftermarkets arc relevant to this action, Plaintiff's

Complaint                               -6-

1 antitrust injury flows from restraints upon competition, monopolization, attempts to monopolize

2 and conspiracy to monopolize the aftermarket for supplies consisting of masters and ink for use

3 in Risographs.

4

5 THE ORIGINAL EQUIPMENT MARKET -- HIGH SPEED DIGITAL DUPLICATORS

6 XVII.

7    Risographs were introduced in 1986 and made other types of duplicating machines

8 such as mimeographs and stencil duplicators, obsolete. Attached hereto as Exhibit "A" are true

9 and cot-rest printouts from the **RISO internet** site describing the company and its products.

10 X V I I I .

11    RISO was the **first** manufacturer of high speed digital duplicators and had a

12 substantial technological and marketing head start in the market. RISO has approximately a 65 %

13 to 75% market share in the original equipment market for sales of new high speed duplicating

14 machines. The **RISO** installed machine base, which dictates the aftermarket for maintenance and

15 supplies, is well in excess of 75 %. High speed digital duplicators **are** often referred to generically

16 as Risographs, much like photocopiers were often referred to as **"xerox** machines".

17 XIX.

18    High speed digital duplicators are a printing system that combines digital scanning,

19 precision imaging and ink on paper printing. High **speed** digital duplicators are a master-driven

20 system similar to an offset press. The operator either places the original in the automatic

21 document feeder or on the platen glass surface, and then selects the number of copies which are

22 to be printed. The original is scanned and **digitalized** and the image creates a master. With

23 printing accessories, the image for the master can also be directly created from a computer. High

24 speed digital duplicators are still sometimes termed stencil duplicators because the duplicating

25 process is performed following the creation of a master, or stencil. Once the master or stencil

26 is generated, it can reliably print 5,000 copies, and can print as **many** as **10,000** copies. The more

27 copies are printed, the cost per copy decreases to as little as a thiid of a cent per page. When it

28 is time to print another page, the old master is automatically ejected or removed before the next

PL00011

1  master is automatically put into place.

2  XX.

3      High speed digital duplicators print at approximately 130 copies a minute, have

4  relatively low service and maintenance costs as compared to other forms of duplication such as

5  photocopiers and laser printers, have minimal power requirements and the operator has the ability

6  to add color and choose inexpensive paper such as newsprint or unusual paper stocks and sizes.

7  The result is an economical, reliable, fast, and flexible printing system that offers many unique

8  printing options over any other type of printing or duplicating system.

9  XXI.

10      High speed digital duplicators are designed to bridge the gap between the

11  photocopier and the offset printer. High speed digital duplicators rarely replace photocopiers,

12  laser printers or offset presses, but typically coexist with them.  High speed digital duplicators are

13  a distinct product which fill the gap between those duplicating jobs which are too large for

14  photocopiers or laser printers and too small for offset printing machines.   For entities which

15  regularly run copy jobs between 20 and 5,000 pages, photocopiers and laser printers have limited

16  color reproduction capabilities, have difficulty printing on unusual paper stock or sizes, are too

17  slow, too expensive and use up too much energy.   Offset print machines are too expensive to

18  purchase and maintain, generate toxic waste product and are difficult to set up and use. High

19  speed digital duplicators have none of these problems, have fewer moving parts and no heat and

20  offer the convenience of a copier or laser printer, the economy of a duplicator and the durability

21  of an offset press.  Although digital duplicators have made significant advances in image quality

22  versus the older mimeographs and stencil duplicators, they do not have the image quality of either

23  photocopiers or offset presses.  As a result, high speed digital duplicators are considered to be a

24  "niche" product which has a limited number of buyers, but which uniquely meets those buyers

25  needs.

26  XXII.

27      Potential customers considering the purchase of a Risograph **look only** at other high

28  speed digital duplicators as options.  Increases in the sales of laser printers and photocopiers have

Complaint         a

PLO0012

1   little or no potential to substantially effect sales of high speed digital duplicators, and vice versa.

2   Increases in sales of offset printers have little or no potential to substantially effect sales of high

3   speed digital duplicators, and vice versa.

4                                      XXIII.

5          By far and away the largest group of customers for high speed digital duplicators

6   are schools. Because schools are relatively easy to identify and are volume purchasers, they are

7   the primary source for customers in the aftermarket for supplies.   Other governmental entities,

8   the printing industry, unions and churches are probably the next largest groups of customers for

9   high speed digital duplicators, but they are dwarfed by the market for schools.   Sellers of

10  aftermarket supplies are also able to identify governmental, print industry, union and church

11  Risograph owners. However, because governmental, print industry, union and church Risograph

12  owners do not buy aftermarket supplies in the same quantities as schools, aftermarket suppliers

13  tend to place less marketing emphasis in attempting to sell to such customers.   In the last few

14  years, there have been some sales of high speed digital duplicators in the general business

15  equipment submarket; but this is a relatively small submarket segment of the total market.   The

16  home submarket is relatively small and unimportant with respect to the aftermarkets for

17  maintenance and supplies.   Sellers of aftermarket supplies have difficulty identifying and

18  attempting to sell supplies to business and home submarkets, and can effectively market to these

19  submarkets only through dealers.

20                                     XXIV.

21         Risographs have, since their introduction in the mid-1980's. enjoyed a technological

22  edge over other high speed digital duplicators.   Risographs come in a variety of models with

23  differing features. Both because of technological advances by RISO and relationships which RISO

24  has developed with vendors who offer products and services that enhance and extend Risograph

25  applications, Risographs have accessories and technological features which none of their

26  competition enjoy. RISO's few competitors have always been attempting to play catch-up with

27  the latest RISO technological advances and features.

28  ///

Complaint                                 -9-

PLO001 3

XXV.

