Merrick F. McCarthy
Director Liability
Japanese Division
49 East Fourth Street
Dixie Terminal South Building
Suite 500
Cincinnati, Ohio 45202-3803
PO Box 5425
Cincinnati, Ohio 45201-5425
Phone:   513-287-8177
Fax:      513-412-7887
E Mail:   rmccarthy@gai-global.com



**GREATAMERICAN.**

**INSURANCE COMPANIES**

March 20, 2000

Ms. Maria Salzillo
Finance Administration Manager
Riso, Inc.
300 Rosewood Drive
Suite 210
Danvers, Ma 01923

| | |
|---|---|
| **Claim Number:** | 514 555205 |
| **Insured:** | Riso, Inc. |
| **Plaintiff:** | Modesto City Schools |
| | Stockton Unified School District |
| **Date of Loss:** | Continuing |

Dear Ms. Salzillo;

The following is our analysis of the issues raised by Riso, Inc.'s tender of defense of the action by the Modesto City Schools and Stockton Unified School District against Riso, Inc and Riso Kagaku Corporation.

The specific litigation is Case Number CIV S-99-2214 DFL DAD, filed by Plaintiffs in United States District Court, Eastern District of California. The case is presently styled;

*Modesto City Schools*
*Stockton Unified School District*
*On their own behalf and on behalf of the class consisting of all Schools and Schools Districts in the United States*

vs

*Riso Kagaku Corporation*
*Riso, Inc*
*RPSI Enterprises, Inc. dba Riso Products of Sacramento*

Great American Insurance • Agricultural Insurance Company • Agricultural Excess and Surplus Lines Insurance Company • American Alliance Insurance Company • American Dynasty Surplus Lines Insurance Company • American National Fire Insurance Company • American Spirit Insurance Company • Contemporary American Insurance Company • Eagle American Insurance Company • Eden Park Insurance Company • Great American Lloyd's Insurance Company • Great Texas County Mutual Insurance Company • Seven Hills Insurance Company
Part of Great American Property & Casualty Insurance Group

*Modesto City Schools and Stockton Unified School District v Riso, Inc. et al.*
*514 555205*
*Page 2*

Plaintiffs filed the original complaint on November 5, 1999. As we understand it, the original remains the active complaint. However, if Plaintiff has filed an amended complaint we would appreciate redeiving a copy.

After review of the complaint, the potentially impacted policies and information developed in through discovery in the similar *Western Duplicating v Riso et al.* litigation, it is our view there is no coverage under the potentially applicable Great American Policies insuring Riso, Inc. and Riso Kagaku, Ltd. for the captioned matter. Our reasoning is explained in more detail below.

## Background

The general nature of the allegations, as expressed by plaintiff in the complaint, are that the defendants, Riso, Inc., Riso Kagaku and other domestic organizations including Riso Products of Sacramento, have engaged in activities which violated the antitrust laws of the United States and violated the Massachusetts Protection Act.

Specifically, Plaintiff alleges that Riso and each defendant have by "contract, combination and conspiracy" acted to acquire and maintain monopoly power and have in fact "willfully implemented multiple restraints of trade to create, preserve and enhance" Riso's monopoly power in the Risograph service and supply markets. Plaintiffs further allege that the Defendants, by means of their "contract, combination and conspiracy" have engaged in multiple restraints of trade including the following;

1. *Joint Boycott* - Restraint of competition in the Risograph Service market by a concerted refusal to sell parts to independent service organizations who cannot compete in the services market for Risographs without a reliable source of Risograph parts.

2. *Tying Arrangement* - Restraint of competition in the service market by imposing ties between the purchase of service and parts

3. *Tying Agreements* - Restraint of competition and maintenance of prices in the supply market by tying the purchase of Riso supplies to the provision of service under warranty and maintenance agreements

4. *Territorial and Customer Restrictions* - Restraint of competition in the Risograph Service and Supply markets by including in the Riso dealer agreement territorial and customer restrictions on the sales of supplies and services.

5. *Exclusive Dealing Agreement* - Restraint of competition in the Risograph supply market by including in the Riso dealer agreements

an exclusive dealing provision that prohibits dealers from selling non-Riso supplies

As part of the burden of proof faced by Plaintiff, they must identify relevant markets implicated by their allegations of restraint of trade. Plaintiffs identify the following markets;l

1. The Original Equipment Market

2. The Digital Duplicator Service Market

3. The Digital Duplicator Supplies Market

4. The Risograph Parts Market

5. The Risograph Service Market

6. The Risograph Supplies Market

Relative to the Digital Duplicator Market, Plaintiffs allege Riso was the first manufacturer of such products and had a substantial technological and marketing head start . Plaintiff's believe that Riso has as much as a 75% share of the overall United States market for original equipment. As to the Public School market, Riso's penetration according to Plaintiffs is in excess of 75%.

Plaintiff points out that though there are other digital duplicators on the market manufactured by Ricoh and marketed under names such as Standard Duplicating, Nashuatec, Gestetner and Savin, only Ricoh has been able to make much headway. According to Plaintiff, 95% of the original equipment market is controlled by Riso or Ricoh, with Riso having by far the dominant share.

According to plaintiff there are a number of barriers to entry into the original equipment market. These include;

1. The existence of patented technology

2. The need for huge capital investments with doubtful prospects of penetrating the market.

3. The need to develop a dealer network to deliver the product to the customer

4. Entrenched buyer preference for Risographs

5. The economies of scale available to Riso that are not available to other manufacturers

6. Superior resources available to Riso in the form of monopolistic profits, resulting from deliberate exploitation of the captive supply and service markets for Risographs

As to the Parts market, Plaintiffs allege the parts used in a Risograph are unique. In most cases they state it is not possible to substitute parts manufactured by others for those manufactured and distributed by Riso and its dealers. Thus, Riso and its dealers, according to plaintiff, possess monopoly power over these Risograph parts.

Plaintiff argues that the maintenance, service and repair markets for Risographs are separate from the original equipment market. They also argue that because of Riso's unique parts, the distribution of which are controlled by Riso and its dealers, and because of Riso's restrictive dealership agreements prohibiting dealers from servicing machines outside their territory and from selling parts to Independent Service Organizations (ISOs ), there are virtually no ISOs capable of servicing Risographs.

Since most customers cannot self-service their machines, Plaintiffs take the position that most customers are forced to purchase yearly or price-per-copy maintenance programs from Riso dealers. This arrangement benefits Riso and its dealers by permitting them to receive substantial additional profit. Riso's intentional exclusion of ISOs from the Risograph service market permits Riso to control the maintenance, service and repair markets and allows them to charge supra-competitive prices.

