UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GREAT AMERICAN ALLIANCE INSURANCE COMPANY, GREAT AMERICAN ASSURANCE COMPANY, GREAT AMERICAN INSURANCE COMPANY, AND GREAT AMERICAN INSURANCE COMPANY OF NEW YORK,<br><br>  Plaintiffs,<br><br>  v.<br><br>RISO, INC.,<br><br>  Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Consolidated Civil Action Nos. 04-12260-GAO<br>)                                                    04-12397-GAO<br>)<br>) |
| RISO, INC.,<br><br>  Plaintiff,<br><br>  v.<br><br>GREAT AMERICAN ALLIANCE INSURANCE COMPANY, GREAT AMERICAN ASSURANCE COMPANY, GREAT AMERICAN INSURANCE COMPANY, AND GREAT AMERICAN INSURANCE COMPANY OF NEW YORK,<br><br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM IN SUPPORT OF RISO, INC.'S MOTION FOR SUMMARY
JUDGMENT ON INSURERS' DUTY TO DEFEND**

### I.   INTRODUCTION

This is an insurance coverage case. Riso, Inc. ("Riso"), the domestic distributor of "Risograph" digital duplicating machines, was sued in two actions in California on allegations that its business practices had injured competitors and consumers in the "aftermarket" for Risograph supplies. In the first action, *Western Duplicating, Inc. v. Riso, Inc. et al.*, No. Civ. S 98-203 FCD GGH (E.D. Cal. filed Jan. 30, 1998), a competitor alleged that Riso had engaged in anti-competitive behavior, including disparagement of the competitor's non-Riso supplies, and

that as a consequence, consumers had purchased Riso products instead of the competitor's less costly "generic" products, thereby injuring the competitor. In the second, *Modesto City Schools, et al. v. Riso, Inc., et al*, No. Civ. S 99-2214 DFL DAD (E.D. Cal., filed Nov. 5, 1999), two California school districts, citing the same allegedly anti-competitive practices, including, *inter alia*, disparagement of non-Riso supplies, sued Riso asserting that these practices had injured them as well, by causing them to pay inflated prices for Risograph supplies.

At the times implicated by the allegations of *Western Duplicating* and *Modesto*, Riso's primary commercial general liability insurers were Great American Insurance Company and Great American Insurance Company of New York (collectively "GAIC"). Riso notified GAIC with respect to both the *Western Duplicating* and *Modesto* cases, claiming coverage under the policies' "personal injury" provisions, under which GAIC promised to defend and indemnify Riso with respect claims for "injury . . . arising out of . . . [o]ral or written publication of material that . . . disparages a person's or organization's goods, products, or services." GAIC agreed to defend Riso with respect to *Western Duplicating*, but refused to defend the *Modesto* action. In these consolidated cases, the parties seek a declaration with respect to GAIC's defense and indemnity obligations in connection with *Modesto*.[1]

Despite GAIC's acknowledgement of its duty to defend Riso in connection with *Western Duplicating*, GAIC denies any obligation to defend Riso in *Modesto* against claims that the exact same publication of allegedly disparaging material also injured consumers. GAIC has taken the position that even though the policies provide coverage for all injury arising out of publication of material that disparages "a person's or organization's goods, products, or services," GAIC is

---

[1] Although GAIC and Riso ultimately disputed the *extent* of GAIC's defense obligation with respect to *Western Duplicating,* that dispute was submitted to binding arbitration and was resolved. Accordingly, GAIC's obligations with respect to *Western Duplicating* are not at issue in this action.

B3076156.5 - 2 -

relieved of its duty to defend because the consumers in *Modesto* did not allege that Riso disparaged *their* goods, products, or services. The Policies' plain language does not limit coverage to circumstances in which the injured parties' own goods, products, or services were disparaged. Thus, the issue presented to the Court is simply whether a Massachusetts court would engraft such a limitation onto the policies.

As set forth herein, a Massachusetts court would conclude that *Modesto* triggered GAIC's duty to defend Riso. Riso therefore moves this Court to declare that GAIC was obligated to provide Riso with a defense in *Modesto*, and to hold that in failing to meet this obligation, GAIC breached the subject policies.

