LEXSEE 2004 US DIST LEXIS 17309

**GLEN DASH, Plaintiff, v. CHICAGO INSURANCE COMPANY, Defendant.**

**CIVIL ACTION NO. 00-11911-DPW**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

**2004 U.S. Dist. LEXIS 17309**

**August 23, 2004, Decided**

**SUBSEQUENT HISTORY:** Amended by, Judgment entered by Dash v. Chi. Ins. Co., 2004 U.S. Dist. LEXIS 20682 (D. Mass., Oct. 18, 2004)

**DISPOSITION:** [*1] Court found Plaintiff entitled to $844,550.93 in defense costs and $578,327.09 in indemnity costs. Judgment was entered.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Chicago Insurance Company, Counter Claimant: David A. Grossbaum, LEAD ATTORNEY, Cetrulo & Capone LLP, Boston, MA.

For Glen Dash, Plaintiff: Alice Olsen Mann, LEAD ATTORNEY, Law Office of Alice Olsen Mann, P.C., Boston, MA.

For Chicago Insurance Company, Defendant: Maura K. McKelvey, LEAD ATTORNEY, Cetrulo & Capone LLP, Boston, MA.

For Glen Dash, Counter Defendant: Alan G. Miller, LEAD ATTORNEY, Alan G. Miller, Boston, MA.

**JUDGES:** DOUGLAS P. WOODLOCK, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** DOUGLAS P. WOODLOCK

**OPINION:**

MEMORANDUM AND ORDER

On June 8, 2001, a jury in Middlesex Superior Court found plaintiff Glen Dash liable to his former employer Intertek Testing Services N.A., Inc. ("Intertek") for, inter alia, legal malpractice. The parties later settled the suit, and the judgment against Dash was satisfied.

Dash brought this action in state court against Chicago Insurance Company ("Chicago"), with whom Dash had a professional liability insurance policy, alleging that Chicago breached its duty to defend and indemnify Dash in the underlying Intertek suit. Chicago [*2] removed the action to this court and the parties then moved for summary judgment. At a hearing on the summary judgment motions, I ruled orally that Chicago had a duty to defend Dash in the Intertek suit but reserved the issues of defense cost allocation and indemnity costs.

The parties have conducted additional discovery and submitted the matter for trial as a case stated on the papers leaving to me resolution of any factual disputes. This Memorandum constitutes my findings and conclusions on the merits, pursuant to Fed. R. Civ. P. 52. In this connection, I incorporate a more extensive statement of reasons for my oral summary judgment ruling that Chicago breached its duty to defend Dash in the Intertek suit.

**I. Background**

**A. Insurance Policy**

On December 11, 1997, Chicago issued a one-year renewal of Dash's professional liability insurance policy (the "Policy") for a continuation of coverage from March 1, 1998 through March 1, 1999. Exhibits by Chicago Insurance, Docket No. 33, Ex. ("Chicago Ex.") F. In the renewal application, which he submitted on around December 4, 1997, Dash indicated, by checking "yes" next to questions, [*3] that he was employed full time with "an employer other than a law firm," n1 and that he spent "less than 25% of [his] time in private practice." Chicago Ex. D, at 1. n2

> n1 The question stated parenthetically that one who works full time for a law firm is not eligible for coverage.

> n2 In his original application for coverage, dated February 18, 1997, Dash provided a breakdown by hours of the weekly time devoted to working for his employer (40 hours) as compared to being "engaged in the independent practice of law

('Moonlighting')" (5 hours), and he accordingly calculated that 12.5% of his weekly work hours were spent "moonlighting." Chicago Ex. D, at 2.

The Policy provided a maximum of one million dollars n3 of coverage for "Damages for Claims ... made against the Insured ... arising out of any negligent act, error, omission or Personal Injury in the rendering of or failure to render Professional Services by the Named Insured." Chicago Ex. E, at 2. The Policy further stated that "[Chicago] shall have [*4] the right and duty to defend any suit against the Insured seeking Damages to which this insurance applies even if any of the allegations of the suit are groundless." Id.

> n3 The Policy's claim limits were $1,000,000 per claim and $1,000,000 in the aggregate. Chicago Ex. F.

The Policy contained several exclusions, only two of which are relevant to this case: Exclusion A barred claims made "based on or arising out of the rendering of or failure to render Professional Services by any insured by an insured as an employee, ... or officer of ... [a] corporation or other business enterprise." Id. at 4. Exclusion I precluded claims "based on any negligent act, error, omission or Personal Injury in the rendering of or failure to render Professional Services by the Insured for his employer." Id. at 5.

**B. Intertek Litigation and Chicago's Denial of Coverage**

In September 1998, Intertek filed a first amended complaint in Middlesex Superior Court in the matter Intertek Testing Services NA, Inc. [*5] , and Testing Holdings USA, Inc. v. Glen Dash, et al., No. 98-903 (Mass. Sup. Ct.), adding Dash as a defendant. Chicago Ex. A. The complaint alleged a total of thirty-one counts against four individuals, including Dash, n4 and a corporation, Curtis-Straus LLC. Id. Nine of the counts implicated Dash, with eight exclusively against him and one against all defendants. n5 Id.

> n4 The other individual defendants named in the complaint were James Lewis, Jon Curtis, and John Perry, all former employees of Intertek.

> n5 The eight counts against Dash were for breach of contract (Count I), breach of covenant of good faith and fair dealing (Count V), breach of fiduciary duty (Count IX), conversion of trade secrets (Count XVI), inducement to breach fiduciary duty (Count XXI), intentional interference with contractual relations (Count XXV), misrepresentation (Count XXIX), and legal malpractice (Count XXX). The claim against all defendants was for unfair trade practices (Count XXXI). Chicago Ex. A.

The amended [*6] complaint alleged the following background facts: In 1991, Inchcape Testing Services (USA), Inc. ("Inchcape") n6 purchased the stock of two companies, Compliance Design, Inc. ("Compliance") and Dash, Straus & Goodhue ("DSG"). Id. P 13. Prior to the acquisition, Dash was a significant shareholder and officer of both Compliance and DSG, and following it, he became General Counsel and Vice President of Research and Development for Inchcape. Id. PP 13, 15. Ultimately, Compliance, DSG, and Inchcape merged into Intertek, id. P 11, and Dash served as General Counsel of Intertek until March 15, 1996. Id. P 165.

> n6 Intertek's first amended complaint refers to Inchcape as "Inchcape Inspection & Testing Services (USA), Inc."

One of the eight counts in the amended complaint alleged exclusively against Dash was for legal malpractice. As the basis for this claim, the amended complaint alleged:

> As plaintiff's General Counsel, Dash breached his duty of loyalty to the company and/or his ethical obligations [*7] to the company and failed to execute the proper degree of care by, among other things, assisting defendant Curtis-Strauss LLC, a competitor, providing financing for that entity, removing or assisting the removal from plaintiff's files of the non-compete agreements signed by defendants Curtis and Lewis, causing copies of plaintiff's confidential documents to be sent to him for use by third parties, and revealing confidences and secrets of the plaintiff.