There are few makers of high speed digital duplicators on the market. There are a number of brands of high speed digital duplicators on the market which are made by Ricoh, but marketed under the names of Standard Duplicating, **Nashuatec, Gestetner** (which is owned by Ricoh), Savin (which is owned by Ricoh) and A.B. Dick. In total, Ricoh has approximately 23% to 33 % of the original equipment market for sales of new high speed digital duplicators. Although Ricoh has greatly expanded its dealer network in recent years, RISO remains dominant in the relevant market for sales of new high speed digital duplicators. The next largest competitor is Duplo, which has approximately a 1 %·to 2% market share in the original equipment market for sales of new digital duplicators. The only other high speed digital duplicator manufacturer is Seiki, which has less than a 1% market share and recently went through the Japanese version of a Chapter 11 reorganization. Their duplicators were being sold under the Standard Duplicating name, but Plaintiff is informed and believes that Standard Duplicating primarily sells digital duplicators manufactured by Ricoh, with **Seiki** being a secondary line.

XXVI.

The entrenched buyer preference and market acceptance, versatility and desirability of Risographs is shown by the fact that in spite of Risographs costing more than roughly comparable high speed digital duplicators sold by other manufacturers and that Risograph owners pay higher maintenance costs and substantially higher aftermarket **supply.costs,** Risographs have always been the dominate brand of high speed digital duplicators on the market since their introduction. Risographs have a long service life in comparison to other types of business equipment such as computers and printers. For example, the standard warranty for the thermal head (the most expensive part of a digital duplicator), on a Risograph is for seven years. In contrast, the standard warranty for most business equipment is 90 days to a year. Because Riographs have a long service life, percentage changes in the original equipment market take years to substantially change market shares in the maintenance and supplies after-markets. It is for this reason that although because of Ricoh's recent expansion of its dealer networks, aggressive marketing and technological advances, attempts to expand the market by selling to customers

Complaint

-10-

1  outside the traditional market base for digital duplicator sales, Ricoh has within the last few years
2  increased its market share in the original equipment market by almost 10% (to approximately 25%
3  to 35% of the original equipment market), Ricoh's share of the total installed equipment base,
4  which dictates the aftermarket for maintenance and supplies, is still less than 25 % .

5  XXVII.

6  Substantial barriers to entry and expansion exist in the original equipment market
7  for sales of new high speed digital duplicating equipment within the United States. There are
8  various patents protecting much of the technology used in high speed digital duplicators which
9  prevent the entry of new competitors.   Entry into the market for sales of high speed digital
10  duplicating equipment requires the development of an extensive, trained, dealer network.  Ricoh
11  was able to obtain an extensive dealer network through its own network and through its acquisition
12  of the Gestetner and Savin dealer networks.  Ricoh has effectively leveraged its photocopier and
13  other business machine products to develop a dealer network for its digital duplicators.   There is
14  an entrenched buyer preference for Riographs and to a much lesser extent, Ricoh manufactured
15  high speed digital duplicators.  Entry into the United States market for sales of high speed digital
16  duplicating equipment would require a hugh capital investment with little prospect for a reasonable
17  return on that investment.  A potential manufacturer would have to obtain a high level of market
18  penetration before economies of. scale are reached.  For these reasons, only Ricoh and its dealer
19  networks exist as a substantial competitor to RISO and its dealers.  Although Duplo and Seiki
20  have, on occassion, taken some sales away from RISO, the presence of Duplo and Seiki have little
21  or no influence upon the prices charged by RISO and its dealers for Riographs.

22

23  THE **AFTERMARKET** FOR MAINTAINING **RISOGRAPHS**

24  XXVIII.

25  Because Risographs are highly durable, Risographs come with a standard seven
26  year, ten million copy warranty on its critical componanf, the thermal imager or thermal head,
27  which covers defects and repairs.   The cost of the warranty is included as part of the purchase
28  price of the **Risograph.** RISO branch offices and dealers regularly offer yearly **maintenance**

Complaint

-11-

1  agreements for an additional charge.   The cost of these yearly maintenance agreements varies

2  considerably from dealer to dealer and from customer to customer of the same dealer.   The cost

3  of the maintenance contracts over the life of the machine, often exceeds the cost of the Risograph.

4  XXIX.

5  Although relatively durable as compared to photocopiers, Risographs need some

6  periodic maintenance and occasionally need to be repaired. RISO is the sole source for most parts

7  for use in the repair of Risographs.   For the most part, RISO parts are not interchangeable with

8  parts for other high speed digital duplicators.   Without access to RISO supplied spare parts, one

9  cannot successfully compete to service Risographs. Because RISO and its local dealers restrict

10  access to RISO manufactured parts, independent service organizations (hereafter, ISOs) have been

11  restrained and excluded from the aftermarket for maintenance of Risographs.

12  XXX.

13  RISO's network of branch offices and dealers service most Risographs.   The only

14  exceptions are those customers with a sufficient number of Risographs that it is economical for

15  the customer to maintain their own Risographs through an in-house service force. Those

16  customers can contract with the local RISO branch office or dealer to send an employee to be

17  trained by RISO in how to service Risographs.   Self-service customers must buy spare parts at

18  retail from RISO or the RISO dealers. There are virtually no ISOs which service Risographs.

19  The only exception is where RISO replaces a dealer with a new dealer and RISO permits the

20  cancelled dealer to purchase replacement parts for a period of time (usually no longer than a year).

21  Thus, where RISO replaces a dealer there is a short transition period where Risograph owners can

-22  choose between the new dealer and the cancelled dealer for service.   RISO typically speeds the

23  transition of maintenance to the new dealer by slow processing of orders and cash with order

24  requirements.

25  XXXI.

26  RISO will agree to train in-house service technicians for Risograph owners upon

27  the request of the dealer selling the Risographs to the customer, but will not train technicians

28  working for ISOs. This practice has restrained and excluded ISOs from the aftermarket for

PL00016

1     maintenance of Risographs.

2                          **XXXII.**

3          Because Ricoh sells high speed digital duplicators under various brand names (A.B.

4 Dick, Standard Duplicating, Gestetner, Nashuatec and Savin) with separate dealer networks for

5 each brand name, each of which is trained to service Ricoh high speed digital duplicators, and

6 because Ricoh replacement parts are generally **interchangable** between brands, the market for

7 servicing Ricoh manufactured high speed digital duplicators is far more competitive than that for

8 Risographs, for which there is no competition except for those limited customers who are capable

9 of self-servicing.