Turning to the supply market, Plaintiff identifies three after-market consumables;

1. Paper
2. Ink
3. Masters

Paper is not an issue in this litigation. One of the advantages of the Risograph is that it can print of a variety of materials, including paper and plastic bags as well as paper, cardstock and the like.

However, Risographs and other digital duplicators require specially formulated inks and masters in order to print. The market for these consumables, inks and masters is a separate market from the Original Equipment market and the maintenance, service and repair market. Plaintiff alleges that Riso's inks and masters are not interchangeable with other makes. Notwithstanding brand uniqueness, there are manufacturers that do provide ink and ink cartridges that are alternatives to those manufactured by Riso. Plaintiff lists the alternative manufacturers as;

*Modesto City Schools and Stockton Unified School District v Riso, Inc. et al.*
*514 555205*
*Page 5*

- Repeat-O-Type
- Starkey Chemical
- Tomoegawa Paper
- Daito Chemical
- Weber Digital Masters
- Standard Duplicating
- American Coating

Plaintiff alleges that Riso and its dealers impose substantial market restraints on the sale of supplies for use in Risographs. The restraints arise from the Riso dealership agreement, which prohibits its dealers from selling supplies outside their assigned territory and also prohibits them from selling to anyone other than an end user. These prohibitions eliminate any reliable alternative source of Riso brand supplies.

Because of the restraints, Riso is able to charge prices that are 30% to 40% higher than those charged for similar products by dealers of Ricoh manufactured digital duplicators. Further, plaintiff argues that by virtue of these restraints, Riso has approximately 90% of the market for inks and masters for use in Risographs.

Combining these allegations into the principle thrust of the case, Plaintiffs allege;

- Riso and its dealers, have contracted, combined and conspired to restrict the availability of Risograph parts. Riso and its dealers have, by their predatory and anticompetitive business practices, used their monopoly power in Risograph parts to restrict or eliminate competition in the Risograph [parts and] services markets. . .

- Riso and its dealers have also, by their predatory and anticompetitive business practices, used their existing monopoly power in the Risograph parts and service markets, to restrict or eliminate competition in the Risograph supply market for inks and masters and have thereby created or attempted to create a second monopoly in the Risograph supply market by leveraging monopoly power in the markets for Risograph parts and Services.. .

- Riso and its dealers have further contracted, combines and conspired to eliminate intrabrand competition in the monopolized markets with the intention of establishing and maintaining supracompetitive prices in the markets for Risograph services and supplies. . .

Plaintiffs allege that these objectives were part of a concerted strategy articulated at the October 14, 1994 Riso Dealer Advisory Council meeting. At the meeting the Dealer Advisory Council recommended Development of a Strategy for dealing with "supply pirates" and "bootlegging" by Riso Dealers. Riso, according

to the plaintiff, defined "supply pirates" as sellers of non-Riso manufactured supplies designed for use with Risographs and "bootleggers" were Riso dealers who sold Riso parts and supplies to entities other than an end user or an authorized Riso dealer or who sold parts and supplies outside its assigned territory.

To further the decisions reached at the 1994 Dealer's Advisory Council meeting, Riso and its dealers, according to Plaintiffs, engaged in a number of restraints of trade. The restraints are intended to maintain Riso's existing monopoly in the Risograph Service and Supply markets. Plaintiffs summarize the restraints, all of which are alleged to be violations of the Sherman Act and the Massachusetts Protection Act, as follows:

1. Concerted Refusals to Deal
2. Joint Boycotts
3. Territorial allocations or divisions
4. Tying arrangements
5. Exclusive Dealing Contracts

## Litigation

On November 5, 1999, Plaintiffs filed Case Number CIV S-99-2214 DFL DAD, in United States District Court, Eastern District of California. The case is styled;

> *Modesto City Schools*
> *Stockton Unified School District*
> *On their own behalf and on behalf of the class consisting of all Schools*
> *and Schools Districts in the United States*

Vs

> *Riso Kagaku Corporation*
> *Riso, Inc*
> *RPSI Enterprises, Inc. dba Riso Products of Sacramento*

### Class Action Allegations

The litigation seeks certification as a Class Action under Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs pray for actual, treble, and punitive damages, as well as restitution, injunctive relief and attorney's fees, on behalf of all public schools and school districts in the United States that own or lease Risographs purchased or leased from Riso or its dealers. Plaintiffs also seek damages and injunctive relief for violations of Section 1 and 2 of the Sherman Act, Violation of the Wilson Tariff Act, and violation of the Massachusetts Protection Act (Mass. Gen. Law Chapter 93A, §2).

### Specific Allegations

Plaintiffs allege the following counts against each of the defendants;

1. **Monopolization of the service market for high speed digital duplicators manufactured and distributed by Riso Kagaku Corporation, Riso, Inc. and their United States dealers in violation of Section 2 of the Sherman Act.**

In this count, Plaintiffs allege that Riso and its dealers have achieved monopoly power in the after-market for repair, service and maintenance of Risographs. They allege the Defendants achieved this monopoly power through anti-competitive and exclusionary conduct which has harmed Plaintiffs specifically and the class in general.

The nature of the harm alleged is that the schools paid prices for service, maintenance, and repair of their Risographs that were substantially greater than they would have been in a competitive environment free of the exclusionary actions of Riso and its dealers.

Under this count, Plaintiffs seek;

> Actual Damages
> Treble Damages
> Attorney's fees and costs
> Injunctive Relief Under Title 15 US Code § 26.

2. **Monopolization of the Risograph supply market (inks and masters) in violation of Section 2 of the Sherman Act**

Under this count, Plaintiffs allege Riso and its dealers have substantial market power in the original equipment market and that that power is dangerously close to attaining a monopoly.  Plaintiffs further allege that Riso's market position has allowed them to control prices to exclude or control competition in the supply market by restricting supplies to a limited number of approved dealers and refusing to allow supplies to be sold by non-authorized dealers.

Plaintiffs allege that the restraints imposed by Riso and its dealers harm competition and consumers in that the prices Plaintiffs and the class are forced to pay for maintenance, service and supplies are substantially higher than they would otherwise be if the market were free to react without the restraints.

Under this count, Plaintiffs seek;

> Actual Damages
> Treble Damages

Attorney's fees and costs
Injunctive Relief Under Title 15 US Code § 26.

### 3. Attempted monopolization of the Risograph service market in violation of Section 2 of the Sherman Act

In Count Three Plaintiffs allege they have been harmed through Riso's anti-competitive and exclusionary conduct in that they must pay higher prices for the service, maintenance and repair of Risographs that they would otherwise have to pay if the market was free of Riso's exclusionary actions.