## II.   SUMMARY STATEMENT OF MATERIAL FACTS[2]

### A.   Riso, Inc.

Riso, a subsidiary of Riso Kagaku Corporation, is a Massachusetts corporation that distributes "Riso" brand digital duplicating machines, parts, and supplies. SMF at ¶ 1. Riso distributes digital duplicating machines known as "Risographs" throughout the United States. *Id.* Riso also distributes parts and supplies, including ink and masters specially formulated for use in Risographs. *Id.* Riso's competitors, including Western Duplicating, Inc., also sell ink and masters for use in Risographs. SMF at ¶ 12.

### B.   The Subject Policies

From 1990 through 1999, GAIC insured Riso under a series of primary general liability policies. SMF at ¶ 4. Riso, which is headquartered in Danvers, Massachusetts, secured the coverage through the Boston, Massachusetts office of J&H Marsh & McLennan ("Marsh"). SMF at ¶¶ 1, 5. The policies were negotiated and delivered in Massachusetts. SMF at ¶ 5.

---

[2] This section summarizes the Concise Statement of Material Facts ("SMF") contained in Riso, Inc.'s Motion for Summary Judgment on Insurers' Duty to Defend.

Each of the GAIC policies provided Riso with "personal injury" coverage. SMF at ¶ 7. Although the policies do not all use the same policy forms, the insuring agreement and key definitions in each policy are identical with respect to the coverage at issue here. SMF at ¶ 6. The policies state that GAIC "will pay those sums that the Insured becomes legally obligated to pay as damages because of 'personal injury' . . . to which this coverage applies," and GAIC will "have the right and duty to defend any 'suit' seeking those damages. . . ." SMF at ¶ 7. This coverage applies to "'personal injury' caused by an offense arising out of your business . . . ." *Id.* The GAIC policies define "personal injury" to mean, among other things, "injury other than bodily injury, arising out of" the covered "offense," of "oral or written publication of material that . . . disparages a person's or organization's goods, products, or services." SMF at ¶ 8.

It is undisputed that Riso is a named insured under all of the policies. It likewise is undisputed that all premiums for the policies were paid in full. SMF at ¶ 5.

**C.   The Precursor Case: *Western Duplicating***

The genesis of *Modesto* was the *Western Duplicating* litigation. SMF at ¶ 13. In *Western Duplicating*, a Riso competitor and supplier of generic supplies for use in Risographs, alleged, among other things, that Riso published disparaging and defamatory materials concerning supplies sold by Western and other sellers of non-Riso supplies for use in Riso duplicators. SMF at ¶ 10. As described by the *Modesto* plaintiffs, in a memorandum joined by Riso, all of these claims, either in whole or in part, rested on allegations that Riso had disparaged non-Riso products. SMF at ¶ 14. GAIC provided Riso with a defense in *Western Duplicating*. SMF at ¶ 11.

**D.   The *Modesto* Complaints**

On November 5, 1999, plaintiffs Modesto City Schools and the Stockton Unified School District commenced the *Modesto* litigation as a purported class-action suit on behalf of all public

schools and school districts in the United States that own or lease Risographs.  SMF at ¶ 12.  The original and amended complaints in *Modesto* alleged a conspiracy—originating in or around October 1994—between Riso and its dealers to "create, preserve and enhance Riso's monopoly power" in the retail markets for Risograph service and supplies through a "concerted strategy by RISO and its dealers to falsely disparage non-RISO inks and masters suitable for use in Risographs."  SMF at ¶ 16.

The plaintiffs alleged that "one part of [this] concerted strategy . . . to falsely disparage non-RISO inks and masters" involved placing stickers on all Risographs warning customers to use only Riso-manufactured supplies.  SMF at ¶ 17.  "This strategy," the plaintiffs alleged, "indiscriminately disparag[ed] all non-RISO supplies."  *Id.*  The plaintiffs further alleged that "RISO refers to any non-RISO source of inks or masters for use in Risographs as being a "pirate," "supply pirate," or "generic pirate," and alleged that Riso engaged in "routine disparagement of all 'generic' or 'pirate' supplies."  SMF at ¶ 18.  Riso's "routine disparagement" also allegedly included "warning [its school customers] that if they use 'non-RISO manufactured inks or masters' they may 'cause serious damage to the ink cylinder and the Risograph' and in turn cause 'repair or service problems . . . ,'" and sending letters stating that "RISO INC., does not 'recommend the use of non-genuine supplies in any Risograph product."  SMF at ¶ 19.  As a result of this alleged "concerted strategy" to disparage competitors' products, the *Modesto* plaintiffs allegedly paid substantially higher prices to obtain Riso supplies than they would have had to pay for generic alternatives.  SMF at ¶ 20.