> During and immediately following the period he served as plaintiff's General Counsel, Dash breached his duty of loyalty to the company and/or his ethical obligations to the company by, among other things, misrepresenting and/or failing fully to disclose his involvement with Curtis-Strauss and his knowledge of Curtis-Straus's activities. n7

Id. PP 167-68. n8

n7 The correct spelling is "Straus," according to a press release issued by Curtis-Straus. Exhibits to Defendant Chicago's Opposition to Dash's Motion for Partial Summary Judgment, Ex. A.

n8 On around June 23, 1999, Intertek filed a Second Amended Complaint, which joined Intertek's parent corporation, Testing Holdings USA, Inc. ("Testing Holdings"). Chicago Ex. B. The legal malpractice count remained essentially identical as between the first and second amended complaints.

[*8]

On September 17, 1998, Carolina Avellaneda, counsel for Dash, sent a letter, along with a copy of the Intertek amended complaint, to Chicago to notify it of an insurance claim arising out of the legal malpractice allegations against Dash. Chicago Ex. C. According to the letter, the legal malpractice claims against Dash "allegedly stem[med] from Mr. Dash's tenure as in-house counsel for Intertek from mid-1994 through March 1996." Id.

On September 25, 1998, Chicago answered Avellaneda by disclaiming coverage for any of Intertek's claims against Dash. Chicago Ex. G. Chicago stated in the letter that as asserted in the Intertek amended complaint, "all of the allegations relative to Mr. Dash arise from his services as an executive employee" and that as a result, they fell within Exclusions A and I. Id. Thus, Chicago stated that the Policy provided no coverage for the Intertek matter and it therefore would not provide Dash with a defense, nor would it "indemnify or hold [Dash] harmless for any adverse judgment, award or compromise." Id.

On March 8, 2000, Alan Miller, counsel for Dash in the present case, sent Chicago a letter requesting that it reverse its [*9] decision to deny Dash coverage for the legal malpractice allegations. Miller's letter stated that Exclusions A and I of the Policy were inapplicable because, among other reasons, the allegations

> specifically include[] acts which took place "... following the period he served as Intertek's General Counsel ..." Clearly, Exclusions A and I can not apply to acts or omissions which followed the termination of Mr. Dash [sic] employment with Intertek. Such exclusions cannot be applicable to wrongful acts committed after the termination of the employment relationship. The allegations contained in [the legal malpractice count] describe certain acts or omissions which took place at a time when Intertek was not Dash's employer. Inasmuch as the damages alleged in said Count cannot be segregated by time period, the exclusionary language cited in your letter is ineffective to bar coverage for Mr. Dash.

Chicago Ex. H, at 2.

Chicago responded with a letter dated March 23, 2000, in which it restated its reasons for denial of defense in the Intertek suit:

> According to exclusion (A), there is no coverage for claims arising out of the rendering of Professional Services [*10] by an Insured as an employee of a corporation. Clearly, the complaint arises out of Mr. Dash's activities while he was an employee of Intertek. There would be no complaint but for the fact that Mr. Dash was employed by Intertek.

Chicago Ex. I, at 2.

### C. The Intertek Judgment and Settlement

In May 2001, the Intertek litigation went to trial before a jury in Middlesex Superior Court. The court instructed the jury that to prove its legal malpractice claim against Dash, Intertek had to prove three elements by a preponderance of the evidence: that (1) Dash had an attorney-client relationship with Intertek; (2) Dash was negligent; and (3) Dash's negligence was a substantial contributing factor in causing some amount of loss to Intertek. Chicago Ex. FF, at 22. As to the first element, the court stated, in part:

> Generally, when an attorney resigns as a counsel to a corporation, as Mr. Dash did effective March 15, 1996, the attorney-client relationship ends on the effective date of the resignation. Once an attorney-client relationship ends, the only duty relevant to this case that continues beyond the end of that relationship is the duty to be truthful with [*11] a former client who makes a direct inquiry about a matter that the attorney handled for the client during the course of the attorney-client relationship.

Id. at 23-24. The court went on to explain that in addition to a continuing duty from a pre-existing attorney-client relationship, the jury could find that a new, implied attorney-client relationship was formed between Dash and Intertek after Dash resigned:

> However, beyond this limited continuing

Case 1:04-cv-12260-GAO Document 19-2 Filed 08/18/2005 Page 4 of 14

Page 4
2004 U.S. Dist. LEXIS 17309, *11

duty to a former client, Intertek argues that there was also an implied attorney-client relationship that continued after March 15, 1996 and existed during conversations between Intertek officers and Mr. Dash after that date. An attorney-client relationship may be implied when (1) a person seeks legal advice or assistance from an attorney, (2) the legal advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired legal advice or assistance. For there to be an implied attorney-client relationship in this case after March 15, 1996, you must find that Intertek sought legal advice from Mr. Dash as to matters [*12] that he had previously handled as an attorney or that were the kind of matters that he had handled as an attorney, and that Mr. Dash gave advice regarding these matters that a reasonable person, considering the totality of the circumstances, would have understood to be legal advice. There cannot be an implied attorney-client relationship if the attorney, before or while giving advice, expressly declares he is not acting as the client's attorney with respect to such advice or that the advice he is rendering is not legal advice.

Id.

Two of the special verdict questions posed to the jury concerned the legal malpractice claim against Dash: "Was Mr. Dash negligent as an attorney for Intertek?"; and (if he was negligent) "Was Mr. Dash's negligence as an attorney a substantial contributing factor in causing some amount of injury to Intertek?". Chicago Ex. GG, at 3. On June 8, 2001, the jury returned its verdict, answering "Yes" to both questions. The jury additionally found that Dash had breached his fiduciary duty as an officer of Intertek and that he had breached a restrictive agreement with Testing Holdings. Chicago Ex. GG, at 3-4. As to damages, the jury found that Dash's [*13] legal malpractice caused Intertek to lose $740,000 of net profits in 1996 dollars. n9 Id. at 8.

n9 The question in the special verdict slip was: "What is the amount of net profits in 1996 dollars that Mr. Dash's legal malpractice caused Intertek to lose?". Chicago Ex. GG, at 8.

On July 25, 2001, the court entered judgment against Dash, ordering him to pay Intertek $520,000 plus prejudgment interest for the breach of contract claim. Chicago Ex. JJ. The court entered a non-cumulative judgment against Jon Curtis on the breach of contract claim for $350,000 plus prejudgment interest. It additionally ordered Dash to pay Intertek $1,580,000 plus prejudgment interest for the legal malpractice and breach of fiduciary duty claims. Id. In total, the jury verdict against Dash for all the claims against him, including prejudgment interest, was $3,060,693.94. n10

n10 Dash prevailed on a counterclaim against Testing Holdings in the amount of $250,000 plus prejudgement interest of $216,741.62. Chicago Ex. II.