10                         **XXXIII.**

11          Because of the absence of **ISOs** capable of servicing Risographs and because most

12 customers do not have the capability of servicing-Risographs, most customers purchase yearly

13 maintenance agreements. RISO branch offices and dealers will, on occasions where they are faced

14 with competition for aftermarket supplies, offer customers a **price-per-copy** contract under which

15 the cost of the machine, the cost of repair and maintenance and the cost of masters and ink are

16 included in a single charge based upon how many copies are run.

17                         **XXXIV.**

18          As discussed below, the warranty agreements, yearly maintenance agreements and

19 to a lesser degree, the cost-per-copy pricing contracts, are part of the strategy developed by RISO

20 and its dealers for suppressing competition from "supply pirates."

21                         **X X X V .**

22          Plaintiff has attempted to develop the capability of servicing Risographs, but has

23 been unsuccessful. Although Plaintiff has been unable to develop the capability of servicing

24 Risographs, Plaintiff does not contend that it has suffered antitrust injury from its exclusion from

25 the maintenance aftermarket. Rather, the reason Plaintiff attempted to develop the capability for

26 servicing Risographs was not to make money in the maintenance aftermarket, but rather was to

27 combat the restraints and exclusionary practices of RISO and its local dealers in the supplies

28 aftermarket.

PL00017

## THE AFTERMARKET FOR SUPPLES

### XXXVI.

High speed digital duplicators use three items of aftermarket supplies: (1) paper; (2) masters; and (3) ink.

### XXXVII.

There are no market restraints with respect to paper for use in high speed digital duplicators. RISO does not manufacture paper and has no reason to attempt to restrain competition with respect to sales of paper for use in Risographs. Paper is interchangeable amongst high speed digital duplicators, although because of various accessories, Risographs are able to print on paper products which their limited competitors are unable to utilize. For the majority of printing jobs, the same paper which can be used in a Risograph can be used in a Ricoh, Duplo or Seiki high speed digital duplicator. The majority of high speed duplicating jobs are printed onto paper suitable for use in photocopiers or laser printers. Indeed, one of the advantages of high speed digital duplicators over photocopiers and laser printers is that they can print on a wide variety of paper stocks of different quality and price. Risogmphs have accessories which give them greater printing freedom than their competitors. With various accessories, Risographs can even print on paper bags and can print high quality business cards.

### XXXVIII.

Ink and masters are not interchangeable amongst high speed digital duplicators. Ink cartridges for Ricoh; Duplo and Seiki high speed digital duplicators do not fit into Risographs and vice versa. Ink which works well in high speed digital duplicators manufactured by Ricoh, Duplo and Seiki, because of viscosity and other differences, does not work well in Risogmphs. Masters for Risographs are different than those used in high speed digital duplicators manufactured by Ricoh, Duplo or Seiki. In short, ink and masters for high speed digital duplicators manufactured by Ricoh, Duplo and Seiki are effectively different products from those used in Risographs.

### XXXIX.

In the aftermarket consisting of masters and ink for use in high speed digital duplicators, there is a short-term or temporary barrier to entry in that it takes considerable time,

usually several months to over a year, after a potential customer is identified before sales begin. Often customers have several months supply of ink and masters on hand and it will be months before any further supplies are purchased.  For aftermarket supplies which are not manufactured by the original equipment manufacturer, customers generally want references from other customers and/or wish to sample the aftermarket supplies for a period of time.  Ordinarily, it is only after they have sampled the ink and masters for a period of time before a customer will consider purchasing different ink or masters when they next order.

### XL.

There is also a barrier to entry in the aftermarket for sales of ink used in high speed digital duplicators in that ink for high speed digital duplicators must be packaged in plastic type containers of special design.  Until a readily available supply of recycled ink containers is obtained (which are cleaned, had their proprietary markings removed and inspected), or an independent source of plastic containers is located, independent aftermarket sources are unable to sell ink. Some customers, usually school districts, prefer recycled ink containers. Plaintiff WESTERN DUPLICATING INC. has overcome this barrier with respect to Risographs, but has had some difficulty with respect to Ricoh produced high speed digital duplicators.

### XLI.

With respect to aftermarket supplies of masters and ink, there are substantial market restraints with respect to sales for use in Risographs and little restraint with respect to Ricoh manufactured high speed digital duplicators.  The aftermarket for supplies of ink and masters for Duplo or Seiki manufactured high speed digital duplicators is extremely small, but without significant restraints.   As a result, prices charged by RISO dealers for ink and masters for aftermarket use in Risographs are substantially higher, ordinarily greater than 40% more, than those prices charged by the various Ricoh dealers for use in Ricoh manufactured high speed digital duplicators.

### XLII.

The anticompetitive practices of RISO and its dealers are the most significant barrier to entry and expansion facing competitors in the aftermarket for sales of ink and masters for use

1     in high speed digital duplicators.

2

## XLIII.

3         Plaintiff WESTERN DUPLICATING INC. sells ink and masters manufactured by

4 Tomoegawa Paper Co., Ltd. of Japan. Tomoegawa Paper Co., Ltd. does business in the United

5 States through its wholly owned subsidiary, Tomoegawa (U.S.A.) Inc., headquartered in

6 Wheeling, Illinois (hereafter, collectively referred to as Tomoegawa). WESTERN

7 DUPLICATING INC. has been marketing Tomoegawa masters for four years and Tomoegawa

8 ink for two years, **with** excellent results in Risographs.

9

## XLIV.

10         Tomoegawa is a sixty year old, half-billion dollar Japanese corporation.

11 Tomoegawa has extensively tested its masters and ink and subjects them to strict quality controls.

12 The masters made by Tomoegawa and sold by Plaintiff WESTERN DUPLICATING INC. are of

13 slightly superior quality to those manufactured by RISO by virtue of certain patents which have

14 not been licensed to **RISO** by Tomoegawa. The ink manufactured by Tomoegawa is manufactured

15 to the original equipment manufacturer's quality and consistency standards of RISO.

16

## XLV.

17         Tomoegawa has approximately four or five other entities in the United States which

18 sell its supplies for use in Risographs. Plaintiff is informed and believes that Plaintiff sells more

19 Tomoegawa supplies than these four or five other entities added together.

20

## XLVI. .

21         Plaintiff is informed and believes that alternative manufacturers or suppliers of ink

22 and cartridges for use in Risographs include: IncPro (A.B. Dick Co.); Repeat-O-Type Mfg.