Under this count, Plaintiffs seek;

Actual Damages
Treble Damages
Attorney's fees and costs
Injunctive Relief Under Title 15 US Code § 26.

### 4. Attempted monopolization of the Risograph supply market in violation of Section 2 of the Sherman Act

Here, Plaintiffs allege that through Riso and its dealer's anti-competitive and exclusionary conduct, they have been forced to pay substantially higher prices for inks and masters that they would have if the market were free of the exclusionary actions of Riso and its dealers.

Under this count, Plaintiffs seek;

Actual Damages
Treble Damages
Attorney's fees and costs
Injunctive Relief Under Title 15 US Code § 26.

### 5. Attempted monopolization of the service market for all digital duplicators in violation of Section 2 of the Sherman Act.

In this count, Plaintiffs allege that through anti-competitive and exclusionary conduct, Defendants have harmed competition, consumers, and the plaintiffs such that each has been forced to pay substantially higher prices for the service, maintenance and repair of Risographs than would be the case if the market were free from the exclusionary actions of Riso and its dealers.

Under this count, Plaintiffs seek;

Actual Damages
Treble Damages

Attorney's fees and costs
Injunctive Relief Under Title 15 US Code § 26.

### 6. Attempted monopolization of the supply market for all digital duplicators in violation of Section 2 of the Sherman Act

In Count Six Plaintiffs allege that through anti-competitive and exclusionary conduct, the defendants have harmed competition, consumers, and the plaintiffs as to the digital duplicator supply market. The harm takes the form of substantially higher prices for the service, maintenance and repair of Risographs than would be the case if the market were free from the exclusionary actions of Riso and its dealers.

Under this count, Plaintiffs seek;

Actual Damages
Treble Damages
Attorney's fees and costs
Injunctive Relief Under Title 15 US Code § 26.

### 7. For multiple restraints of trade in the Risograph service market in violation of Section 1 of the Sherman Act, including a joint boycott, tying arrangements, and customer and territorial restrictions

Under this count, Plaintiffs allege that Riso and its dealers have engaged in multiple restraints of trade. Each restraint is prohibited by Section 1 of the Sherman Act. Plaintiffs describe the specific restraints as follows;

#### Concerted Refusals to Deal

Plaintiffs allege that Riso and its dealers use their monopoly power to restrict or eliminate inter-brand competition from Independent Service Organizations (ISOs) in the Risograph service market. Specifically;

- Riso and its dealers restrict ISO access to Riso manufactured replacement parts.
- Riso and its dealers intentionally exclude ISOs from competing in the repair, maintenance and service market for Risographs.
- Riso Dealer Agreements prohibit the sale of spare parts outside a dealer's assigned geographical territory
- Riso Dealer Agreements restrict Riso's dealers to selling replacement parts only to end-users.
- Riso Dealer Agreements prohibit an authorized dealer from selling parts to a third party who could then sell Risograph replacements parts to ISOs.

The impact of Riso's prohibitions in the Dealer Agreements and Riso's refusal to sell parts to ISOs constitutes a *joint boycott* and a *refusal to deal* with ISOs. The prohibitions are part of Riso's conscious commitment to a common scheme to achieve the unlawful objective of excluding all inter-brand competition from the service market for Risographs. Accordingly, Riso's *joint boycott* injures competition, restrains trade and is a violation of Section 1 of the Sherman Act.

### Territorial Restrictions

Plaintiffs allege Riso has allocated specific territories to its dealers. The dealer's assigned territory is described in Riso's Dealer Agreement for each dealer. Such territorial allocations constitute *per se* Violations of Section 1 of the Sherman Act.

### Tying Arrangements

Plaintiffs allege that Riso, through its original equipment manufacturer (OEM) marketing power has illegally tied service agreements to their products by restricting competition from ISOs. The only exception is that Riso permits a dealer to sell parts to end-users who service their own machines. Since most end-users do not service their own machines, they are forced to enter into a Riso service agreement. The impact of this is that most end-users buy the machine, its maintenance and its supplies from Riso and no other source. This action restricts the ISOs from these markets and violates Section 1 of the Sherman Act.

Under this count, Plaintiffs seek;

> Actual Damages
> Treble Damages
> Attorney's fees and costs
> Injunctive Relief Under Title 15 US Code § 26.

8. **For multiple restraints of trade in the Risograph supply market in violation of Section 1 of the Sherman Act, including a joint boycott, tying arrangements, and customer and territorial restrictions**

Under Count Eight Plaintiffs allege that Riso and its dealers have violated Section 1 of the Sherman Act in that their actions are part of an integrated strategy to eliminate competition in the Risograph Supply Market. The violations arise from Riso's tying arrangements, territorial allocations and concerted refusals to deal and their exclusive dealing contracts.

### Tying Arrangements

Riso and its dealers provide a seven-year or 10,000,000 copy warranty for all Risographs purchased in the United States. According to Plaintiffs, this original equipment warranty may be invalidated if the end-user installs "unauthorized supplies" in the machine.

Plaintiffs allege that Riso and Riso Dealers have conspired to use warranty language in their maintenance agreements that may void the agreement if "unauthorized supplies" are used. The restrictions state that the service plan and the warranty on the machine are both void when "unauthorized supplies" are used whether or not those supplies result in actual damage to the machine.

In Plaintiffs view, the restriction is part of Riso's overall plan to restrict competition from ISOs by threating customers with the loss of their service agreement and warranty if they don't purchase and use Riso manufactured inks and masters.

Both Plaintiffs allege they purchased less expensive inks and masters from a non-Riso supplier after comparing price and performance. Both School Districts allege they were threatened with loss of warranty service by Riso Products of San Francisco, Inc. (RPSI) and that in the face of these threats, Plaintiffs were forced to discontinue their purchases from the ISO and return to purchasing RISO inks and masters from RPSI at a price that was 40% higher than the price of non-Riso inks and masters through the ISO.

In October 1997, the Modesto Schools purchasing agent wrote a letter to RSPI asking what products were "Authorized" by Riso. The response was a generic letter stating that Riso does not "recommend the use of non-genuine supplies in any Risograph product. Thus the only way for Plaintiffs to maintain their warranty and their service agreement was to use only those supplies "authorized" by Riso. Since Riso only "authorizes its own products, plaintiffs were forced to deal with Riso and its authorized dealers and could not obtain inks and masters from the ISO.