Although many of these allegations appear in Count 8 of the Complaint and Count 2 of the Amended Complaint, they are expressly incorporated into each subsequent count.  Moreover, the allegations concerning Riso's "concerted strategy . . . to falsely disparage non-RISO inks and

masters . . ." were, according to the *Modesto* court, central to the entire complaint. SMF at ¶ 15. As the court's November 17 Memorandum and Order states, "Plaintiffs' complaint alleged ten claims . . . *arising out of defendants' alleged disparagement of non-Riso supplies*." *Id.* (emphasis added).

E.   **Procedural Background**

Riso filed a declaratory judgment action against GAIC in Massachusetts Superior Court on October 27, 2004. *Riso, Inc. v. Great Am. Ins. Co., et al*, C.A. No. 04-4683 (Suffolk, filed Oct. 27, 2004). SMF at ¶ 23. On November 12, 2004, GAIC removed the Massachusetts suit to the U.S. District Court for the District of Massachusetts, where it was consolidated with this action filed by GAIC against Riso. SMF at ¶ 24.

### III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is a material fact only if it has the "potential to affect the outcome of the suit under applicable law." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996). Ordinarily, "the interpretation of an insurance policy and the determination of the policy-dictated rights and obligations are questions of law, appropriate grist for the summary judgment mill." *Merchants Ins. Co. of N.H. v. U.S. Fid. & Guar. Co.*, 143 F.3d 5, 8 (1st Cir. 1998); *accord B&T Masonry Const. Co., Inc. v. Pub. Svc. Mut. Ins. Co.*, 382 F.3d 36, 38-39 (1st Cir. 2004). The present case is no exception: whether Great American had a duty to defend Riso in *Modesto* is dictated by the plain terms of the policies and the allegations of the underlying claim, without need to resort to any extrinsic facts. Summary judgment is therefore appropriate to resolve this issue.

## IV.   ARGUMENT

**A.   Massachusetts Law Governs**

As private contracts, insurance policies are governed by state—rather than federal—law. As a threshold matter, therefore, it is necessary to determine which state's law applies. The parties have not specified the governing law in the subject policies, and therefore, a choice-of-law analysis is necessary. Because this is a diversity action, the Court should apply the choice-of-law rules of Massachusetts, the state in which the Court sits. *See Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 491 (1941).

Under Massachusetts choice-of-law rules, the law of the state with the "most significant relationship" to the contract applies. *Brennan v. Carvel Corp.*, 929 F.2d 801, 806 (1st Cir. 1991). Determining which state has the most significant relationship to a contract involves consideration of several factors, including "(a) the place of contracting, (b) the place of negotiation of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Bushkin Assoc., Inc. v. Raytheon, Co.*, 473 N.E.2d 662, 669 (Mass. 1985); *accord Grabowski v. Bank of Boston*, 997 F.Supp. 111, 118 (D. Mass. 1997). In the particular context of nationwide general liability policies, the application of the policies to any given claim "should not depend on the law of the jurisdiction governing that particular claim but rather should be determined by the law governing the interpretation of the insurance policy and its issuance." *W.R. Grace & Co. v. Hartford Accident & Indem. Co.*, 555 N.E.2d 214, 221 (Mass. 1990) (addressing *forum non conveniens*); *see W.R. Grace & Co. v. Md. Cas. Co.*, 600 N.E.2d 176, 179 (Mass. App. Ct. 1992) (applying analysis of *W.R. Grace & Co. v. Hartford* to resolve choice of law issue).