[*14]

On October 19, 2001, Intertek and Testing Holdings filed a notice of satisfaction of judgment with the court, indicating that the judgment entered against Dash on July 25, including interests and costs, had been satisfied in full. Chicago Ex. KK. Under the parties' settlement agreement, Dash and Curtis agreed to pay Intertek and Testing Holdings $2,000,000 in full satisfaction of the judgement, and the parties released all claims, damages, and judgments in connection with the Intertek action. The Parties' Joint Stipulation of Agreed Facts, P 89. As a result of the settlement, Dash ultimately paid Intertek and Testing Holdings $1,700,000, and Curtis paid the two companies $300,000. Id. PP 90-91. The parties did not, however, allocate the settlement amount among the specific claims for which Dash and Curtis had been found liable. Id. P 92. Curtis-Straus reimbursed Dash for his legal fees and costs ($ 473,550.42) and expert fees ($ 9,079.80) for a total of $482,630.22. Id. P 95.

**D. The Present Action**

On July 11, 2000, in the midst of the Intertek litigation, Dash initiated the instant action in Middlesex Superior Court. Dash filed a First Amended Complaint [*15] on September 18, 2000, and Chicago removed the case to federal court on September 21, 2000.

Dash's First Amended Complaint alleges three claims: 1) declaratory relief that the claims alleged in the Intertek litigation are covered under the Policy; 2) breach of contract; and 3) breach of the duty of good faith and fair dealing. n11 Chicago has counterclaimed for declaratory judgment to establish that the Policy does not cover the Intertek claims.

n11 On January 25, 2002, more than three weeks after the close of discovery, Dash moved to amend his complaint to reintroduce a Mass. Gen.

Laws ch. 93A claim that he alleged in his original complaint but had abandoned in his First Amended Complaint. I declined to permit the resurrection of that claim at such a late juncture.

On cross-motions for summary judgment, the parties sparred primarily over whether under the Policy Chicago had the duty to defend Dash in the Intertek litigation and whether Chicago had a duty to indemnify Dash for the judgment against [*16] him resulting from that litigation. On May 8, 2002, I held a motion hearing on the cross-motions, and at the hearing, I orally denied Chicago's motion. I also allowed Dash's motion as to the issue of duty to defend, finding that under the Policy and given the Intertek complaint, Chicago breached its duty to defend Dash in the Intertek litigation. I deferred all remaining issues to give the parties the opportunity to develop the record more fully and for further briefing on remaining issues.

There are two central issues presently before me, now fully-developed following further discovery, additional briefing, and a trial on the merits as a case stated: The first concerns whether Dash's defense costs for the Intertek litigation should be allocated between covered and non-covered claims under the Policy, and if so, the appropriate allocation determination. The second involves determining the portion of the Intertek legal malpractice judgment against Dash, if any, for which Chicago must indemnify Dash.

After revisiting my finding that Chicago breached its duty to defend Dash in the Intertek suit to develop more fully my oral ruling, I address the defense cost allocation [*17] and indemnity issues in turn.

**II. Discussion**

**A. Duty to Defend**

Whether an insurer had an initial duty to defend is determined by "matching the third-party complaint with the policy provisions: if the allegations of the complaint are 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense." Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 439 Mass. 387, 394, 788 N.E.2d 522 (2003) (quoting Cont'l Cas. Co. v. Gilbane Bldg. Co., 391 Mass. 143, 146, 461 N.E.2d 209 (1984)). Thus, whether Chicago had a duty to defend Dash in the Intertek litigation depends on the specific language of the Policy, on the one hand, and the allegations of the Intertek complaint, on the other. n12

> n12 In addition to facts alleged in the complaint, the duty to defend is based on those facts which are known by the insurer. Ruggerio Ambulance Serv. v. National Grange Ins. Co., 430 Mass. 794, 796, 724 N.E.2d 295 (2000) (quoting Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 10-11, 545 N.E.2d 1156 (1989)). Chicago has not offered any such facts here, and thus the dispute in this case concerns whether the legal malpractice claim against Dash, as alleged in the Intertek amended complaint, is covered under the Policy.

Because Intertek's First Amended Complaint was the document Dash's counsel initially sent to Chicago as notification of Dash's insurance claim, I will consider that version of the complaint. In any event, as noted earlier, supra note 8, the Second Amended Complaint is identical in all relevant respects to the First Amended Complaint.

[*18]
In interpreting an insurance policy, traditional rules of contract interpretation govern construction of an insurance policy. Brazas Sporting Arms, Inc. v. Am. Enter. Surplus Lines Ins. Co., 220 F.3d 1, 4 (1st Cir. 2000). Thus, the language of the policy must be given its plain and ordinary meaning, and a court must "consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." Id. (quoting Trustees of Tufts Univ. v. Commercial Union Ins. Co., 415 Mass. 844, 849, 616 N.E.2d 68 (1993)).

Dash contends that the legal malpractice count in the Intertek complaint alleging that "during and immediately following the period he served as Intertek's General Counsel, Dash breached his duty of loyalty to the company" constituted a claim within the general coverage language of the Policy and thus triggered Chicago's duty to defend Dash in the suit. Chicago argues that while the general coverage language in the Policy encompasses the legal malpractice claim, Chicago had no duty to defend Dash in the Intertek suit because Exclusions A and I expressly disclaim coverage of the claim. Thus, the parties' disagreement [*19] centers on the applicability of Exclusions A and I to the legal malpractice count in the Intertek complaint.

Chicago bears the burden to prove that the exclusions apply. Mt. Airy Ins. Co. v. Greenbaum, 127 F.3d 15, 19 (1st Cir. 1997) (while the insured bears the initial burden of proving coverage under the policy, the insurer bears the burden of demonstrating that an exclusion applies). Moreover, while "words in exclusionary clauses of insurance contracts should be construed 'in their usual and ordinary sense,'" Bagley v. Monticello Ins. Co., 430 Mass.

454, 457, 720 N.E.2d 813 (1999) (quoting Liquor Liab. Joint Underwriting Ass'n of Mass. v. Hermitage Ins. Co., 419 Mass. 316, 320, 644 N.E.2d 964 (1995)), "exclusionary clauses must be strictly construed against the insurer ... and [] doubts created by any ambiguous words or provisions are to be resolved against the insurer." Camp Dresser & McKee, Inc. v. Home Ins. Co., 30 Mass. App. Ct. 318, 324, 568 N.E.2d 631 (1991); see Brazas Sporting Arms, 220 F.3d at 4.

Exclusions A and I, though similar, are not identical. Exclusion A states that the Policy does not apply to claims "based on or arising [*20] out of the rendering of or failure to render" legal services "as an employee." Chicago Ex. E, at 4. Exclusion I excludes claims "based on any negligent act, error, omission or Personal Injury in the rendering of or failure to render Professional Services by the Insured for his employer." Id. at 5.