23 Corp.; Perfecopy Co., formerly a division of Starkey Chemical; Weber Digital Masters; and

24 American Coated Products. Plaintiff is informed and believes that American Coated Products,

25 selling ink manufactured by Daito Chemical Corporation of Japan, is the largest seller of **non-**

26 RISO aftermarket ink for use in Risographs, with less than a 4% market share of **the** aftermarket

27 for sales of ink for use in Risographs. To run **IncPro** ink in Risographs require settings alterations

28 and for this reason, they are viewed by some in the industry as being of inferior quality. **RISO**

1    has had independent tests run on IncPro supplies by Buyers Laboratory. Inc. and has published

2    the results of those tests, using the results to argue that IncPro supplies are of inferior quality.

3    Attached hereto as Exhibit "B" are the results of the tests which RISO had performed upon IncPro

4    ink.    RISO also has obtained information indicating that Perfecopy ink cartridges have been

5    defective and have published this information. Attached hereto as Exhibit "C" is the information

6    RISO sent to its dealers relative to Perfecopy.   RISO has either chosen not to test the Tomoegawa

7    or Daito manufactured supplies or has tested those supplies and refused to publish the results of

8    those tests.

9                                    XLVII.

10           Plaintiff **WESTERN DUPLICATING INC.** focuses its marketing in the western

11   United States, whereas American Coated Products and the other entities selling Tomoegawa

12   manufactured ink and masters focus their marketing on the eastern United States.   IncPro and

13   Repeat-O-Type supplies are-sold nationally.

14                                    XLVIII.

15           The Tomoegawa produced masters and inks sold by Plaintiff WESTERN

16   DUPLICATING INC. are of consistently high quality and the machines operate using the same

17   density settings as when using **RISO** manufactured supplies.

18                                    XLIX.

19           Independent sources for aftermarket supplies such as Plaintiff WESTERN

20   DUPLICATING INC., can readily identify schools as potential customers. The RISO strategy

21   for suppressing competition from "supply pirates" is primarily directed at schools.

22                                    L.

23           It is more difficult for independent aftermarket suppliers to identify potential

24   customers in the printing industry, governmental entities (other than schools), churches and

25   unions.   Because these customers arc relatively small accounts, it is most efficient to attempt to

26   market to these potential customers through business machine dealers.   When RISO and its dealers

27   perceive there to **be** a threat from "supply pirates" with respect to taking away customers which

28   are governmental entities. print shops, unions and churches, RISO and its dealers will also attempt

Complaint                              -17-

PLO002 1

1   to suppress competition from "supply pirates" as to these customers. Independant sources of

2   aftermarket supplies have difficulty identifying potential customers amongst business owners and

3   the home market.   If independent sources of aftermarket supplies are to successfully market to

4   these customers, they must ordinarily sell through dealers. As discussed more fully below, RISO

5   and its dealers have combined, conspired and agreed that no RISO dealer will sell non-RISO

6   manufactured ink or masters to Risograph owners.  Therefore, independent sources for aftermarket

7   supplies, including. Plaintiff WESTERN DUPLICATING INC., are restrained and effectively

8   precluded from selling ink and masters to Risograph owners in the printing industry, churches,

9   unions or the home market.

10                                             LI.

11          Plaintiff WESTERN DUPLICATING INC. projects that it will have sales of 2½

12   million in 1998.  A small portion of Plaintiff's sales are to Mexico and to a company in Miami,

13   Florida, for export to Brazil.   Approximately one third of Plaintiff's sales are for use in high

14   speed digital duplicators manufactured by Ricoh or Seiki, in spite of the fact that Plaintiff has been

15   selling ink and masters for use in Ricoh manufactured high speed digital duplicators for a much

16   shorter period of time than for Risographs and Plaintiff has had difficulties obtaining an adequate

17   and reliable supply of ink cartridges suitable for use in Ricoh manufactured high speed digital

18   duplicators.

19                                             LII.

20          Approximately two-thirds of Plaintiffs sales, measured by dollars of sales, are of

21   masters.   Plaintiffs profit for unit of sale of masters is approximately the same as that for ink.

22   However, because masters are a more expensive item, the profit margin on masters is lower than

23   that for ink. Thus, although approximately two-thirds of Plaintiff's sales are of masters while only

24   one-third are of ink, Plaintiff derives approximately 50% of its profit from sales of masters and

25   50% from sales of ink.

26                                             LIII.

27          As discussed more fully below, because of the restraints of trade and exclusionary

28   practices of RISO and its dealers here in issue, Plaintiff WESTERN DUPLICATING INC. 's

Complaint                                    -18-

1  successes in marketing ink and masters to Risograph owners is generally to those limited number

2  of Risograph owners who self-service their Risographs.

3                                                    **LIV.**

4             As discussed more fully below, because of the various restraints of trade and

5  exclusionary practices of **RISO** and its dealers here in issue, **RISO** has a market share in excess

6  of 90% in the aftermarket for supplies of ink and masters for use in Risographs.

7

8                          THE RELEVANT GEOGRAPHICAL MARKET

9                                                    **LV.**

10           The relevant geographical market for the original equipment market for sale of new

11 high speed digital duplicators is the United States, although because of **RISO's** territorial and

12 customer allocations amongst its local dealers, customers are limited in their options as to where

13 to purchase a Risograph.   All high speed digital duplicators are sold in the United States through

14 local dealers.

15                                                   **LVI.**

16           The relevant maintenance and repair aftermarkets are inherently local or regional.

17 RISO repairs, services, and maintains high speed digital duplicators throughout the United States

18 through a wholly owned U.S. subsidiary with an extensive network of local dealers.  As discussed

19 more fully below, RISO and its dealers have allocated territories and customers amongst

20 themselves. There are few if any **ISOs** servicing Risographs. Thus, customers seeking repairs,

21 servicing and maintenance for Risographs have the choice of self-service, which is not a viable

22 option for most customers, or using the local RISO dealer.  Those customers who self-service are

23 generally large school districts with trained in-house equipment maintenance personnel, which can

24 leverage a large machine purchase to the dealer agreeing to training their personnel.