### Riso Warning Stickers

Of specific interest to the potential application of coverage is the portion of Count Eight that addresses Riso's application of warning stickers to its machines. Specifically, Plaintiffs allege that as a further coercive tactic, Riso and its dealers placed warning stickers on all Risographs telling customers to use only Riso manufactured supplies. According to Plaintiffs, this strategy indiscriminately disparages all non-Riso supplies and is designed to bolster the coercive effect of the warranty and service agreement bans on the use of "unauthorized supplies."

In short, Plaintiffs allege that Riso directly threatens its customers, including Plaintiff school districts, with the warning that if they use "non-Riso manufactured inks or masters" they may "cause serious damage to the ink cylinder and the

Risograph" and in turn may cause "repair or service problems not covered by the warranty or service agreement."

Plaintiffs allege that this warning sticker is part of Riso's concerted strategy to falsely disparage non-Riso inks and masters suitable for use in Risographs in order to reinforce the tying arrangement between Risograph warranty service and the use of Risograph inks and masters. According to Plaintiff, Riso's routine disparagement of all "generic" or "pirate" supplies include statements which are false and known to be false, or reckless as to the truth of the assertions made.

The result of Riso's concerted strategy, at least as alleged by the plaintiffs, is that customers are "coerced" by means of the restrictions in the original equipment warranty and in subsequent service agreements into purchasing Riso brand after-market inks and masters from an authorized Riso dealer at substantially higher prices than those supplies would cost in a competitive market, free of the restrictive arrangements.

### Territorial Allocations

Plaintiffs allege that the territorial allocations set out in Riso's Dealer Agreements are unreasonable and injure competition. According to Plaintiff these restrictions violate Section 1 of the Sherman Act and violate the rule of reason.

### Concerted Refusal to Deal

Here Plaintiffs allege that the Defendants restrain trade in the supply market by refusing to sell to anyone but the end-user or an authorized deakler. The impact of this restraint is to eliminate sales by non-Riso dealers, including those ISOs that wish to compete in the Risograph service and supply markets, because they are prohibited from obtaining Riso manufactured supplies. In Plaintiff's view, these restraints constitute a concerted refusal to deal and are illegal and in violation of Section 1 of the Sherman act.

### Exclusive Dealing Contract

Plaintiffs allege that Riso's exclusive dealer agreement includes a prohibition of the sale of non-Riso inks and masters to non-authorized dealers or end-users. In Plaintiff's view, the prohibition functions as a tying arrangement restricting the sale of Riso supplies of Inks and masters. In short, Riso has tied the sale of Risographs and spare parts for Risographs to the sale of Riso brand inks and masters. Riso has also negatively tied the sale of Risographs and spare parts to dealers not purchasing competitive inks and masters.

Again, in Plaintiffs view, this is part of Riso's concerted strategy to control prices and the market for after-market supplies.

Under this count, Plaintiffs seek;

> Actual Damages
> Treble Damages
> Attorney's fees and costs
> Injunctive Relief Under Title 15 US Code § 26.

### 9. For multiple restraints of trade in the market for articles imported into the United States, in violation of the Wilson Tariff Act.

In this count, Plaintiffs allege that Defendants have violated the Wilson Tariff Act by acting to restrain lawful trade or free competition in lawful trade and to increase the price of articles imported into the United States. These restraints were achieved through contracting, combining and conspiring to implement an integrated strategy that was intended to eliminate competition in the market for Risograph supplies and to exploit the captive market by charging supra-competitive prices for those imports Riso itself supplies.

Under this count, Plaintiffs seek;

> Actual Damages
> Treble Damages
> Attorney's fees and costs
> Injunctive Relief Under Title 15 US Code § 26.

### 10. Unfair methods of competition in violation of the Massachusetts Protection Act.

Here, Plaintiffs allege that the Riso's actions to suppress competition in the supply after-market and the service, repair and maintenance after-markets constitutes unfair methods of competition and unfair or deceptive acts or practices under Mass. Gen. Law Chapter 93A Section 2.

Under this count, Plaintiffs seek;

> Actual damages
> Treble Damages
> Attorneys Fees and Costs

## Coverage

### Great American Policies Written

Great American has written the following policies for Riso, Inc. and Riso Kakagu, Ltd.:

*Modesto City Schools and Stockton Unified School District v Riso, Inc. et al.*
514 555205
Page 14

| SYM | POLICY M | CO | EFF | EXP |
|-----|----------|-----|-----|-----|
| PAC | 2792736 | 0 | 3 | 890 | 891 |
| UMB | 2792738 | 0 | 3 | 890 | 891 |
| PAC | 2792736 | 1 | 3 | 891 | 892 |
| UMB | 2792738 | 1 | 3 | 891 | 892 |
| PAC | 7188725 | 0 | 1 | 892 | 893 |
| UMB | 7188729 | 0 | 3 | 892 | 893 |
| PAC | 7875465 | 0 | 1 | 893 | 894 |
| UMB | 7875468 | 0 | 3 | 893 | 894 |
| MAC | 8006920 | 0 | 3 | 894 | 895 |
| UMB | 8006923 | 0 | 3 | 894 | 895 |
| MAC | 8006920 | 2 | 1 | 895 | 896 |
| UMB | 8006923 | 1 | 2 | 895 | 896 |
| PAC | 1241864 | 0 | 3 | 896 | 897 |
| UMB | 1241867 | 0 | 2 | 896 | 897 |
| PAC | 1241864 | 1 | 3 | 897 | 898 |
| UMB | 1241867 | 1 | 2 | 897 | 898 |
| PAC | 3772225 | 1 | 3 | 898 | 999 |
| UMB | 3772228 | 2 | 4 | 898 | 999 |
| PAC | 3772225 | 2 | 3 | 999 | 900 |
| UMB | 3772228 | 4 | 4 | 999 | 900 |

### Date of Occurrence

In the present complaint, Plaintiff refers specifically to the October 14, 1994, Dealer Advisory Meeting, noting that the minutes of that meeting speak directly to the issue of "Supply Pirates" and transgressions by authorized dealers of the dealer agreement. Plaintiff imply that following this meeting, Riso and its dealers generated a stream of letters, publications, and documents that appear to flow from the strategies developed at the meeting. For example;

On March 1, 1995 Riso, through Da-com, released a warning to its customers of problems with quality, yield and long term cost if they use non-Riso products. The warning specifically speaks about repair costs incurred by customers that are not covered under the maintenance agreements or the Original Equipment Warranty.