Massachusetts law should apply to the present case. The policies provided Riso with nationwide general liability coverage. Under the *W.R. Grace* decisions, therefore, we look *not* to

the law governing *Modesto*, but to the law the parties likely contemplated as governing the policies at the time of issuance, regardless of the state in which any particular covered claim might be filed.  Here, insurers licensed in Massachusetts sold the policies to Riso, a Massachusetts-based nationwide business, after negotiations with Marsh's Boston office.  SMF at ¶¶ 1-3, 5.  *Compare W.R. Grace & Co. v. Md. Cas. Co.*, 600 N.E.2d at 179 (New York law applied where "insurers doing business in New York sold the relevant policies to Grace, a New York based conglomerate, after negotiating coverage with Grace's New York insurance broker, Marsh and McLennan, in that State").  Because Massachusetts has the most significant relationship to the policies, Massachusetts law applies.  *See id.*; *Bushkin*, 473 N.E.2d at 671.

Once a federal court has determined that the law of a particular state applies, that court is "absolutely bound by a current interpretation of that law formulated by the state's highest tribunal."  *Daigle v. Me. Med. Ctr., Inc.*, 14 F.3d 684, 689 (1st Cir. 1994).  For a court to do otherwise would "invade[] rights which . . . are reserved by the Constitution to the several States."  *Erie R.R. v. Tompkins*, 304 U.S. 64, 80 (1938).  If the state's highest court has yet to rule on an issue, the role of federal judges "is not to formulate a tenet which [they], as free agents, might think wise, but to ascertain, as best [they] can, the rule that the state's highest tribunal would likely follow."  *Porter v. Nutter*, 913 F.2d 37, 40-41 (1st Cir. 1990) (quoting *Kathios v. Gen. Motors Corp.*, 862 F.2d 944, 949 (1st Cir. 1988); *see also Commissioner v. Estate of Bosch*, 387 U.S. 456, 464 (1967).  This general rule that a federal court must faithfully apply the applicable state's law has even greater force where—as is the case here—a defendant chooses to remove an action from state to federal court.  *Porter*, 913 F.2d at 41; *Kassel v. Gannett Co., Inc.*, 875 F.2d 935, 950 (1st Cir. 1989); *Freeman v. Package Mach. Co.*, 865 F.2d

1331, 1349 (1st Cir. 1988); *Dash v. Chi. Ins. Co.*, 2004 U.S. Dist. LEXIS 17309, at *35 (D. Mass. 2004) (attached hereto as Exhibit A).

B.	**Massachusetts Principles of Policy Interpretation**

Under Massachusetts law, the interpretation of insurance policies "begin[s] with the actual language of the policies, given its plain and ordinary meaning . . . , consider[ing] what an objectively reasonable insured, reading the policy language would expect to be covered." *Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co.*, 220 F.3d 1, 4 (1st Cir. 2000). "When the scope of coverage provided by a clause is unclear, the policy should be read so as to provide coverage to the insured." *SCA Svcs., Inc. v. Transp. Ins. Co.*, 646 N.E.2d 394, 397 (Mass. 1995); *see also Brazas*, 220 F.3d at 4. Thus, where a policy provision is susceptible of two or more rational interpretations, the court must construe the ambiguity in the insured's favor. *Brazas*, 220 F.3d at 4-5.

Determining whether an insurer has a duty to defend its insured entails "matching the third-party complaint with the policy provisions: if the allegations of the complaint are 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense." *Sterilite Corp. v. Cont'l Cas. Co.*, 458 N.E.2d 338, 340 (Mass. App. Ct. 1984). In other words, "the process is one of envisaging what kinds of losses may be proved as lying within the range of the allegations of the [underlying] complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy." *Id.* at 341. Moreover, "the underlying complaint need only show, through general allegations, a *possibility* that the liability claim falls within the insurance coverage. There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage." *Id.* (emphasis added) (quoting *Union Mut. Fire Ins. Co. v. Topsham*, 441 A.2d 1012, 1015 (Me. 1982)). In addition,

"the obligation of the insurer to defend is based not only on the facts alleged in the complaints but also on the facts that are known or readily knowable by the insurer. *Desrosiers v. Royal Ins. Co. of America*, 468 N.E.2d. 625, 628 (Mass. 1984).