The Intertek complaint plainly alleges that Dash's legal malpractice occurred "during and immediately following" Dash's termination of employment with Intertek. Chicago Ex. A P 168 (emphasis added). Dash thus contends that Exclusions A or I are inapplicable to the legal malpractice allegations because they concern, at least in part, the period after he left Intertek and during which he could not have been acting (or failing to act) "as an employee" or "for his employer." Chicago, on the other hand, argues that the allegations clearly fall within the exceptions because the legal malpractice claim arose out of Dash's employment with Intertek. Chicago contends that the duties and obligations contemplated in the malpractice allegations, even the portion pertaining to the period "immediately following" Dash's departure from Intertek, stemmed from Dash's employment with [*21] Intertek. In short, Chicago argues that the entire legal malpractice claim falls within the exclusions because there would be no claim "but for" the fact that Dash had been employed by Intertek.

In support of its interpretation, Chicago points out that the phrase "arising out of" generally is given broad scope when used in exclusionary clauses in insurance contracts. Bagley, 430 Mass. at 457 ("The phrase 'arising out of' must be read expansively, incorporating a greater range of causation than that encompassed by proximate cause under tort law."). Chicago also correctly notes that Massachusetts courts apply a "but for" test to determine whether a claim "arises out of" an act or failure to act. Id.

As an initial matter, however, Chicago ignores the fact that Exclusion I does not contain "arising out of" language but rather applies to claims "based on" acts done for an employer. In any event, Chicago's argument fails as a matter of plain construction. The object of the phrases "arising out of" and "based on" — and hence the source of the Intertek's alleged injury — is "the rendering of or failure to render Professional Services." Under Chicago's interpretation [*22] the inquiry would be whether there would be a claim but for Dash's employment relationship with Intertek. Such an interpretation, however, does not give due force to the "rendering of or failure to render Professional Services" language.

The more natural interpretation of the exclusions involves reading the "rendering" language in conjunction with the employment language; insofar as a "but for" test is appropriate, the relevant inquiry posed by the exceptions is whether there would be a claim but for the rendering of or failure to render professional services as an employee or for an employer. Thus, given that the phrases "as an employee" and for his employer" suggest a present tense construction, see Webster's Third New Int'l Dictionary 120, 886 (1986) (defining "as" as "in the role, function, [or] capacity ... of" and "for" as "in behalf of"), the exclusions apply to claims based on or arising out of Dash's actions (or failure to act) while an employee of Intertek.

Applying this to the Intertek claims, it is clear that the legal malpractice count against Dash, as alleged in the complaint with the "immediately following" language, at least potentially covered acts separate [*23] from any acts Dash committed while still employed with Intertek. As the First Circuit has held, "it is at least arguable ... that a lawyer's honoring of his continuing ethical duties ... is itself a 'legal service' the lawyer provides to his clients." Home Ins. Co. v. St. Paul Fire & Marine Ins. Co., 229 F.3d 56, 65 (1st Cir. 2000). While the ethical duties giving rise to the legal malpractice claim based on such legal services are continuing duties stemming from the lawyer's prior employment relationship, the same is not necessarily true of the conduct underlying the claim. The allegations in the complaint potentially encompassed claims rooted in Dash's ongoing ethical obligations to Intertek but nevertheless could also be read to have been based on conduct by Dash wholly separate from any rendering or failure to render legal services on the part of Dash while he was employed with Intertek. n13 See Bagley, 430 Mass. at 458 ("It is the source from which the plaintiff's personal injury originates rather than the specific theories of liability alleged in the complaint which determines the insurer's duty to defend." (quoting New England Mut. Life Ins. Co. v. Liberty Mut. Ins. Co., 40 Mass. App. Ct. 722, 727, 667 N.E.2d 295 (1996))). [*24]

> n13 Chicago implies that such a view unjustifiably broadens the scope of the insurance coverage. It notes that the Policy was a "moonlighting" policy that offered substantial coverage for a low premium. Because the Exclusions A and I barred

claims stemming from his employment, Chicago argues, Dash's moonlighting as a lawyer was inherently limited by his full-time employment with Intertek, thereby justifying the low premium from an underwriting perspective. Chicago thus contends that imposing a duty to defend the Intertek claims would undercut the purpose and underwriting rationale of the Policy. I disagree. Even under the interpretation I adopt, the exclusions by definition, apply to conduct for an employer or as an employee. As I interpret them, the claims fall under the Policy only insofar as they concern Dash's rendering or failure to render legal services after he left Intertek. Thus, while providing legal services to Intertek should be considered beyond the policy's coverage when Dash was still employed by Intertek is excluded, such services should be considered "moonlighting" after he left Intertek because at that time he was a full-time employee of Curtis-Straus.

**[*25]**

To give rise to a duty to defend, "the underlying complaint need only show, through general allegations, a possibility that the liability claim falls within the insurance coverage. There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage." SCA Servs. v. Transportation Ins. Co., 419 Mass. 528, 532, 646 N.E.2d 394 (1995) (emphasis added) (quoting Sterilite Corp. v. Cont'l Cas. Co., 17 Mass. App. Ct. 316, 319, 458 N.E.2d 338 (1983)); see also Simplex Technologies, Inc. v. Liberty Mut. Ins. Co., 429 Mass. 196, 199, 706 N.E.2d 1135 (1999). Accordingly, I find because the legal malpractice count alleged in the Intertek complaint at least contemplates a "rendering or failure to render" legal services by Dash separate from any such rendering of failure to render services he committed while an employee of Intertek, Exclusions A and I at least potentially did not apply. Thus, I conclude that Chicago had (and breached) a duty to defend Dash as to the Intertek legal malpractice claims. n14

> N14 Dash has offered the alternative argument that even under Chicago's interpretation the exclusions do not apply because the malpractice could have stemmed from an implied attorney-client relationship arising entirely after Dash left Intertek. Given my acceptance of Dash's primary argument, I need not fully address his alternative argument. However, I note that I question its persuasiveness. While the Intertek court's jury instructions included an implied attorney-client theory, which I discuss in the context of allocation, infra, there was no indication whatsoever in the Intertek complaint of such a theory. Moreover, the correspondence sent by Dash's attorney to Chicago made no mention of an implied attorney-client relationship. See Transamerica v. KMS Patriots, L.P., 52 Mass. App. Ct. 189, 194, 752 N.E.2d 777 (2001) (finding no duty to defend because insured failed to inform insurer of relevant facts). Thus, I am not persuaded there is a duty to defend on such a basis.