25                                                   **LVII.**

26           The relevant market for aftermarket ink and masters for use in Risographs is the

27 United States, although the level of competition varies from region to region depending upon the

28 level of self-servicing by customers.    When customers are willing to consider purchasing

Complaint                                          -19-

1   aftermarket ink and masters from an entity other than the local RISO dealer, those customers look

2   to distributors and sellers in the United States. The price of aftermarket ink and masters is not

3   substantially affected by retail sales outside the United States.

4

5   <u>COUNT I -- VIOLATION OF SHERMAN ACT § 1</u>
    (HORIZONTAL AND VERTICAL CONSPIRACY TO SUPPRESS COMPETITION

6   FROM "SUPPLY PIRATES" AND ELIMINATE "BOOTLEGGING" BY DEALERS
    IN VIOLATION OF RULE OF REASON)

7

8                                     LVIII.

9       Plaintiff WESTERN DUPLICATING INC. hereby realleges by reference,

10  paragraphs I and V to LVII of the introductory allegations,

11                                     LIX.

12      Defendant RISO and its local dealers have market power in the original equipment

13  market for sales of new high speed digital duplicators.   As discussed above Risographs have

14  always been the technological leader in high speed digital duplicators, enjoy a high degree of

15  favorable name recognition and are generally acknowledged as the market leader. RISO has

16  approximately a 65 % to 75 % market share in the original equipment market for sale of new high

17  speed digital duplicators within the United States.   RISO and its local dealers have a market share

18  with respect to installed machines in excess of 75%.   As discussed below, RISO and its local

19  dealers have leveraged their market power in the original equipment market to restrain competition

20  in the ink and masters supplies aftermarket for Risographs.

21                                     Lx.

22      Defendant **RISO** and its **local** dealers have market power in the aftermarket for

23  repair, service and maintenance of Risographs.   As discussed above, because of the absence of

24  **ISOs** capable of servicing Risographs and because most customers do not have the capability of

25  servicing Risographs, most customers purchase yearly maintenance agreements and are dependant

26  on **RISO's** territorially allocated dealers and branch offices for service. As discussed below, **RISO**

27  and its local dealers have leveraged their market power in the maintenance aftermarket to restrain

28  competition in the aftermarket for ink and masters for use in **Risographs.**

Complaint                              -20-

                                                            _____  ¦

## LXI.

Defendant **RISO** and its dealers have market power in the aftermarket for marketing, distribution and sales of aftermarket supplies consisting of ink and masters for use in Risographs. Because of the restraints here in issue, **RISO** and its dealers control more than 90% of the aftermarket for sales of ink and masters for use in Risographs.

## LXII.

At the time the majority of the Risographs which are part of the installed machine base were purchased, **RISO** faced little or no effective competition. The competitive high speed digital duplicators which did exist were clearly inferior to Risographs. Because of the **RISO** program allowing customers to trade in old Risographs and trade up to newer and more advanced Risographs, **RISO** and its dealers are able to keep customers from switching to competitive high speed digital duplicators to replace an existing Risograph.

## LXIII.

Governmental units, such as schools, are particularly vulnerable to supracompetitive aftermarket supply costs. Purchasing decisions for school districts and other governmental units are based upon yearly budgetary periods. Purchasing **decisions** with respect to digital duplicators for school districts and other governmental units are generally not based upon life cycle cost studies or projections. Even if customers were to attempt to make purchasing decisions based upon life cycle cost studies, such would be near impossible to make. Maintenance contracts are agreed upon yearly and vary considerably in cost. The price for maintenance of Risographs can vary by over 100% from school district to school district **serviced** by the same dealer. The cost of ink and masters varies from order to order. Many school districts have purchased their Risographs in ignorance of the provisions pertaining to use of "unauthorized supplies", discussed below.

## LXIV.

During all the times mentioned, defendants have unlawfully combined and conspired together and do now unlawfully combine and conspire together to carry out restrictions in the trade, business, **and** commerce in which defendants are engaged. During all of these times,

PLO0025

1   defendants have unreasonably increased the prices at which they sell aftermarket supplies

2   consisting of ink and masters for use in Risographs.   During all of these times, defendants have

3   prevented competition in the sale of aftermarket ink and masters for use in Risographs. The

4   practices of RISO and its dealers here in issue have effectively foreclosed a substantial share of

5   the relevant 'market for sales of ink and masters for use in high speed duplicators, are

6   exclusionary, anticompetitive and not justified by legitimate business considerations.

7                                      LXV.

8         Every act and action here in issue was done by defendants pursuant to the unlawful

9   combination and conspiracy.   The combination and conspiracy of defendants has operated to

10   unlawfully raise the price of new Risographs by eliminating competition amongst RISO dealers

11   through territorial and customer allocations. The combination and conspiracy of defendants has

12   operated to unlawfully raise the prices charged for maintenance and repair of Risographs by

13   eliminating all **ISOs** from the market by depriving them of the spare parts necessary to compete

14   and by eliminating competition amongst RISO dealers through territorial and customer allocations.

15   The combination and conspiracy of defendants has operated to unlawfully raise the prices charges

16   for aftermarket supplies to the injury of consumers and has injured and destroyed the business of

17   persons, firms and corporations engaged in attempting to sell aftermarket supplies of ink and

18   masters for use in Risographs through contractual terms which effectively tie Risograph owners

19   to use RISO manufactured ink and masters.   The aftermarket for sales of ink and masters for use

20   in Risographs comprises more than 75 % of the entire potential market for sale of supplies for all

21   high speed digital duplicators and RISO and its dealers control more than 90% of the aftermarket

22   for sales of ink and masters for use in Risographs.  The effect of the combination and conspiracy

23   by RISO and its local dealers has been to exclude competitors by unreasonable and anticompetitive

24   means and to lessen competition in the relevant markets.