COSCO, an authorized Riso dealer. published a similar release dated March 6, 1995. The release bore the Riso Trademark. As such, it implied Riso's consent.. The warning spoke of "fake inks" and advised customers that service problems, maintenance problems and warranty problems may result if non-Riso products were used.

In June, 1997, Riso released the "Warnings" News Flash and the "Warning Label Program" described in the complaint. From June, 1997 forward all Risographs in service and all machines sold subsequent to this date carried the warnings.

From the Western Duplicating litigation, we know of a number of specific instances where school districts received these warnings. As an illustration we can cite the following;

In late 1996, the Stockton Unified School District ordered supplies from Western Duplicating. In September 1997, Stockton received letters from their Riso dealer warning them of the problems with the invalidation of their warranty and their service contract if they continued to use non-Riso products. In response, Stockton cancelled the program with Western Duplicating and returned to use of the more expensive Riso products.

From the Western Duplicating litigation we also have evidence of a similar series of events, all beginning in 1996, involving the following school districts, each of whom received such warnings;

- San Juan Unified School District
- Bela Vista High School
- Autumn Elementary School
- Sacramento School District
- Woodland Unified Shchools
- Lovington Schools
- Antioch School District
- Oakland Unified School District
- San Jose Unified School District
- San Leandro School District
- San Lorenzo School District
- San Ramon Unified School District
- San Francisco Schools
- Konocti Unified School District
- San Jose Middle School
- Selma Unified School District
- Oceanside Unified School District
- San Diego Unified School District
- Bay View Terrace Elementary School

*Modesto City Schools and Stockton Unified School District v Riso, Inc. et al.*
*514 555205*
*Page 16*

- Mead Elementary School
- Ross Elementary School
- ABC Unified Schools
- Arcadis Unified Schools
- Azusa Unified Schools
- Baldwin Park Unified Schools
- Burbank Unified Schools
- Compton Unified Schools
- Inglewood Unified School District

Relative to the present case, the key date therefore appears to be the October 14, 1994 Dealer Advisory Counsel meeting. From that date forward, it can be argued that a "concerted plan" as alleged by Plaintiff appears to have been articulated and shortly thereafter put into practice.

Therefore, we believe that the Policy in effect on October 14, 1994 and those issued subsequently are potentially triggered.

Relative to the actual "disparagement," Plaintiffs focus specifically on the disparaging nature of the Warnings that were attached to Risographs from June 1997 forward. We know from the Western Duplicating case that Riso and its dealers issued letters to various customers prior to release of the warnings that said essentially the same thing. Again, though plaintiffs in this litigation focus on the Warnings Stickers as the disparaging material, disparagement allegations could be made going back to the time immediately after the Dealer Advisory Meeting. Accordingly, the incident that potentially triggers coverage probably begins in October of 1994 and continues.

### Policies Potentially Triggered

Assuming an October 1994 and continuing date of incident, the following policies are potentially triggered;

| SYM | POLICY M | CO | EFF | EXP |
|-----|----------|-----|-----|-----|
| MAC | 8006920 | 0 | 3 | 894 | 895 |
| UMB | 8006923 | 0 | 3 | 894 | 895 |
| | | | | | |
| MAC | 8006920 | 2 | 1 | 895 | 896 |
| UMB | 8006923 | 1 | 2 | 895 | 896 |
| | | | | | |
| PAC | 1241864 | 0 | 3 | 896 | 897 |
| UMB | 1241867 | 0 | 2 | 896 | 897 |
| | | | | | |
| PAC | 1241864 | 1 | 3 | 897 | 898 |
| UMB | 1241867 | 1 | 2 | 897 | 898 |

| PAC | 3772225 | 1 | 3 | 898 | 999 |
| UMB | 3772228 | 2 | 4 | 898 | 999 |
| | | | | | |
| PAC | 3772225 | 2 | 3 | 999 | 900 |
| UMB | 3772228 | 4 | 4 | 999 | 900 |

### Named Insured

The named Insured on the Declarations page of each policy is Riso, Inc. By endorsement, the following are included under the 1994 policy, MAC 8006920;

> **Riso, Inc.**; Managers or Lessors of Premises; Vendors    (Only with Respect to BI or PD arising out of the Insureds products, distributed or sold in the regular source of the vendor's business); Lessors of leased equipment; The 401K savings plan relative to ERISA coverage;

Under the 1995 policy, MAC 8006920, the Insureds are:

> **Riso, Inc.**; Vendors    (Only with Respect to BI or PD arising out of the Insureds products, distributed or sold in the regular source of the vendor's business);Lessors of leased equipment;

Under the 1996 and subsequent policies, the Insureds are;

> **Riso, Inc.**; **Riso Kagaku Corporation** but only with respect to their liability arising out of; a. their financial control of Riso, Inc. or b. Premises they own, maintain or control while you lease and occupy these premises; As required by Written Contract; Managers or Lessors of Premises; Vendors    (Only with Respect to BI or PD arising out of the Insureds products, distributed or sold in the regular source of the vendor's business); Lessors of leased equipment; Riso Products of South Carolina, Inc.; Riso Products of Florida. Inc.

### Endorsements

Each of the policies carries a Broad Form Vendors endorsement which does not appear to have application to this litigation.

### Coverage Forms

The potentially triggered policies are written on the following CGL forms;

| SYM | POLICY | M | CO | EFF | EXP | CGL | Edition | State |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| MAC | 8006920 | 0 | 3 | 894 | 895 | CG0001 | Oct-93 | MA |
| UMB | 8006923 | 0 | 3 | 894 | 895 | GAI6002 | Feb-89 | XS |

*Modesto City Schools and Stockton Unified School District v Riso, Inc. et al.*
*514 555205*
*Page 18*

| MAC | 8006920 | 2 | 1 | 895 | 896 CG0001 | Oct-93 MA |
|-----|---------|---|---|-----|------------|-----------|
| UMB | 8006923 | 1 | 2 | 895 | 896 GAI6002 | Feb-89 XS |
| PAC | 1241864 | 0 | 3 | 896 | 897 CG0001 | Jan-96 MA |
| UMB | 1241867 | 0 | 2 | 896 | 897 GAI6002 | Feb-89 XS |
| PAC | 1241864 | 1 | 3 | 897 | 898 CG0001 | Jan-96 MA |
| UMB | 1241867 | 1 | 2 | 897 | 898 GAI6002 | Feb-89 MA |
| PAC | 3772225 | 1 | 3 | 898 | 999 CG0001 | Jan-96 MA |
| UMB | 3772228 | 2 | 4 | 898 | 999 GAI6002 | Feb-89 MA |
| PAC | 3772225 | 2 | 3 | 999 | 900 CG0001 | Jul-98 MA |
| UMB | 3772228 | 4 | 4 | 999 | 900 GAI6002 | Jun-97 MA |