Massachusetts recognizes a critical distinction between the insured's alleged offense and the theories of liability contained in the underlying complaint. As the Massachusetts Supreme Judicial Court instructs, "[i]t is the source from which the plaintiff's personal injury originates rather than the specific theories of liability alleged in the complaint which determines the insurer's duty to defend." *Bagley v. Monticello Ins. Co.*, 720 N.E.2d 813, 817 (Mass. 1999) (emphasis added) (quoting *New Eng. Mut. Life Ins. Co. v. Liberty Mut. Ins. Co.*, 667 N.E.2d 295 (Mass. 1996); *see also Brazas*, 220 F.3d at 7 (quoting *Bagley*).

C.  **The Policy Language, Given its Plain and Ordinary Meaning, Required GAIC to Defend Riso In the *Modesto* Litigation**

Having set forth these general rules of policy interpretation in Massachusetts, we turn to the plain and ordinary meaning of the pertinent policy language. As described above, the policies impose a duty on GAIC to defend any suit seeking damages because of "personal injury." SMF at ¶ 7. The policies define "personal injury" to include "injury, other than bodily injury, arising out of . . ." one or more of a set of five covered "offenses," including "oral or written publication of material that . . . disparages a person's or organization's goods, products, or services." SMF at ¶ 8. Thus, under Massachusetts law, because each of Riso's competitors was "a person or organization," GAIC had a duty to defend Riso in the *Modesto* litigation if allegations in the *Modesto* complaints indicated any possibility that the plaintiffs' alleged injuries arose out of Riso's "offense" of "oral or written publication of material that . . . disparage[d]" its competitors' products. *See Sterilite*, 458 N.E.2d at 341. The allegations in the *Modesto* complaints easily satisfy this standard.

As the *Modesto* court itself stated, the *Modesto* complaint alleged ten claims "arising out of defendants' alleged disparagement of non-Riso supplies." SMF at ¶ 15. The plaintiffs alleged injury resulting wholly or in part from Riso's "concerted strategy . . . to falsely disparage non-Riso inks and masters . . . ." SMF at ¶ 16. Riso's alleged purpose in disparaging non-Riso products was to prompt consumers to choose Riso products over cheaper alternatives, and, as a consequence, the *Modesto* plaintiffs paid more for Risograph supplies than they otherwise would have had to pay, causing them injury. SMF at ¶ 20. According to the complaint, therefore, Riso caused injury by disparaging an organization's products. *Id.* Because the policies compel GAIC to defend any suit alleging injury "arising out of . . . oral or written publication of material that . . . disparages a[n] organization's . . . products," the allegations in the *Modesto* complaint triggered GAIC's duty to defend.

        1.        **The Policy Language Does Not Require That the Underlying Plaintiff Allege that *Its* Goods, Products, or Services Were Disparaged**

As set forth above, the policies provide coverage for "publication of material that . . . disparages *a* person's or organization's goods, products, or services." SMF at ¶¶ 7-8 (emphasis added). Unlike the definite article "the," "a" is indefinite. Use of the word "a" thus implies not *one specific* thing, but *any* thing. By choosing to employ the indefinite term "*a* person's or organization's goods . . .*" instead of a definite term such as "*the* underlying plaintiff's goods," GAIC clearly indicated that allegations that the insured disparaged *any* person's or organization's goods, products, or services—not simply those of the underlying plaintiff—trigger the duty to defend if that disparagement allegedly caused injury to the plaintiff. Had GAIC wished to limit the policies' coverage to circumstances where Riso directly disparaged the underlying plaintiff's goods, it could easily have done so by substituting in the policies the words

"the plaintiff's . . ." for "a person's or organization's . . . ." GAIC did not do so, and there is no basis in the policy language for imposing such a limitation.

Notwithstanding the absence of language in the policy limiting coverage to where the insured disparages the underlying plaintiff's products, GAIC has contended that because the *Modesto* allegations do not support a claim for the tort of "product disparagement," GAIC's duty to defend never attached. Because the tort of "product disparagement" requires disparagement of the plaintiff's products, the argument continues, the alleged publication of disparaging material must have disparaged the underlying plaintiff's goods, products, or services—even though the policies do not contain such a limitation. Neither the policy language nor Massachusetts law support GAIC's position.