**[*26]**

### B. Allocation of Defense Costs

Ordinarily, the insurer has a duty to defend the entire lawsuit if it "has a duty to defend any of the underlying counts in the complaint." Liberty Mut. Ins. Co. v. Metro. Life Ins. Co., 260 F.3d 54, 63 (1st Cir. 2001); Mt. Airy, 127 F.3d at 19; see Aetna Cas. & Surety Co. v. Cont'l Cas. Co., 413 Mass. 730, 732 n.1, 604 N.E.2d 30 (1992); Palermo v. Fireman's Fund Ins. Co., 42 Mass. App. Ct. 283, 289, 676 N.E.2d 1158 (1997). Chicago argues, however, that this general rule does not—or at least should not—extend to actions, such as the present one, in which some or many of the claims in the underlying litigation were not even potentially covered by the insurance policy at issue.

Massachusetts courts have not definitively determined whether an insurer that has a duty to defend a covered, or potentially covered, claim must additionally defend claims alleged in the same suit which clearly are not covered. But in Aetna, the Massachusetts Supreme Judicial Court strongly suggested that it does:

> Although Massachusetts law does not yet provide an answer, the weight of authority places the duty to defend **[*27]** all counts on an insurer which has a duty to defend at least one count of a complaint, barring a contrary agreement with the insured.

413 Mass. at 732 n.1; see also Vappi & Co. v. Aetna Cas. & Sur. Co., 348 Mass. 427, 430 n.3, 204 N.E.2d 273 (1965) (noting in dicta that "relevant decisions indicate ... that, until [insurer], during its defence of [insured], narrowed the claims to those seeking 'a recovery that the policy did not cover,' [insurer] was not relieved from its obligation to defend"). Additionally, the Massachusetts Appeals court has implied the same. See Palermo, 42 Mass. App. Ct. at 290 ("It was [the insurer's] duty to defend all of the counts in the [] complaint."). n15

n15 In Palermo, insureds with a homeowners policy covering "damages because of bodily injury or property damages ... caused by an occurrence" requested coverage in a suit alleging, inter alia, negligence, nuisance, malicious prosecution, and breach of covenant. 42 Mass. App. Ct. 284 n.2. The insurer provided a partial defense, covering only the negligence claims, and it withdrew when those counts were dismissed on directed verdict. Id. at 285. In holding that the insurer breached its duty to defend, the Palermo court stated that the insurer's duty to defend extended to the nuisance claim because there was initially at least the possibility of coverage of such a claim under the policy. Id. at 289. Moreover, the court, without any further analysis, stated that the insurer was required to defend all of the counts in the complaint. Id. at 290.

[*28]

Chicago advocates the opposite rule, which would allow for the allocation of defense costs between covered and noncovered claims. Several courts outside of Massachusetts have adopted such a rule. n16 See Aerojet-General Corp. v. Transp. Indem. Co., 17 Cal. 4th 38, 70 Cal. Rptr. 2d 118, 948 P.2d 909 (Cal. 1998); Buss v. Superior Court, 16 Cal. 4th 35, 65 Cal. Rptr. 2d 366, 939 P.2d 766 (Cal. 1997); SL Indus., Inc. v. Am. Motorists Ins. Co., 128 N.J. 188, 607 A.2d 1266 (N.J. 1992); see also E.E.O.C. v. Southern Publ'g Co., 894 F.2d 785, 791 (5th Cir. 1990) (Mississippi law); Ins. Co. of N. Am. v. Forty-Eight Insulations, 633 F.2d 1212, 1224-25 (6th Cir. 1980) (Illinois and New Jersey law). For example, in allowing for defense cost allocation, the California Supreme Court in Buss stated that a duty to defend an action in its entirety does not arise contractually; rather, because insurance policies impose a duty to defend any action seeking damages for covered claims, and not for "an action simpliciter," n17 it follows that "the insurer has a duty to defend as to the claims that are at least potentially covered, but not as to those that are not." 939 P.2d at 775. [*29] Thus, the Buss court held that in a "mixed" action involving some claims that are potentially covered and some claims that are not even potentially covered, the insurer may seek reimbursement for defense costs. Id. at 776. I decline to adopt such a rule in this case.

n16 Chicago contends that the First Circuit, in Liberty Mutual, also endorsed such a rule as a matter of Massachusetts law. The court in that case stated:

Massachusetts courts have not expressly decided which party bears the burden of allocating defense costs, but when allocation generally falls on the insurer. This is certainly the rule as to allocation of indemnity costs, ... and this approach likely applies to defense costs, since the insurer should have been in a position to properly allocate both types of costs had it defended the lawsuit.

260 F.3d at 63 (citations omitted). The Liberty Mutual court, however, found that no duty to defend arose since none of the claims against the insured were even potentially covered. Consequently, the court's observation about the burden of defense cost allocation is dicta. Moreover, the court did not provide any basis for the underlying premise that defense cost allocation is appropriate in the first instance. Thus, I find Liberty Mutual to be, at best, equivocal support for Chicago's position; it certainly is not binding precedent for the position in the courts of Massachusetts or otherwise, especially under circumstances such as those here, where the insurer neglected to provide any defense whatsoever.

[*30]

n17 The Buss court noted that even if a particular policy's language were unclear as to this point, "the hypothetical insured could not have an objectively reasonable expectation otherwise." 939 P.2d at 775.

In advocating the rule adopted in Buss, Chicago misses a crucial point: it defaulted on its duty to defend. Buss rests on an assumption that the duty to defend has been undertaken. In Buss, the insurer fully defended the entire underlying action and sought reimbursement for the expenses it incurred in defending noncovered claims. Although it allowed the retroactive allocation between defense costs of covered and noncovered claims, the Buss court underscored the importance of imposing on an insurer the prospective duty to defend a "mixed" action in its entirety, even though such a duty was not contractually obligatory. The court stated:

We can, and do, justify the insurer's duty to defend the entire "mixed" action prophylactically, as an obligation imposed by law in support of the policy. To defend meaningfully, the insurer must defend immediately. [*31] To defend immediately, it must defend entirely. It cannot parse the claims, dividing those that are at least potentially cov-

ered from those that are not. To do so would be time consuming. It might also be futile ... The fact remains: As to the claims that are at least potentially covered, the insurer gives, and the insured gets, just what they bargained for, namely, the mounting and funding of a defense. But as to the claims that are not, the insurer may give, and the insured may get, more than they agreed, depending on whether defense of these claims necessitates any additional costs.

Id. at 775.

Here, by contrast, Chicago is not seeking reimbursement for costs it incurred in defending Dash against non-covered claims; rather, Chicago wholly defaulted on its duty to defend and seeks retroactively to apportion out the costs for non-covered claims in reimbursing Dash his defense costs. This case is therefore critically distinguishable from the line of cases permitting defense cost allocation because in most such cases the insurer actually fulfilled its obligation to defend the insured in the underlying action in its entirety. n18 In light of its breach as to Dash, Chicago's [*32] contention that a rule such as the rule adopted in Buss should be applied in this case loses much of its force.

> n18 Several cases, however, have allowed defense cost allocation even where the insurer defaulted on its duty to defend. See, e.g., Forty-Eight Insulations, 633 F.2d 1212 (6th Cir. 1980).