25                                      LXVI.

26         RISO and its dealers have adopted a long-range monopolistic pricing and marketing

27   strategy predicated upon maintaining or increasing its market share in the high speed duplicating

28   market by having lower profit margins on its original equipment.   RISO and its dealers then make

1    up for relatively lower profits in the sale of original equipment by charging supra-competitive

2    monopoly prices for aftermarket supplies. As a result, while the price of Risographs usually are

3    greater than comparably equiped high speed digital duplicators manufactured by **Ricoh**, Duplo and

4    Seiki, and are greater than they would be in a market where **RISO** dealers were not restrained by

5    territorial allocations from competing with one another, the profit margins on new Risographs

6    are not as high as the profit margins on aftermarket supplies.  The prices charged for maintenance

7    and repair of Risographs are higher than they would be in a market where **RISO** dealers are not

8    restrained from competing with one another and where ISOs are not excluded.

9                                              **LXVII.**

10        On or about October 14. 1994 was held a "Riso Dealer Advisory Council" meeting.

11   The President of **RISO**, INC. and several other representatives of **RISO**, INC. were present at the

12   meeting along with a select, representative group of leaders from **RISO's** local dealer network.

13   A true and correct copy of the minutes from that meeting are attached hereto as Exhibit "D" and

14   are incorporated herein by reference.  Plaintiff is **informed** and believes that prior to October 14,

15   1995, **RISO** and its dealers had a tacit agreement or understanding to restrain competition and

16   exclude competitors and that the agreements reached during the "Riso Dealer Advisory Council"

17   meeting simply formalized the earlier tacit agreement.  Plaintiff is further informed and believes

18   that RISO and its dealers have at all times since the "**Riso** Dealer Advisory Council" meeting of

19   October 14, 1995, acted in furtherance of the agreement and understanding reached at that

20   meeting,

21                                            **LX-VIII.**

22        At the October 14, 1994 meeting, RISO and its dealers agreed to allocate. territories

23   and customers amongst dealers, which territorial and customer assignments would be enforced by

24   **RISO**, INC. cancelling any RISO dealer which competed for customers outside its assigned

25   territory.

26                                             **LXIX.**

27        At the October 14, 1994 "Riso Dealer Advisory Council" meeting, **RISO** and the

28   Dealer Advisory' Council agreed that while the photocopier market was "very competitive", the

PL00027

1  high speed digital duplicator market is not competitive and RISO should maintain its long-range

2  marketing strategy, noting that "The Risograph is different in that we already have more than 75%

3  market share" later stating that the Dealer Advisory Council "stressed the need for new products

4  so that Riso will continue to dominate the market". Later it was noted that the introduction of two

5  new Risograph models "represent an engineering advance which will distance us from our

6  competitors". Subsequent to the formation of the conspiracy, RISO and its dealers have continued

7  to dominate the market for high speed digital duplicators within the United States.

8  LXX.

9        At the October 14, 1994 Riso Dealer Advisory Council meeting, it was

10  recommended by the Dealer Advisory Council and RISO agreed, that RISO would "Develop a

11  strategy for dealing with Pirates" which RISO, in combination with the dealers, would thereafter

12  follow. The conduct here in issue is in furtherance of that agreement and strategy.

13  LXXI.

14        Plaintiff WESTERN DUPLICATING INC. is what RISO and its dealers term a

15  "pirate", "supply pirate" or "generic pirate". A "supply pirate" sells supplies consisting of

16  masters and ink cartridges which were not manufactured by RISO for use in Risographs. A RISO

17  dealer is also deemed a "supply pirate" (1) if that dealer purchases supplies from an entity such

18  as Plaintiff WESTERN DUPLICATING INC. for resale to its customer base; or (2) if that dealer

19  sells outside of its assigned territory or customers. On page 3 of the memorandum of the October

20  14, 1994, Dealer Advisory Council meeting it states:

21  
> Another major concern raised by the DAC [Dealer Advisory
22  > Council] is the need to develop a strategy for dealing with the
> pirates. Two kinds of pirates were discussed. There are the
> vendors of off-brand masters and ink who offer their products to end
23  > users and other dealers. An authorized Riso dealer who sells Riso
> products outside his assigned territory or sells to someone other than
24  > an end user is a pirate of the worst kind. As we become more
> successful, we will become a more tempting target for these pirates.

25

26  LXXII.

27        At the October 14, 1994 Riso Dealer Advisory Council meeting, it was

28  recommended by the Dealer Advisory Council and RISO agreed, that RISO would "Develop a

PL00028

1   strategy for dealing with Bootlegging by Riso dealers. " A RISO dealer engages in "bootlegging"

2   if it sells RISO manufactured supplies to entities such as Plaintiff or if it sells RISO manufactured

3   supplies outside of its designated geographical area.

4                                              LXXIII.

5          After the Dealer Advisory Council made these two recommendations:

6          It was **agreed** that Riso **and Riso dealers** must work together to
           **find ways to protect the existing and future base of supplies so**
7          **vital to both.** Since schools are the easiest target for pirates, Riso
           has a program to support pricing through the bid desk.., ¶ DAC
8          members discussed **cost per copy plans,** supplies contracts, coupon
           books and other local sales, service and marketing strategies **being**
9          **used by dealers to protect their supplies base.**
                                              ***
10         In order to protect our mutual investments in developing our
           businesses together, Riso **agrees to:**
11         * Use all means available to ensure that **Riso dealers do not sell**
           **outside their assigned territories.**
12         * Riso will **vigorously enforce the terms of the Riso Dealer**
           **Agreement.**
13         * **Riso will cancel dealers who sell competing digital duplicating**
           **products** in their assigned Riso territories. **Riso will immediately**
14         **and permanently stop shipment of parts and supplies to any**
           **dealer who sells competing supplies for use in a Risograph.**
15         (emphasis added.)

16                                             LXXIV.

17         As a result of this combination, conspiracy, and agreement, if a RISO dealer

18  becomes a "supply pirate" or "bootlegger" it will be cancelled as a dealer by RISO. Plaintiff

19  WESTERN DUPLICATING INC. has thus been foreclosed from selling supplies to RISO dealers.

20                                             LXXV.

21         RISO and its local dealers have an agreement in order to protect their "mutual

22  investments" under which "Riso will immediately and permanently stop shipment of parts and

23  supplies to any dealer who sells competing supplies for use in a Risograph" and will cancel dealers

24  who sell competing supplies for use in Risographs.  It does not matter whether or not the dealer

25  is selling "competing supplies" in that dealer's assigned/allocated territory. So long as the dealer

26  is selling "competing supplies" for use in Risographs located anywhere in the United States, all

27  sales of RISO products to that dealer will immediately cease and that dealer will be terminated.