There are three primary coverage forms

| CG0001 | 10/93 |
|--------|-------|
| CG0001 | 01/96 |
| CG0001 | 07/98 |

And two umbrella forms;

| GAI 6002 | 02/89 |
|----------|-------|
| GAI 6002 | 06/97 |

## Primary Forms Comparison

The following chart compares the three primary forms;

| CG0001 10/93 | CG0001 1/96 | CG0001 7/98 |
|--------------|-------------|-------------|
| SECTION I - COVERAGES COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY | SECTION I - COVERAGES COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY | SECTION I - COVERAGES COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY |
| 1. Insuring Agreement<br>a.<br>We will pay those sums that the Insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. | 1. Insuring Agreement<br>a.<br>We will pay those sums that the Insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the Insured against any "suit" seeking those damages.<br>However, we will have no duty to defend the Insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. | 1. Insuring Agreement<br>a.<br>We will pay those sums that the Insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the Insured against any "suit" seeking those damages.<br>However, we will have no duty to defend the Insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. |

*Modesto City Schools and Stockton Unified School District v Riso, Inc. et al.*
*514 555205*
*Page 19*

We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that
    may result. But:
    (1)
    the amount we will pay for damages is limited as described in
      Limits Of Insurance (Section III); and

    (2)
    our right and duty to defend end when we have used up the
    applicable Limit of Insurance in the payment of judgments or
    settlements under Coverages A or B or medical expenses under
      Coverage C.
    No other obligation or liability to pay sums or perform acts or
    services is covered unless explicitly provided for under
      Supplementary Payments - Coverages A and B.
b.  This insurance applies to "bodily injury" and "property damage" only if: (1) the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and (2) the "bodily injury" or "property damage" occurs during the policy period.
c. Damages because of "bodily injury" include damages claimed by anyperson or organization for care, loss of services or death resulting at any time from the "bodily injury."

**CG0001 10/93**
**SECTION V - DEFINITIONS**

**3. "Bodily injury"** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**15. "Property damage"** means:
  a. physical injury to tangible property, including all resulting
  loss of use of that property. All such loss of use shall be
  deemed to occur at the time of the physical injury that caused
  it; or
  b. loss of use of tangible property that is not physically injured.
  All such loss of use shall be deemed to occur at the time of the
    "occurrence" that caused it.

**12. "Occurrence"** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
**COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY**

Insuring Agreement
a.

---

We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that
    may result. But:
    (1)
    the amount we will pay for damages is limited as described in
      Limits Of Insurance (Section III); and

    (2)
    our right and duty to defend end when we have used up the
    applicable Limit of Insurance in the payment of judgments or
    settlements under Coverages A or B or medical expenses under
      Coverage C.
    No other obligation or liability to pay sums or perform acts or
    services is covered unless explicitly provided for under
      Supplementary Payments - Coverages A and B.
b.  This insurance applies to "bodily injury" and "property damage" only if: (1) the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and (2) the "bodily injury" or "property damage" occurs during the policy period.
c. Damages because of "bodily injury" include damages claimed by anyperson or organization for care, loss of services or death resulting at any time from the "bodily injury."

**CG0001 1/96**
**SECTION V - DEFINITIONS**

**3. "Bodily injury"** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**15. "Property damage"** means:
  a. physical injury to tangible property, including all resulting
  loss of use of that property. All such loss of use shall be
  deemed to occur at the time of the physical injury that caused
  it; or
  b. loss of use of tangible property that is not physically injured.
  All such loss of use shall be deemed to occur at the time of the
    "occurrence" that caused it.

**12. "Occurrence"** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
**COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY**

Insuring Agreement
a.

---

We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that
    may result. But:
    (1)
    the amount we will pay for damages is limited as described in
      (Section III) - Limits Of Insurance and
    (2)
    our right and duty to defend end when we have used up the
    applicable Limit of Insurance in the payment of judgments or
    settlements under Coverages A or B or medical expenses under
      Coverage C.
    No other obligation or liability to pay sums or perform acts or
    services is covered unless explicitly provided for under
      Supplementary Payments - Coverages A and B.
b.  This insurance applies to "bodily injury" and "property damage" only if: (1) the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and (2) the "bodily injury" or "property damage" occurs during the policy period.
c. Damages because of "bodily injury" include damages claimed by anyperson or organization for care, loss of services or death resulting at any time from the "bodily injury."
**CG0001 7/98**
**SECTION V - DEFINITIONS**

**3. "Bodily injury"** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**17. "Property damage"** means:
  a. physical injury to tangible property, including all resulting
  loss of use of that property. All such loss of use shall be
  deemed to occur at the time of the physical injury that caused
  it; or
  b. loss of use of tangible property that is not physically injured.
  All such loss of use shall be deemed to occur at the time of the
    "occurrence" that caused it.

**13. "Occurrence"** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
**COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY**

Insuring Agreement
a.

*Modesto City Schools and Stockton Unified School District v Riso, Inc. et al.*
*514 555205*
*Page 20*

We will pay those sums that the Insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages.

We may at our discretion investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

(1)
the amount we will pay for damages is limited as described in **CG0001 10/93**

LIMITS OF INSURANCE (SECTION III); and

(2)
our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under

Supplementary Payments - Coverages A and B.

b.
This insurance applies to:
(1) "personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

(2) "advertising injury" caused by an offense committed in the course of advertising your goods, products or services; but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**
This insurance does not apply to:
a.
"Personal injury" or "advertising injury":

(1)
arising out of oral or written publication of material, if done

---

We will pay those sums that the Insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend the Insured against any "suit" seeking those damages

However, we will have no duty to defend the Insured against any "suit" seeking damages for "personal injury" or "advertising injury" to which this insurance does not apply.