The policy language makes no reference to the tort of "product disparagement." The term "disparagement" does not appear in the policies at all. Rather, the policies refer to "*publication of material that disparages* . . . a person's or organization's goods, products, or services." SMF at ¶ 8. Even if the term "disparagement" could conceivably refer narrowly only to the tort of "product disparagement," the term, "publication of material that disparages . . ." is far broader. As the Massachusetts Supreme Judicial Court ("SJC") concluded in *Boston Symphony Orchestra v. Commercial Union Insurance Co.* ("*BSO*"), "Disparage means, among other things, 'to lower in rank and estimation by actions or words,' or 'to speak slightingly of.'" 545 N.E.2d 1156, 1159 (Mass. 1989) (rejecting insurer's contention that policy terms referring to "publication . . . of . . . disparaging material" should be interpreted as referring exclusively to the tort of product disparagement); *see also Open Software Found., Inc. v. U.S. Fid. & Guar. Co.*, 307 F.3d 11, 20 (1st Cir. 2002) (quoting *BSO*). Similarly, although the policies could have provided coverage only for "torts," the policies employ the more expansive term, "offenses."

There is simply no basis in the policy language for interpreting "offense" as synonymous with "tort"; "a person's or organization's . . . products" as synonymous with "the plaintiff's products"; or "publication of material that disparages . . . a person's or organization's goods, products, or services" as synonymous with the tort of "product disparagement." *See BSO*, 545 N.E.2d at 1159; *Open Software*, 307 F.3d at 20.

Had GAIC wished to limit coverage to underlying suits alleging the elements of the tort of product disparagement, it could easily have done so. The language GAIC chose, however, clearly signaled that its coverage obligations extend beyond the tort of product disparagement. At a minimum, an objectively reasonable insured reading the policy language could expect as much. *See Brazas*, 220 F.3d at 4. As the Massachusetts SJC observed in *BSO*, "[i]f an insurer desires to cover, and therefore to defend against, only those actions seeking damages for . . . product disparagement . . . , then the insurer can issue a policy that says as much." 545 N.E.2d at 1159. GAIC chose not to do so. GAIC cannot now demand that this Court retroactively impose a limitation to coverage that GAIC itself chose to omit.

  2. **The Massachusetts Supreme Judicial Court Has Expressly Refused to Import the Elements of the Tort of Product Disparagement into Policy Language Providing Coverage for Publication of Disparaging Material**

An analysis of Massachusetts case law compels the same conclusion. In *BSO*, considering policy language functionally identical to that at issue here, the Massachusetts Supreme Judicial Court rejected an insurer's attempt to define "publication . . . of . . . disparaging material" as synonymous with the tort of "product disparagement." *Id*. The underlying suit in *BSO* involved a dispute over the Boston Symphony Orchestra's ("BSO") cancellation of a contract under which the actress Vanessa Redgrave was to appear as narrator in a series of performances. *Id*. at 1157. Although pleading only breach of contract claims,

Redgrave alleged that the BSO's repudiation of the contract damaged her reputation and caused others not to hire her. *Id.* The BSO's insurer refused to defend the suit, contending that the covered "offense" of "publication or utterance of a libel or slander or other defamatory [or] disparaging material" referred only to formal actions in tort, namely libel, slander, product disparagement, or disparagement of property, whereas Redgrave's complaint alleged only breach of contract. *Id.* at 1159. The SJC rejected this contention, holding that the term "disparage" should be given its ordinary meaning, rather than a technical legal one, and that accordingly, coverage applied to Redgrave's breach of contract claim, even though the complaint asserted no cause of action for libel, slander, or disparagement.[3] *Id.* In so ruling, the SJC emphasized that the process of determining the duty to defend is "not one of looking at the legal theory enunciated by the pleader," but instead requires consideration of the insured's alleged underlying acts. *Id.*; *accord Bagley*, 720 N.E.2d at 817 (stating that "[i]t is the source from which the