This is not to say that I am entirely unsympathetic to Chicago's argument. My finding of Chicago's duty to defend, after all, is based on the "possibility" that the legal malpractice claim as alleged was covered by the Policy, and that claim was the only one out of eight alleged against Dash in the Intertek action that was even potentially covered. Thus, Chicago's contention that it is disproportionate to impose upon it the costs of defending the entire action when only a slice of it was even contemplated by the Policy resonates to some degree. n19 Moreover, Chicago is inherently penalized by its breach of its duty to defend Dash insofar as it cannot now change decisions made by Dash's counsel [*33] in the Intertek matter that impact its ability to allocate defense costs between covered and non-covered claims. n20 While it is only fair that Chicago bear such negative consequences of its breach, see Palermo, 42 Mass. App. Ct. at 290, there are arguably ways to recalibrate equities to account for Chicago's breach that are less harsh than treating defense costs as non-allocable. n21

> n19 Dash identified $92,374.85 of the $844,550.93 he spent on defense fees as tasks involving the legal malpractice claim. Parties' Joint Stipulation of Agreed Facts P 93. Dash now disputes that these were the only costs incurred in defending the legal malpractice claim, but his only basis for disputing the $92,374.85 figure is his generalized contention that all of the allegations against him in the Intertek litigation "required the full participation of [his] attorneys in defense of the lawsuit." Dash's Supplement to the Facts Disputed by the Parties Ex. Q, at 2. In other words, Dash implies that defending the legal malpractice claim was essentially coterminous with providing the defense to all the claims against him. This is unpersuasive, especially given Dash's ability to specify the $92,374.85 figure in his initial interrogatory responses. Were I to conclude that Chicago is entitled to an allocation of defense costs, I would hold Dash to the $92,374.85 figure.

[*34]

> n20 Courts which allow defense cost allocation generally place the burden of proof of allocation with the insurer. See, e.g., Buss, 939 P.2d at 778. Thus, to the extent Dash's counsel did not carry out a defense in a manner amenable to allocation, Chicago would not be able to carry such a burden.

> n21 For instance, the breach of its duty to defend could merely implicate the level of proof required of Chicago in demonstrating allocation. See Morgan, Lewis & Bockius LLP v. Hanover Ins. Co., 929 F. Supp. 764, 770 (D.N.J. 1996) (noting that other courts require a "greater degree of certainty" than the New Jersey Supreme Court in allocation of defense costs).

However, as noted above, Massachusetts courts have unambiguously adopted the broad rule that an insurer has a duty to defend an entire suit in which any claim is even potentially covered. There is no reason to assume that in establishing such a rule the courts failed to anticipate the possibility of "mixed" cases or have otherwise not fully contemplated the consequences of the rule. n22 Thus, even were I [*35] to accept the rationale of cases such as Buss, there is no basis for a federal court, sitting in diversity, to carve a backwards-looking limitation out of well-established Massachusetts Supreme Judicial Court precedent. See Daigle v. Maine Med. Ctr., Inc., 14 F.3d 684, 689 (1st Cir. 1994) (noting that a federal court is "absolutely bound by a current interpretation of that law formulated by the state's highest tribunal"). This is espe-

cially so given that Chicago chose to remove this action from state court, see Porter v. Nutter, 913 F.2d 37, 41 (1st Cir. 1990) ("[A] litigant ... who deliberately 'chose to reject a state-court forum in favor of a federal forum ... is in a perilously poor position to grumble' about our stodginess." (quoting Kassel v. Gannett Co., 875 F.2d 935, 950 (1st Cir. 1989))). Moreover, because this case does not present the more straight-forward claim of an insurer seeking reimbursement for costs incurred in defending noncovered claims but rather involves an insurer looking to limit its liability for breaching its duty to defend, allowing for defense cost allocation would create a substantial caveat to Massachusetts [*36] law as it presently exists. Under these circumstances, I find that Chicago is not entitled to apportion defense costs as between claims covered and not covered under the Policy. n23

> n22 While Buss represents the majority rule, a number of courts have adopted the opposite position. See Shoshone First Bank v. Pac. Employers Ins. Co., 2 P.3d 510 (Wyo. 2000); Jostens, Inc. v. CNA Ins./Cont'l Cas. Co., 403 N.W.2d 625 (Minn. 1987); Timberline Equipment Co. v. St. Paul Fire & Marine Ins. Co., 281 Ore. 639, 576 P.2d 1244 (Or. 1978); Bedoya v. Illinois Founders Ins. Co., 293 Ill. App. 3d 668, 688 N.E.2d 757, 228 Ill. Dec. 59 (Ill. App. Ct. 1997); J G Industries, Inc. v. National Union Fire Ins. Co. 218 Ill. App. 3d 1061, 578 N.E.2d 1259, 161 Ill. Dec. 613 (1991)J G Industries, Inc. v. National Union Fire Ins. Co. 578 N.E.2d 1259, 218 Ill. App. 3d 1061, 161 Ill. Dec. 613 (Ill. App. Ct. 1991); see also Riley Stoker Corp. v. Fidelity and Guar. Ins. Underwriters, Inc., 26 F.3d 581, 589 (5th Cir. 1994) (Louisiana law). Indeed, in Shoshone, the Supreme Court of Wyoming squarely rejected Buss. The Shoshone court enforced the literal terms of the insurance policy at issue there, stating that because the policy required the insurer to defend "in any suit" and not for specific claims and the policy did not distinguish between covered and non-covered claims, the insurer was contractually obligated to defend the entire action, including non-covered claims. 2 P.3d at 515.

[*37]

> n23 As a result, I do not reach the question of which party would carry the burden of proof of such allocation. Nor is it necessary to determine appropriate allocated defense costs (see supra note 19).

1. Defense Cost Amount

Dash claims $844,550.93 n24 in attorneys' fees, expert witness fees and other costs in the Intertek matter from September 11, 1998, when he was named a defendant in the amended complaint, through October 2001, when the notice of satisfaction of judgment was filed. Dash's Trial Memorandum, at 7. The parties do not dispute the reasonableness of the rates charged by Dash's counsel as compared to similarly-sized firms and by lawyers with similar legal experience, expertise, and reputation. Joint Stipulation of the Parties on Hourly Rates.

> n24 Dash originally claimed $864,550.93 but later subtracted $20,000 for time spent preparing expert testimony related to his counterclaim. Dash's Trial Memorandum, at 7.

[*38]

Chicago argues, however, that the rates are not reasonable because they exceed rates counsel Chicago would have retained had it defended Dash in the Intertek suit. Chicago bases this assumption on the fact, not disputed by Dash, that a large number of legal malpractice cases are defended by lawyers who carry out defense work for insurance companies and charge a lower rate. n25 Aside from being entirely speculative both as to what Chicago would have done and as to whether Dash's fees could properly have been limited to rates customarily charged by insurance company counsel, Chicago's arguments are unfounded. Having breached its duty to defend and removed itself completely from the Intertek matter, Chicago cannot now, after the fact, object to Dash's choices regarding his defense counsel. Dash was entitled to seek counsel he felt would best protect his interests, and I find no reason to question his decision to have Gadsby and Hannah LLP represent him or the rates the firm charged in doing so.