28  ///

Complaint

PLO0029

## LXXVI.

As a result of this horizontal concerted refusal to deal, enforced vertically through the RISO dealership agreement, RISO will cancel any dealer which purchases aftermarket ink and masters from Plaintiff WESTERN DUPLICATING INC. for use in Risographs.    Plaintiff WESTERN DUPLICATING INC. has thus been foreclosed and restrained from selling supplies to or through RISO dealers.

## LXXVII.

Any purported business justification for the blanket prohibition on RISO dealers handling the ink and masters of competitors is pretextual.   The purpose for the prohibition is to restrain competition from non-RISO aftermarket supplies and to allow RISO and its dealers to continue to charge supracompetitive prices.    The limitation was the product of a horizontal agreement amongst RISO dealers.    If the RISO dealer limitations were simply a vertical requirement designed to promote the loyalty and best efforts of RISO's dealers in selling RISO manufactured aftermarket supplies, such would not require RISO to prohibit dealers from selling non-RISO ink and masters outside of their assigned territories and would not require RISO to prohibit dealers from selling RISO brand ink and masters to third parties and customers outside their assigned territories. RISO's policy is designed to preserve its supracompetitive pricing, not to increase sales in a competitive market.

## LXXVIII.

The primary strategy developed by RISO for "dealing with the pirates", which strategy for suppressing competition is carried out in combination with its local dealers, is to include a seven year or ten million copy warranty on thermal imagers for all Risographs purchased in the United States which warranty is invalidated if "unauthorized supplies" are used and a standardized maintenance agreement which is also voided if "unauthorized supplies" are used. The standard "Risograph Agreement" for the purchase of a new Risograph, includes a seven year ten million copy warranty which provides that **"This warranty shall not apply if machine has been subjected to** misuse, neglect, **unauthorized operating supplies** or accident..."    Attached hereto as Exhibit "E", and incorporated herein by 'reference, is a specimen copy of a maintenance

1  agreement, which contains the identical provision.

2  ## LXXIX.

3  Any purported business justification for the blanket prohibition invalidating the

4  warranty agreement if "unauthorized supplies" are used is pretextual. Only RISO manufactured

5  supplies are ever authorized.  Indeed, there is no mechanism to obtain authorization for ink or

6  masters manufactured by an entity other than RISO.  The warranty, which the customer pays for

7  as part of the price when purchasing the Risograph, is invalidated irrespective of whether or not

8  the "unauthorized" non-RISO ink and masters cause any damage to the Risograph.  Since the cost

9  of the warranty is included in the price of the Risograph, the appropriate business response would

10 be to negotiate a higher price reflecting the increased incidence of warranty repair if lower quality

11 aftermarket supplies are used.  Instead, the'customer is presented with a coercive all-or-nothing

12 proposition and is deprived of making a trade-off between paying a higher price for the Risograph

13 and paying substantially less for non-RISO ink and masters.

14 ## Lxxx.

15 Any purported business justification for the blanket prohibition invalidating

16 maintenance agreements if "unauthorized supplies" are used is pretextual.   only **RISO**

17 manufactured supplies ever are authorized. Indeed, there is no mechanism to obtain authorization

18 for any non-RISO manufactured ink or masters.   The maintenance agreement is invalidated

19 irrespective of whether or not the "unauthorized" non-RISO ink and masters cause any damage

20 or increased incidence of maintenance to the Risograph.   Since the cost of the maintenance

21 agreement is separately negotiated, if particular non-RISO ink and masters require increased

22 maintenance, the appropriate business response would be to negotiate a higher price reflecting the

23 increased incidence of maintenance if lower quality aftermarket supplies are used. Instead, the

24 customer is presented with a coercive all-or-nothing proposition and is deprived of making a trade-

25 off between paying a higher price for maintenance and paying substantially less for non-RISO ink

26 and masters.

27 ///

28 ///

Complaint

-27-

LXXXI.

RISO and its dealers enforce or at a minimum, threaten to enforce, the prohibition on the use of unauthorized supplies which is contained in the warranty and yearly maintenance agreements. Attached hereto as Exhibit "F" and incorporated herein by reference, is a typical warning letter sent Risograph owners found using non-RISO supplies, indicating such will void the warranty and maintenance agreements. Exhibit "F" was sent by defendant RISO PRODUCTS OF SACRAMENTO to the Modesto Unified School District. Although the letter-was from RISO PRODUCTS OF SACRAMENTO, Plaintiff is informed and believes that the letter was written by RISO with defendant RISO PRODUCTS OF SACRAMENTO having simply added their letterhead thereafter and that the enclosure was from RISO. The letter is consistent with the standard RISO warranty and is consistent with and part of the RISO strategy for dealing with "supply pirates". In order to bolster the coercive and restraining effects of the "unauthorized supplies" prohibitions contained in the warranty and maintenance contracts, the RISO dealers also have a custom and practice of falsely attributing all problems with Risographs to use of non-RISO manufactured aftermarket supplies and disparaging the quality and safety of aftermarket supplies irrespective of whether RISO has any information to support their claims.

LXXXII.

These enforcement actions, threats and false disparagement have had a pronounced effect upon the vast majority of Risograph owners which do not service their own machines. Those customers must rely upon the territorially assigned RISO branch offices and dealers for service, repair and maintenance of their Risographs.

LXXXIII.