We may, at our discretion, investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

(1)
the amount we will pay for damages is limited as described in **CG0001 1/96**

Limits of Insurance (Section III); and

(2)
our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under

Supplementary Payments - Coverages A and B.

b.
This insurance applies to:
(1) "personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

(2) "advertising injury" caused by an offense committed in the course of advertising your goods, products or services; but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**
This insurance does not apply to:
a.
"Personal injury" or "advertising injury":

(1)
arising out of oral or written publication of material, if done

---

We will pay those sums that the Insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the Insured against any "suit" seeking those

damages. However, we will have no duty to defend the Insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1)
the amount we will pay for damages is limited as described in **CG0001 7/98**

Section III; Limits of Insurance and

(2)
our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under

Supplementary Payments - Coverages A and B.

b.
This insurance applies to:
"personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**
This insurance does not apply to:
a.
"Personal and advertising injury":

(1)
Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";
(2)
arising out of oral or written publication of material, if done

*Modesto City Schools and Stockton Unified School District v Riso, Inc. et al.*
514 555205
Page 21

by or at the direction of the Insured with knowledge of its
  falsity;
    (2)
  Arising out of oral or written publication of material whose
  first publication took place before the beginning of the policy period;
 (3)
 arising out of the willful violation of a penal statute or
  ordinance committed by or with the consent of the Insured; or
CG0001 10/93
    (4)
  For which the insured has assumed liability in a
  contract or agreement. This exclusion does not apply to liability for
  damages that the insured would have in the absence of the contract or
  agreement;

by or at the direction of the Insured with knowledge of its
  falsity;
    (2)
  Arising out of oral or written publication of material whose
  first publication took place before the beginning of the policy period;
    (3)
  arising out of the willful violation of a penal statute or
  ordinance committed by or with the consent of the Insured;
CG0001 1/96
    (4)
  For which the insured has assumed liability in a
  contract or agreement. This exclusion does not apply to liability for
  damages that the insured would have in the absence of the contract or
  agreement;

(5)  arising out of the actual, alleged ⟨.⟩ threatened
  discharge, dispersal, seepage, migration, release or escape of
  pollutants at any time.

by or at the direction of the insured with knowledge of its
  falsity;
    (3)
  Arising out of oral or written publication of material whose
  first publication took place before the beginning of the policy period;
    (4)
  Arising out of a criminal act committed by or at the direction
  of any insured;
CG0001 7/98
    (5)
  For which the insured has assumed liability in a
  contract or agreement. This exclusion does not apply to liability for
  damages that the insured would have in the absence of the contract or
  agreement;
    (6)  Arising out of a breach of contract, except an implied
  contract to use another's advertising idea in your "advertisement":
    (7)  Arising out of the failure of goods, products or
  services to conform with any statement of quality or performance made
  in your "advertisement":
    (8)  Arising out of the wrong description of the price of
  goods, products or services stated in your "advertisement":
    (9)  Committed by an insured whose business is advertising,
  broadcasting, publishing or telecasting. However, this exclusion does
  not apply to Paragraphs 14.a., b. and c. of "personal and advertising
  injury" under the Definitions Section; or
    (10)  arising out of the actual, alleged or threatened
  discharge, dispersal, seepage, migration, release or escape of
  pollutants at any time.
b. Any loss, cost or expense arising out of any:
    (1)  request, demand or order that any Insured or others
  test for, monitor, clean up, remove, contain, treat, detoxify or
  neutralize, or in any way respond to, or assess the effects of
  "pollutants"; or
    (2)  claim or suit by or on behalf of a governmental
  authority for damages because of testing for, monitoring, cleaning up,
  removing, containing, treating, detoxifying or neutralizing, or in any
  way responding to, or assessing the effects of "pollutants".
CG0001 7/98

CG0001 10/93
b. "Advertising injury" arising out of:

CG0001 1/96
b. "Advertising injury" arising out of:

*Modesto City Schools and Stockton Unified School District v Riso, Inc. et al.*
514 555205
Page 22

(1)
breach of contract, other than
misappropriation of advertising
ideas under an implied contract;
(2)
the failure of goods, products or
services to conform with
advertised quality or performance;
(3)
the wrong description of the price of
goods, products or
services; or
(4) an offense committed by an
Insured whose business is
advertising, broadcasting, publishing
or telecasting.

(1)
breach of contract, other than
misappropriation of advertising
ideas under an implied contract;
(2)
the failure of goods, products or
services to conform with
advertised quality or performance;
(3)
the wrong description of the price of
goods, products or
services; or
(4) an offense committed by an
Insured whose business is
advertising, broadcasting, publishing
or telecasting.
c. Any loss, cost or expense arising out
of any:
(1) request, demand or order that any
Insured or others
test for, monitor, clean up, remove,
contain, treat, detoxify or
neutralize, or in any way respond to, or
assess the effects of
pollutants; or
(2) claim or suit by or on behalf of a
governmental
authority for damages because of
testing for, monitoring, cleaning up,
removing, containing, treating,
detoxifying or neutralizing, or in any
way responding to, or assessing the
effects of pollutants.
Pollutants means any solid, liquid,
gaseous or thermal irritant
or contaminant, including smoke,
vapor, soot, fumes, acids, alkalis,
chemicals and waste. Waste includes
materials to be recycled,
reconditioned or reclaimed.

**SECTION V - DEFINITIONS**

**1. "Advertising injury"** means injury
arising out of one or
more of the following offenses:

a.

oral or written publication of material
that slanders or libels a
person or organization or disparages
a person's or organization's
goods, products or services;
b.
oral or written publication of material
that violates a person's
right of privacy;
c.

**SECTION V - DEFINITIONS**

**1. "Advertising injury"** means injury
arising out of one or
more of the following offenses:

a.

oral or written publication of material
that slanders or libels a
person or organization or disparages
a person's or organization's
goods, products or services;
b.
oral or written publication of material
that violates a person's
right of privacy;
c.

**SECTION V - DEFINITIONS**

**1. "Advertisement"** means a notice
that is broadcast or
published to the general public or
specific market segments about your
goods, products or services for the
purpose of attracting customers or
supporters.

CG0001 10/93
misappropriation of advertising ideas
or style of doing business;
or
d.
infringement of copyright, title or
slogan.

CG0001 1/96
misappropriation of advertising ideas
or style of doing business;
or
d.
infringement of copyright, title or
slogan.

CG0001 7/98

**13. "Personal injury"** means injury,
other than "bodily

**13. "Personal injury"** means injury,
other than "bodily

*Modesto City Schools and Stockton Unified School District v Riso, Inc. et al.*
514 555205
*Page 23*

injury," arising out of one or more of the following offenses:

a.
false arrest, detention or imprisonment;

b.
malicious prosecution;

c.
the wrongful eviction from, wrongful entry into, or invasion
of the right of private occupancy of a room, dwelling or
premises that a person occupies by or on behalf of its owner,
landlord or lessor;

d.
oral or written publication of material that slanders or libels a
person or organization or disparages a person's or organization's
goods, products or services; or

e.
oral or written publication of material that violates a person's
right of privacy.

injury," arising out of one or more of the following offenses:

a.
false arrest, detention or imprisonment;

b.
malicious prosecution;

c.
the wrongful eviction from, wrongful entry into, or invasion
of the right of private occupancy of a room, dwelling or
premises that a person occupies by or on behalf of its owner,
landlord or lessor;

d.
oral or written publication of material that slanders or libels a
person or organization or disparages a person's or organization's
goods, products or services; or

e.
oral or written publication of material that violates a person's
right of privacy.