---

[3] Although the SJC makes plain in *BSO* that policy terms providing coverage for publication of disparaging material do not require that the underlying suit allege the elements of product disparagement, Massachusetts courts have taken a different approach where policies employ legal terms of art. *See e.g.*, *Smartfoods, Inc. v. Northbrook Prop. & Cas. Co.*, 618 N.E.2d 1365, 1368 (Mass.App.Ct. 1993) ("unfair competition" implies palming off); *see also Global NAPs, Inc. v. Fed. Ins. Co.*, 336 F.3d 59, 63-64 (1st Cir. 2003) (holding that "malicious prosecution" unambiguously refers to the tort of the same name); *Open Software*, 307 F.3d at 15-17 (noting that Massachusetts has "construe[d] unfair competition in a general commercial liability policy as equivalent in scope to the state common law tort of the same name"); *Open Software Found., Inc. v. U.S. Fid. & Guar. Co.*, 2001 U.S. Dist. LEXIS 12019, at *19 (copy attached as Exhibit B) ("Massachusetts courts construe the term 'unfair competition' in a liability insurance policy . . . to signify that common law tort").

This Court explained in *Open Software* that the rationale for interpreting policy terms containing legal terms of art with reference to torts with the same name is that "[i]t is hardly unreasonable for a drafter of an insurance policy, or any other instrument, to expect that a legal term used in the policy will be accorded the meaning that the courts have given it." *Open Software*, 2001 U.S. Dist. LEXIS 12019, at *20. This rationale does not apply to policy terms that are not legal terms of art, such as "publication of material that . . . disparages." *BSO*, 545 N.E.2d at 1159.

plaintiff's personal injury originates rather than the specific theories of liability alleged in the complaint which determines the insurer's duty to defend"); *see also Brazas*, 220 F.3d at 7; *cf. New Eng. Mut. Life Ins. Co. v. Liberty Mut. Ins. Co.*, 667 N.E.2d 295, 297 (Mass. App. Ct. 1996).

3.  **Application of the SJC's Decision in *BSO* to the Facts at Issue Calls For a Ruling in Riso's Favor**

Although *BSO* did not address the precise situation at issue here, in giving "disparaging" its ordinary meaning and rejecting the insurer's contention that the policy covered only the formal tort of product disparagement, the SJC's decision in *BSO* dictates the proper result in this case: that GAIC had a duty to defend *Riso* against the allegations raised in *Modesto*. This conclusion is perhaps best illustrated by comparing and contrasting the analytical approach taken by the SJC in *BSO* with the approach taken by jurisdictions that have addressed whether a duty to defend arises where the insured's alleged publication of disparaging material causes the underlying plaintiff injury but does not disparage the underlying plaintiff's own products.

Addressing facts closely mirroring those at issue here, The United States District Court for the Northern District of Illinois employed the same analytical approach as the Massachusetts SJC in *BSO* and held the insurer obligated to defend its insured. *Knoll Pharm. Co. v. Auto. Ins. Co. of Hartford*, 152 F.Supp.2d 1026, 1034-35 (N.D. Ill. 2001). The case, *Knoll Pharmaceutical v. Automobile Insurance Co. of Hartford*, involved allegations (as here) that the insured had disparaged competitors' products as well as the reputation of a doctor who claimed that the competitor's products were of equivalent quality to those of the insured. *Id.* at 1030. The *Knoll* court rejected the insurers' argument that "'disparagement' entails an element of reputational injury to the plaintiff or the plaintiff's goods, meaning that these offenses must directly injure the underlying plaintiff to trigger a duty to defend." *Id.* at 1034. Employing the same analytical

approach as the Massachusetts SJC in *BSO*, the *Knoll* court refused to interpret the policy terms, "publication of material that . . . disparages a person's or organization's goods, products or services," (the precise policy terms at issue here) as synonymous with the tort of "product disparagement." *See id.* Concluding that the policy language did not unambiguously limit coverage exclusively to the tort of product disparagement, the *Knoll* court ruled in favor of coverage: "the policy language does not entail that the insured must have . . . disparaged the underlying plaintiffs, and, accordingly, we conclude that such language does not preclude Knoll from stating a claim that Defendant Insurers owe them a duty to defend." *Id.* at 1035.