> n25 The parties agree that the firms typically charge $130-170/hour for associates and $200/hour for partners; Gadsby and Hannah LLP, Dash's counsel, by comparison, charged hourly rates of $150-$ 220 for associates and $215-$ 375 for partners to Dash in for the Intertek matter. Joint Stipulation of the Parties on Hourly Rates.

[*39]

I therefore find that the rates Gadsby and Hannah LLP charged Dash to provide his defense in the Intertek litigation were reasonable, and accordingly, Dash is entitled to recover $844,550.93 in defense costs from Chicago.

Chicago argues that the defense cost amount should be offset by $482,630.22, the amount that Dash was reim-

bursed by Curtis-Straus for legal fees, costs, and expert fees in the Intertek litigation. n26 While awarding Dash the full amount of defense costs here admittedly would, at least in the short term, amount to a partial double recovery for Dash, the appropriateness of such a windfall is not properly implicated in this case. n27 This case concerns only the dispute between Dash and Chicago, and on that score, I have concluded that Dash is entitled to full reimbursement for his defense costs. Attempting to recalibrate the defense cost amount by factoring in Curtis-Straus's payment to Dash is unwarranted given that Curtis-Straus is not a party to this litigation, and moreover, it would be inappropriate given the absence of details concerning the payment in the trial record.

> n26 Dash does not dispute the amount. The Parties' Joint Stipulation of Agreed Facts P 95.

**[*40]**

> n27 The recovery of fees and costs from Curtis-Straus, however, is in dispute. In an action brought by Dash presently pending in Middlesex Superior Court, Dash, et al. v. Straus, et al., No. 02-1369 (Mass. Sup. Ct.), defendants Isidor Straus, Jon Curtis, James Lewis, and Curtis-Straus LLC have counterclaimed against Dash for reimbursement of the amounts Curtis-Straus paid for Dash's defense fees and costs in the Intertek action. The Parties' Joint Stipulation of Agreed Facts P 96.

Finally, I note that Dash is entitled to prejudgment interest on the defense costs. In a diversity case, prejudgment interest is considered substantive law and is therefore governed by state law. Commercial Union Ins. Co. v. Walbrook Ins. Co., 41 F.3d 764, 775 (1st Cir. 1994). The applicable statute is Mass. Gen. Laws ch. 231, § 6C, which states:

> In all actions based on contractual obligations, upon a verdict, finding or order for judgment for pecuniary damages, interest shall be added by the clerk of the court to the amount of damages, at the contract rate, **[*41]** if established, or at the rate of twelve per cent per annum, from the date of the breach or demand.

Here, given my finding that Chicago breached its duty to defend to Dash in the Intertek litigation, § 6C applies on its face, and because no interest rate is specified in the Policy, n28 the statutory twelve percent prejudgment interest rates applies.

> n28 The only mention of prejudgment interest in the Policy is in an endorsement which states that "prejudgment interest, where payable where payable under this policy, will be in addition to the limits of liability stated in the declarations." The Parties' Joint Stipulation of Agreed Facts P 133.

Additionally, while Chicago can be said to have breached its duty to defend in September, 1998 when it disclaimed defense coverage for Dash in the Intertek litigation, the Massachusetts Supreme Judicial Court has interpreted § 6C for cases such as this to provide prejudgment interest that is calculated on the basis of the dates on which the legal bills were **[*42]** paid, not calculated from the date of the breach as the literal language of the statute indicates. Sterilite Corp. v. Continental Casualty Co., 397 Mass. 837, 842, 494 N.E.2d 1008 (1986); see also Santos v. Chrysler Corp., 430 Mass. 198, 218, 715 N.E.2d 47 (1999). Thus, I conclude that under § 6C Dash is entitled to the twelve percent prejudgment rate applied to the amounts and dates of actual payments. n29

> N29 It appears unlikely that there will be any dispute as to the amounts of payments Dash made for defense costs or the dates on which he made them. The matter has not been presented to me for resolution; consequently, no prejudgment calculation as to defense costs can be determined at this juncture. I assume the parties will be able to agree upon such a calculation in light of the Sterilite formula I adopt above.

**C. Duty to Indemnify**

The duty to indemnify is "narrower in scope and distinct from the duty to defend." Home Ins. Co., 229 F.3d at 66; Travelers Ins. Co. v. Waltham Indus. Labs. Corp., 883 F.2d 1092, 1099 (1st Cir. 1989). **[*43]** While the duty to defend is based on allegations in the complaint, the duty to indemnify "is determined by the facts, which are usually established at trial." Travelers Ins., 883 F.2d at 1099. Thus, while Chicago is liable to Dash for all defense costs, it is only liable for the judgment as to the legal malpractice claim. Because Chicago defaulted on its duty to defend Dash, it bears the burden of proof in allocating the judgment between the covered and noncovered claims. See Polaroid Corp. v. Travelers Indem. Co., 414 Mass. 747, 764, 610 N.E.2d 912 (1993) ("An insurer that wrongfully declines to defend a claim will have the burden of proving that the claim was not within its policy's coverage.").

It is undisputed that the jury in the Intertek case found Dash liable for legal malpractice in the amount of $740,000 which resulted in a total judgment of $1,042,245.45 once prejudgment interest was factored in. While the settlement between the Intertek parties, resulting in a payment by Dash of $1,700,000, did not allocate between the various counts on which Dash was found liable, Dash does not dispute that applying to the settlement a ratio based on the proportion of the legal malpractice [*44] judgment to the total judgment against him is appropriate. n30 Thus, I find that Dash paid $578,327.09 in satisfaction of the legal malpractice claim of the Intertek judgment.

> n30 Dash does dispute, however, that $3,060,693.94, the total judgment awarded by the Intertek court against him, is the appropriate figure to be used in determining the ratio. Dash argues that the $300,000 Curtis paid toward the settlement should be subtracted from the $3,060,693.94 because the awards against him and Curtis were non-cumulative and joint and several. I see no basis for such a subtraction because the relevant ratio is between his liability under the legal malpractice judgment and his total liability, wholly aside from whether Curtis was jointly or severally liable. Otherwise, the ratio would have to be applied to the total $2 million dollar settlement.
>
> Dash also argues he is entitled to prejudgment interest for the legal malpractice jury verdict calculable by multiplying the ratio of prejudgment interest for the legal malpractice award to the total judgment by the $1.7 million settlement amount. This, however, would double count the prejudgment interest for the legal malpractice award since the $578,327.09 figure was derived using total judgment amounts, which include prejudgment interest.