Few customers which rely upon the territorially assigned RISO branch offices and dealers for service, repair and maintenance of their Risographs are willing to even test a non-RISO manufactured master or ink in a Risograph. Attached hereto as Exhibit "G" is a true and correct copy of a correspondence received by Plaintiff from the San Juan Unified School District after a sales call indicating that schools in the district with Risographs would not even test Plaintiffs aftermarket supplies because of the "unauthorized supplies" provision in the maintenance

PL00032

1   agreement, whereas the District would be testing Plaintiff's supplies for the **Ricoh** manufactured

2   Gestetner brand digital duplicators.  In short, because of the prohibition on use of "unauthorized

3   supplies" contained in the RISO warranty and maintenance agreements, Plaintiff has been

4   precluded from even making a competitive bid to sell ink and masters for use in the District's

5   Risographs.  This response in typical of Risograph owners which rely upon the local RISO dealer

6   for maintenance of their Risographs.  Risograph owners would be willing to test non-RISO ink

7   and masters which are being offered for 25% to 45% below the prices being charged for RISO

8   brand ink and masters except for the coercive effect of the RISO warranty and maintenance

9   prohibitions on "unauthorized supplies. "

10   **LXXXIV.**

11         When customers are unaware that the warranty and maintenance agreement are

12   voided if **non-RISO** manufactured supplies are used, they often will test the competitive non-RISO

13   aftermarket supplies until the local **RISO** dealer informs the customer that use of the competitive

14   non-RISO supplies will damage Risographs; will cause fires, will **void** the warranty, will void the

15   maintenance agreement, etc. Plaintiff WESTERN DUPLICATING INC. has, on occasion, been

16   successful in obtaining some orders for supplies from Risograph owners which rely upon the local

17   RISO dealer for maintenance. However', the local RISO dealers then engage in an increased

18   campaign of threats and false product disparagement, resulting in Plaintiff WESTERN

19   DUPLICATING INC. losing those customers and incurring additional expenses attempting to

20   counteract the threats and false disparagement of Plaintiff's aftermarket supplies.  Attached hereto

21   as Exhibit "H" is a true and correct copy of a correspondence received by Plaintiff from the

22   Stockton Unified School District cancelling a large order for ink and masters from Plaintiff after

23   defendant RISO PRODUCTS OF SACRAMENTO informed .the District that using Plaintiff's

24   aftermarket supplies would void their warranty and maintenance agreements. This response in

25   typical of Risograph owners which rely upon the local RISO dealer for maintenance of their

26   Risographs.  Risograph owners would be willing to purchase **non-RISO** ink and masters which are

27   being offered for 25% to 45% below the prices being charged for **RISO** brand ink and masters

28   except for the **coercive** effect of the **RISO** warranty and maintenance prohibitions on "unauthorized

PL00033

1 | supplies."

2 | ## LXXXV.

3 | The local RISO dealers and RISO branch offices are aware that there is a significant

4 | ripple effect in the aftermarket for sale of supplies of ink and masters for use in Risographs. A

5 | school district is much more likely to sample and purchase non-RISO manufactured ink and

6 | masters when such aftermarket supplies are being used by a neighboring school district. As a

7 | result, local RISO dealers act aggressively to deter incipient competition in their assigned territory.

8 | ## LXXXVI.

9 | Defendants RISO PRODUCTS OF SACRAMENTO and IKON, in the greater Bay

10 | Area, have engaged in a consistent and aggressive pattern of threats and product disparagement

11 | toward those school districts which have sampled or purchased ink and masters from Plaintiff

12 | WESTERN DUPLICATING INC. Plaintiff WESTERN DUPLICATING INC. has lost numerous

13 | customers to these two RISO dealers in the Sacramento, Stockton, Modesto and Bay areas because

14 | of such threats and false disparagement.

15 | ## LXXXVII.

16 | These enforcement actions, threats and false disparagement have a less pronounced

17 | effect upon those limited number of customers who service their own machines. Those customers

18 | who service their own machines are more likely to be willing to test competitive non-RISO

19 | manufactured ink and masters and to order such aftermarket supplies. Risograph owners who

20 | service their own equipment are less likely to believe the false disparagement of Plaintiffs masters

21 | and ink. Almost all of the long-term customers of Plaintiff WESTERN DUPLICATING INC.

22 | service their own equipment.

23 | ## LXXXVIII.

24 | Although not one of the RISO primary tactics for destroying competition from

25 | "supply pirates", RISO branch offices and dealers which are faced with competitive prices for

26 | aftermarket supplies will resort to "cost per copy plans" whereby the cost of the Risograph, repair

27 | and maintenance and aftermarket supplies are sold as a package at a price based upon the number

28 | of copies run. Cost per copy plan pricing was one of the tactics discussed at the **RISO** Dealer

Complaint                                    -30-

**PL00034**

1    Advisory Council meeting of October 14, 1994, as being a marketing strategy 'being used by

2    dealers to protect their supplies base. "   Cost per copy plan pricing has the effect of tying the sale

3    of the equipment, service/repair and aftermarket supplies into a single price package,   Such

4    pricing is also a vehicle for RISO branch offices and dealers to discriminate in the prices they

5    charge based upon the Risograph owner's sensitivity to aftermarket supply costs.   Cost per copy

6    plan pricing has the most appeal to customers which do not wish to service their own equipment.

7                                    LXXXIX.

8               Plaintiff has lost sales because of such cost per copy plan pricing.   Plaintiff is

9    informed and believes that other sellers of aftermarket supplies for use in Risographs have lost

10   sales because supplies have been tied to warranty, maintenance and repair work through cost per

11   copy plans.

12                                    x c.

13              The warranty, maintenance and cost per copy plan sales by RISO and its dealers

14   constitute a tying arrangement which is used to unreasonably restrain competition, exclude

15   competitors, and control and dominate the aftermarket for the sale of supplies of ink and masters

16   for use in Risographs.

17                                    XCI.

18              The warranty, maintenance and "cost per copy" plan tying arrangements imposed

19   by RISO and its dealers have resulted in contracts and combinations which substantially restrain,

20   restrict, and limit competition in the aftermarket for ink and masters for use in Risographs and

21   foreclose and limit customers from access to competitive aftermarket suppliers.   The result is that

22   customers are coerced into purchasing RISO brand aftermarket ink and masters at substantially

23   higher prices than those supplies would cost in a competitive market, free of the restraints here

24   in issue.

25                                    XCII.

26              One act of disparagement regularly utilized by RISO and its local dealers is to

27   falsely claim that the use of any aftermarket ink not manufactured by RISO can cause tires when

28   used in Risographs.   Attached hereto as Exhibit "I" is a true and correct copy of a warning label

Complaint                              -31-

PLO0035