14. "Personal and advertising injury" means injury including
consequential "bodily injury" arising out of one or more of the
following offenses:

a.
false arrest, detention or imprisonment;

b.
malicious prosecution;

c.
the wrongful eviction from, wrongful entry into, or invasion
of the right of private occupancy of a room, dwelling or
premises that a person occupies, committed by or on behalf of its
owner,
landlord or lessor;

d.
oral or written publication of material that slanders or libels a
person or organization or disparages a person's or organization's
goods, products or services;

e.
oral or written publication of material that violates a person's
right of privacy.

f. The use of another's advertising idea in your
"advertisement" or

g. Infringing upon another's copyright, trade dress or
slogan in your "advertisement".

CG0001 10/93

CG0001 1/96

CG0001 7/98

## Application of Coverage A. Bodily Injury and Property Damage Liability

Though there are minor differences between the several coverage forms, the insuring agreement and key definitions remain essentially the same. Accordingly, we can state that none of the allegations in the complaint states an "occurrence" as defined in the policy.

We can also state that none of the Counts of the present complaint seek damages in the form of "Bodily Injury" or "Property Damage" as defined in the policy.

For these reasons, there is no coverage under Coverage A. – Bodily Injury and Property Damage Liability. Accordingly, Great American has no obligation to defend or indemnify Riso, Inc. for claims arising from this litigation under Coverage A.

### Application of Coverage B. Personal and Advertising Injury Liability

Though there are differences between the organization and content of the three forms, each provides the same basic coverage for "Personal Injury" or "Advertising Injury" caused by an "offense" arising out of the insured's business, but only if the offense was committed within the coverage territory.

Under Section V – Definitions, the definition of "Personal Injury," contained in the 1994 through 1998 policies, includes, as one of the enumerated offenses, the following language:

> 13.    "Personal Injury" means injury, other than "bodily injury," arising out of one or more of the following offenses;
>
> d) Oral or written publication of material that slanders or libels a person or organization' or disparages a person's or organization's goods, products or services;

Under Section V – Definitions, the definition of "Advertising Injury," contained in the 1994 through 1998 policies, includes, as one of enumerated offenses, the following language;

> 1.    "Advertising Injury" means injury arising out of one or more of the following offenses;

> a. oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

The 1999 policy, which uses the CG0001 07/98 form, contains two changes in language. First, in Section V Definitions, the 1999 policy defines "Advertisement" to mean;

> 1. . . . a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters

Second, the 1999 form combines the definitions of "Personal" and "Advertising" injury into a single definition containing the following pertinent language;

> 14. "Personal" and "Advertising Injury" means injury including consequential "bodily injury" arising out of one or more of the following offenses:
>
> d. oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

Count Eight, entitled **Violation of the Sherman Act Section 1** and directed against all defendants for restraints of trade in the Risograph Supply Market, contains the only reference to "disparagement" in the entire complaint. Specifically, Plaintiff refers to the disparagement in the context of the alleged "Tying Arrangements." More specifically, Plaintiff alleges that the disparaging publication was the "Warning Sticker" Riso applied to its machines following the June 26, 1997, News Flash." The "Warning Sticker" reads as follows:

WARNING
Be sure your masters and ink cartridges carry
The original RISO logo
[Riso Logo Inserted]
Use of non-Riso manufactured inks or masters may
Result in lower print quality, higher cost per copy, a
Significant increase in set off and may cause serious
damage to the ink cylinder and the Risograph.

Use of non-Riso manufactured inks or master may
Cause repair or service problems not covered by your
Warranty or service agreement. Please consult your
Authorized Riso representative for further information

*Modesto City Schools and Stockton Unified School District v Riso, Inc. et al.*
*514 555205*
*Page 26*

Riso itself, in a June 26, 1997 Dealer News Flash explained the purpose of the "Warning Sticker;'

> The use of these warning labels on your installed base and new machines is a step toward fighting the supply pirates and protecting both of our revenue streams.

In plaintiff's words;

> The warning labels are one part of a concerted strategy by Riso and its dealers to falsely disparage non-Riso inks and masters suitable for use in Risographs to reinforce the tying arrangement between Risograph warranty service and use of Risograph inks and masters.

Plaintiff concludes that the result of the uniform policies implemented by Riso and its dealers;

> . . . is that customers are coerced by means of the original equipment and service warranties (the "tying" product) into purchasing   Riso brand aftermarket inks and masters (the "tied" product) at substantially higher prices than those supplies would cost in a competitive market, free of the tying arrangement.

In our view, the allegations of "disparagement" mentioned in the context of Count Eight of the complaint do not trigger coverage. Our reasoning is as follows;

> First, the Warning as affixed to Risograph machine is not advertising as defined under the current policy.

> Second,  Plaintiffs do not allege *they* have been disparaged. Instead, Plaintiff alleges Riso and its dealers have disparaged others and as a result, Plaintiffs state they have been  "coerced" into buying the higher priced Riso products. Read in contextof the complaint, Plaintiff's allegation is not one of "disparagement", but rather, it is one of   "coercion." "Coercion" is not one of the enumerated offenses required to trigger coverage.

> Third, neither Plaintiff has standing to recover damages for Riso's alleged "disparagement" of competing after-market suppliers. Such claims are for the after-market suppliers to make.

> Fourth, because the Plaintiffs have no standing to recover damages for Riso's alleged disparagement of others goods services or products, the suit cannot be amended so as to permit Plaintiffs to recover these damages.

*Modesto City Schools and Stockton Unified School District v Riso, Inc. et al.*
*514 555205*
*Page 28*

### Summary Application of Coverage B. Personal and Advertising Injury Coverage

For the reasons discussed above, It is our view that the complaint as presently plead does not trigger coverage under Coverage B. Personal and Advertising Injury Coverage.

### Summary

For the reasons discussed above, it is our position that this matter, at least as it is presently plead is not covered and Great American has no duty to defend or indemnify Riso, Inc. or Riso Kagaku for damages or expense arising from the litigation.

Should you have questions, or should Plaintiff amend the complaint or should you have additional material you wish us to consider, please do not hesitate to contact me.

Sincerely,

Merrick F. McCarthy
Director Liability
Japanese Division