In contrast to *Knoll*, in *QSP, Inc. v. Aetna Casualty & Surety Company*, the Connecticut Supreme Court employed the very approach rejected by the SJC in *BSO* to deny coverage to an insured. *QSP, Inc. v. Aetna Cas. & Sur. Co.*, 773 A.2d 906, 918 (Conn. 2001). As in the present case, the insured allegedly disparaged its competitor's products, thereby injuring consumers—the plaintiffs in the underlying litigation. *Id.* at 911. The policy at issue in *QSP*—like that at issue here and in *Knoll*—provided coverage for "'personal injury' . . . arising out of . . . oral or written publication of material that . . . disparages a person's or organization's goods, products or services . . . ." *Id.* at 914. In stark contrast to *BSO* and *Knoll*, however, the *QSP* court accepted the insurers' contention that the policy language referred only to formal, legally-defined torts. *See id.* at 918. Accordingly, the *QSP* court tested whether the plaintiff's allegations could satisfy the elements of the tort of product disparagement. *Id.* Noting that the elements of product disparagement "require that the alleged damaging statement be made concerning the plaintiff," the court denied coverage "[b]ecause the [underlying] plaintiffs were not the targets of the alleged commercial disparagement committed by QSP." *Id.* In requiring that the underlying allegations meet the formal elements of the tort of product disparagement, the *QSP* court clearly

departed from the analytical approach employed in *BSO*, in which the SJC expressly rejected the applicability of the formal, legal definition of product disparagement, favoring instead the ordinary meaning of "disparage." *Compare id.*, *with BSO*, 545 N.E.2d at 1159.

As the foregoing illustrates, *Knoll* is consistent with the Massachusetts SJC's ruling in *BSO*; *QSP* is not. The *Knoll* court, like the SJC in *BSO*, interpreted the policy by reference to ordinary usage, refusing to read the legal definition of the tort of "product disparagement" into the policy. *Compare Knoll*, 152 F.Supp.2d at 1035, *with BSO*, 545 N.E.2d at 1159. The *QSP* court did just the opposite. *Compare QSP*, 773 A.2d at 918, *with BSO*, 545 N.E.2d at 1159. Because the *Knoll* court employed the same approach as the SJC's in *BSO* to find a duty to defend, the decision in *Knoll* illustrates that a court faithfully applying the SJC's ruling in *BSO* would conclude that the *Modesto* complaints plead an offense covered by the policies, therefore triggering GAIC's duty to defend. This result is also entirely consistent with the SJC's conclusion in *Bagley v. Monticello Insurance Co.*, that "[i]t is the *source* from which the plaintiff's personal injury originates rather than the specific theories of liability alleged in the complaint which determines the insurer's duty to defend." *Bagley*, 720 N.E.2d at 817 (emphasis added). As set forth above, *BSO* makes clear that the Massachusetts Supreme Judicial Court would find GAIC obligated to defend Riso against the *Modesto* litigation, and this Court should rule accordingly. This is "especially so given that [GAIC] chose to remove this action from state court." *Dash*, 2004 U.S. Dist. LEXIS 17309, at *35; *accord Porter*, 913 F.2d at 40-41; *Kassel v. Gannet Co., Inc.*, 875 F.2d 935, 950 (1st Cir. 1989) (observing, "If plaintiff, fully chargeable with knowledge of the decided [state court] cases, nonetheless chose to reject a state-court forum in favor of a federal forum, he is in a perilously poor position to grumble when [the federal court] follow[s] existing state precedent").

## V. CONCLUSION

For the foregoing reasons, Riso respectfully requests that this Court find and declare that GAIC had a duty to defend Riso in the *Modesto* litigation and that in failing to discharge that duty, GAIC breached the subject policies.

> RISO, INC.
>
> By its attorneys,
>
> /s/ Martin C. Pentz
> Martin C. Pentz (BBO# 39405)
> Jeremy A. M. Evans (BBO# 661048)
> FOLEY HOAG LLP
> 155 Seaport Boulevard
> Boston, MA 02210-2600
> (617) 832-1000

Dated: August 18, 2005