[*45]

Chicago has submitted a substantial amount of evidence from the underlying Intertek litigation in an attempt to demonstrate that none of the judgment on the legal malpractice claim against Dash was covered under the Policy. Chicago argues that the evidence demonstrates the utter lack of any basis for a jury finding of a separate, implied attorney-client relationship between Dash and Intertek, which was formed subsequent to Dash's departure from Intertek in March 1996. Chicago concludes that on a standard somewhat akin to a directed verdict standard, I can, and should, determine that the Intertek jury's determination that Dash had committed legal malpractice could not, as a matter of law, have been based on any conduct except conduct implicating Exclusions A and I.

As an initial matter, Chicago's argument fails because it has not established that extrinsic evidence can be used to demonstrate coverage (or lack thereof) where a jury's special verdict did not adequately distinguish between covered and noncovered conduct. Chicago points to no case law which endorses use of extrinsic evidence; indeed, existing Massachusetts case law on the issue indicates that such use is not appropriate [*46] in this context. In Palermo, the court stated:

> An insurer who unjustifiably refuses or fails to defend its insured, even in good faith, assumes the consequential risks of that breach of its insurance contract. Those risks not only include liability for the amount of the judgment reflecting claims covered by the policy, but also extend to bearing the burden of proof with respect to apportionment of a judgment between claims that were covered by the policy and claims that were not covered.

42 Mass. App. Ct. at 290. The court thus held the insurer responsible for the entire judgment against the insured, even though the judgment pertained to both covered and uncovered counts. The court further stated that

> such a result is eminently fair, since [the insurer] could (and should) have participated fully in the defense of the action against the [insured] under a reservation of rights; and "had [it] participated, and explained to the trial judge in the [] action [against the insured] the need for a verdict which would require the jury separately to state their findings as to liability and damages between the [covered and noncovered] claims, [*47] it is likely that the judge would have employed other special questions to accomplish that result."

Id. (quoting Liquor Liab., 419 Mass. at 323).

Similarly here, had Chicago satisfied its duty to defend Dash, it could have adequately protected against a judgment that did not sufficiently distinguish between covered and noncovered conduct. Having failed to do so, Chicago is bound by the judge's instructions to the jury and the jury's answers to the special questions in the Intertek action, which are the law of the case so long as they are not "patently incorrect." Hohenleitner v. Quorum Health Resources, Inc., 435 Mass. 424, 433, 758 N.E.2d 616 (2001) (noting that where no objection is made, a

special question posed to the jury becomes the law of the case so long as it is not "patently incorrect"). The special questions posed to the jury did not indicate the basis for the legal malpractice judgment, and Chicago cannot now retroactively partition the verdict with extrinsic evidence.

Even if Chicago is correct that use of extrinsic evidence is appropriate in the present context—and that I am to evaluate the jury verdict on a directed verdict standard—its [*48] arguments nevertheless fail. The only extrinsic evidence Chicago has presented pertains to the implied-attorney client relationship, but ruling out such a relationship still leaves intact a basis for the legal malpractice claim that is covered under the Policy. As noted above, see supra section II.A, the Intertek complaint provides a basis for legal malpractice that stems from Dash's continuing duties to Intertek as former general counsel which renders Exclusions A and I in applicable to the claim. Under First Circuit precedent, a lawyer owes a former employer ongoing ethical obligations which could result in malpractice liability based on conduct unrelated to any rendering or failure to render legal advice as an employee. See Home Ins. Co., 229 F.3d at 65. ("It is at least arguable ... that a lawyer's honoring of his continuing ethical duties ... is itself a 'legal service' the lawyer provides to his clients."). More importantly, the jury instructions clearly permitted such a basis for verdict against Dash as to the legal malpractice claim:

> Once an attorney-client relationship ends, the only duty relevant to this case that continues beyond the end [*49] of that relationship is the duty to be truthful with a former client who makes a direct inquiry about a matter that the attorney handled for the client during the course of the attorney-client relationship.

Chicago Ex. FF, at 23.

Thus, even assuming Chicago is correct that there was no basis for the jury to have found an implied attorney-client relationship between Dash and Intertek, the jury could nevertheless have found Dash liable for legal malpractice based on conduct covered by the Policy. Chicago has adduced no evidence as to allocation between that basis for liability and the uncovered basis—namely, Dash's conduct while still employed at Intertek. Thus, I find Chicago liable for the legal malpractice judgment against Dash and conclude that it has failed to prove that any further allocation of the $578,327.09 amount is appropriate. Accordingly, I find that Dash is entitled to $578,327.09 as indemnification for the legal malpractice judgement in the Intertek suit. Because the sum of this indemnity amount and the defense costs exceeds the $1,000,000 limit in the Policy, Chicago's total liability here will be $1,000,000 limit.

Finally, just as Dash is entitled [*50] to prejudgment interest for defense costs, he can recover prejudgment interest on the indemnity amount running from the time of payment of the settlement with Intertek. See generally supra at 28-29. Because the actual date (or dates) Dash paid out the $1.7 million settlement amount is not in the record, I cannot here make a final determination as to the exact prejudgment interest amount. However, as with the prejudgment interest associated with the defense costs, see supra note 29, I will assume the parties will be able without court intervention to perform the necessary calculations.

### C. Other Damages

Dash is entitled to his attorney fees and costs in this action. Courts regularly award such fees and costs incurred where the insured has had to bear the cost of enforcing his right to a defense under the insurance policy. Rubenstein v. Royal Ins. Co., 429 Mass. 355, 358-59, 708 N.E.2d 639 (1999) (awarding attorneys fees where insureds brought action for declaratory judgment against insurer); Swift v. Fitchburg Mutual Ins. Co., 45 Mass. App. Ct. 617, 629 n.15, 700 N.E.2d 288 (treating attorneys fees and costs as damages for breach of the duty to defend). n31

> n31 In addition to the costs of defense and judgment (up to the claim limitation of $1 million), Dash also seeks damages under the Policy for time spent at the Intertek trial and his legal fees and costs related to the instant litigation. Under the Policy, Chicago must compensate Dash with Supplementary Payments for lost earnings up to $250 per day for each day that he is required to attend the trial in the suit against him, up to a cap of $5,000. Chicago Ex. E, at 4. Dash is presumably entitled to these payments, but he did not offer any evidence as to the number of days of trial or the amount of lost earnings caused by his attendance at trial. Consequently, I will not include any such costs in the judgment.

[*51]

### IV. CONCLUSION

For the reasons set forth more fully above, I find that Dash is entitled to $844,550.93 in defense costs and $578,327.09 in indemnity costs. Thus, I will direct the clerk to enter judgment for Dash for the $1,000,000 Policy limit, plus prejudgment interest pursuant to Mass Gen. Laws ch. 231, § 6C.

/s/

DOUGLAS P. WOODLOCK

UNITED STATES DISTRICT JUDGE