LEXSEE 2001 US DIST LEXIS 12019

OPEN SOFTWARE FOUNDATION, INC., and HEWLETT-PACKARD COMPANY, Plaintiffs v. UNITED STATES FIDELITY & GUARANTY COMPANY, Defendant

CIVIL ACTION NO. 98-11177-GAO

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

2001 U.S. Dist. LEXIS 12019; 2001-2 Trade Cas. (CCH) P73,425

August 16, 2001, Decided
August 17, 2001, Entered

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For OPEN SOFTWARE FOUNDATION, INC., HEWLETT PACKARD COMPANY, Plaintiffs: David A. Gauntlett, Gauntlett & Associates, Irvine, CA.

For OPEN SOFTWARE FOUNDATION, INC., HEWLETT PACKARD COMPANY, Plaintiffs: Stephen G. Hennessy, Robert M. Hynes, Corcoran, FitzGerald & Hennessy LLP, Milton, MA.

For UNITED STATES FIDELITY AND GUARANTY CO., Defendant: James S. Greenan, David M. Ostrander, Cooper, White & Cooper LLP, Walnut Creek, CA.

For UNITED STATES FIDELITY AND GUARANTY CO., Defendant: John Graceffa, Morrison, Mahoney & Miller, Boston, MA.

**JUDGES:** George A. O'Toole, Jr., DISTRICT JUDGE.

**OPINIONBY:** George A. O'Toole, Jr.

**OPINION:**

### MEMORANDUM AND ORDER

August 16, 2001

O'TOOLE, D.J.

The plaintiffs Open Software Foundation, Inc. ("OSF") and Hewlett-Packard Co. ("H-P") allege that the defendant United States Fidelity & Guaranty Co. ("USF&G") was obliged by the terms of insurance policies issued by it to assume the costs of defending a lawsuit brought against the plaintiffs by a third party, Addamax Corporation ("Addamax"). The complaint seeks a declaratory judgment to that effect, as well as damages in the amount of reasonable defense costs. USF&G contends its policies did not [*2] cover the Addamax claim and that its refusal to assume the defense of that suit was proper. Both sides have moved for summary judgment. After review of the voluminous filings by the parties and after hearing, I conclude that USF&G's policies did not provide coverage for the claims presented in the Addamax suit and, accordingly, the insurer's refusal to defend the suit on behalf of the plaintiffs was proper.

1. Background

OSF is a non-profit, Delaware membership corporation registered as a joint venture under the National Cooperative Research Act of 1984, 15 U.S.C. §§ 4301, *et seq.* It was organized in 1988 by seven computer hardware and software companies, including H-P, (its "Sponsors"), for the purpose of designing and marketing a UNIX-based multi-function software product for the computer industry, which became known as OSF/1. In addition to its Sponsors, OSF had approximately 300 "Members," which were businesses also involved in the computer hardware and software industry.

To find and develop technologies to be used in the OSF/1 product, OSF employed open competitions. OSF would invite submissions by issuing a Request for Technology ("RFT"), and [*3] after an evaluation process, which would include input from its Sponsors and Members, OSF would decide which technology to incorporate in OSF/1. In October 1989, OSF issued an RFT for security software that would satisfy certain stringent government standards. Two companies responded to the RFT: Addamax and its main competitor, SecureWare, Inc. ("SecureWare"). After the evaluation process, in March 1990, OSF announced its selection of the SecureWare software for OSF/1.

On April 25, 1990, an attorney for Addamax wrote to OSF and complained that OSF's selection of SecureWare's product for inclusion in OSF/1, and the consequent exclu-

Case 1:04-cv-12260-GAO    Document 19-3    Filed 08/18/2005    Page 2 of 7

Page 2

2001 U.S. Dist. LEXIS 12019, *3; 2001-2 Trade Cas. (CCH) P73,425

sion of Addamax's product, was the result of a "buyers' cartel" among horizontal competitors — the Sponsors and Members of OSF. He argued that the arrangement constituted a combination in restraint of trade that *per se* violated section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1. On behalf of Addamax, the attorney threatened suit if the grievance could not be otherwise resolved.

About a year later, no resolution having occurred, Addamax commenced suit in this District against OSF, H-P, and Digital Equipment Corporation, another [*4] OSF Sponsor. The complaint summarized the claims being presented:

> This is an action to recover damages and obtain permanent injunctive relief against the Open Software Foundation, Inc. ("OSF"), Digital Equipment Corporation ("DEC"), and Hewlett-Packard Company ("H-P") for violations of federal and state antitrust laws, unfair trade practice law, and the common law of the Commonwealth of Massachusetts. . . . OSF acts as an illegal cartel through which its Sponsors . . . have illegally combined, contracted, or conspired to exercise their aggregate market power by, among other things, fixing prices for the software technology OSF acquires from software developers; setting a price ceiling in certain software markets; allocating product markets among the Sponsors; and boycotting certain independent software developers, including [Addamax]. The net effect, among others, of the defendants' activities has been and will be to unlawfully and unreasonably restrain trade, substantially lessen competition among purchasers of software, drive independent software developers out of business, and reinforce the strong market positions of OSF and its Sponsors.
>
> Addamax Compl., Civil Action [*5] No. 91-11152-C, P 1, at 1-2.

The complaint set forth nine counts, the first seven of which explicitly invoked either federal or state antitrust statutes. The eighth count asserted that the conduct of the defendants, as alleged in the foregoing parts of the complaint, constituted "unfair methods of competition and unfair or deceptive acts or practices" in violation of Mass. Gen. Laws ch. 93A, §§ 2 and 11 ("Chapter 93A"). Addamax Compl. P 100, at 29. The ninth count alleged that "by reason of the foregoing agreements, acts, practices, and conduct, including, but not limited to, the formation of OSF, its deal or die philosophy, and the selection of an OSF standard technology, OSF and its Sponsors, including H-P and DEC, have intentionally and improperly interfered with Addamax's actual contractual relations and prospective contractual relations." Id. P 104, at 29-30. As an example, Addamax alleged that a company that had contracted to purchase a license for Addamax's product refused to go ahead with its purchase as a direct result of OSF's selection of SecureWare as the source for OSF's standard security software. Id. P 105, at 30.

At all relevant times, OSF was insured under [*6] both primary and excess liability policies issued by USF&G. OSF did not tender the Addamax suit to USF&G for defense under the insurance policies until almost a year after it was brought. On March 5, 1992, OSF's corporate counsel wrote to USF&G's agent, noting that there had been some question whether any of the Addamax claims were covered by the policies, but that recent developments in case law seemed to indicate that there was coverage. Accordingly, OSF requested USF&G to take up the defense of the claims. The letter included an internal OSF memo that set forth a basis for considering the Addamax claims as falling within coverage provided under the policies for "unfair competition" arising out of an "advertising injury" or a "personal injury." On August 25, 1992, USF&G wrote to OSF, advising that it did not consider any of the claims to fall within the coverage furnished by the policies and declining to accept the tender of the defense.

OSF and H-P thereafter successfully defended the Addamax suit. See Addamax Corp. v. Open Software Found., 152 F.3d 48 (1st Cir. 1998); Addamax Corp. v. Open Software Found., 964 F. Supp. 549 (D. Mass. 1997); Addamax Corp. v. Open Software Found., 888 F. Supp. 274 (D. Mass. 1995). [*7] In 1998, while the case was still on appeal, OSF and H-P commenced this action.

2. Discussion

"It is axiomatic that an insurance company's duty to defend is broader than its duty to indemnify. . . . The duty to defend is based on the facts alleged in the complaint and those facts which are known by the insurer." Boston Symphony Orchestra v. Commercial Union Ins. Co., 406 Mass. 7, 545 N.E.2d 1156, 1158 (Mass. 1989). "The question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense. . . . Otherwise stated, the process is one of envisaging what kinds of losses may be proved as lying within the range of allegations of the complaint,

Case 1:04-cv-12260-GAO   Document 19-3   Filed 08/18/2005   Page 3 of 7

Page 3

2001 U.S. Dist. LEXIS 12019, *7; 2001-2 Trade Cas. (CCH) P73,425

and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy." Continental Cas. Co. v. Gilbane Bldg. Co., 391 Mass. 143, 461 N.E.2d 209, 212 (Mass. 1984) [*8] (quoting Sterilite Corp. v. Continental Cas. Co., 17 Mass. App. Ct. 316, 458 N.E.2d 338, 340-41 (Mass. App. Ct. 1984) (citations and footnote omitted). Further, "even where the complaint itself does not cast on the insurer a duty to defend, the insurer is so obligated if it knows or reasonably could ascertain facts that implicate such a duty." Swift v. Fitchburg Mut. Ins. Co., 45 Mass. App. Ct. 617, 700 N.E.2d 288, 293 (Mass.App.Ct. 1998) (citations and internal-quotations omitted).

The Addamax complaint principally asserts statutory antitrust claims which are plainly not covered — and which the plaintiffs do not seriously assert are covered — by the USF&G policies. Rather, the plaintiffs contend that two state law theories — unfair trade practices in violation of Chapter 93A and interference with business relations — state or "adumbrate" n1 claims falling within either of two coverage provisions when the complaint is read with extrinsic evidence that USF&G knew or reasonably could have ascertained when it declined to accept the defense of the case. Specifically, the plaintiffs argue that the Addamax claims fell within the scope of the policies' [*9] coverage for "personal injury" or "advertising injury." n2

> n1 The plaintiffs suggest the word "foreshadow" as a synonym for "adumbrate." That is possible in some contexts, but it does not accurately reflect the sense of Justice Kaplan's use of the word in the Sterilite formulation of the duty to defend. An alternate, and more apt, meaning of "adumbrate" is "to give a sketchy representation of; outline broadly, omitting details (there was only time to [approximately] the plan)" or "to suggest, indicate, or disclose partially and with a purposeful avoidance of precision (the meaning of the poem is *adumbrated* in its title)." **1 WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY** 30 (G.&C. Merriam Co., Chicago, 1981). See also, **RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY** 19 (New York 1992) ("to give a faint image or indication of; outline or sketch").

> n2 The terms of similar policies issued in subsequent years changed slightly, but those policies are not relevant since Addamax's claimed injury arose from events that occurred during the applicability of the policies discussed in the text. In any event, if an analysis of the modified terms were undertaken, it would undoubtedly come to the same result, because, for the reasons elaborated in the text, the unalterable fact is that the Addamax complaint was focused on antitrust claims, and not other possibly available defamation or unfair competition claims.

[*10]

A. Personal Injury Coverage

The primary policy in effect when OSF issued its "Security RFT" and when it selected SecureWare's product over Addamax's contained the following pertinent provisions regarding "personal injury" coverage:

> "Personal Injury" means injury arising out of one or more of the following offenses committed during the policy period:
>
>> (1) false arrest, detention, imprisonment, or malicious prosecution;
>>
>> (2) wrongful entry or eviction or other invasion of the right of private occupancy;
>>
>> (3) a publication or utterance
>>
>> (a) of a libel or slander or other defamatory or disparaging material, or
>>
>> (b) in violation of an individual's right of privacy; except publications or utterances in the course of or related to advertising, broadcasting, publishing or telecasting activities conducted by or on behalf of the named insured shall not be deemed personal injury.

OSF/H-P Compl., Ex. 1, Sec. II, Personal Injury and Advertising Injury Liability Coverage, P D.

Similarly, the umbrella policy providing excess insurance contained the following pertinent provisions regarding coverage for "personal injury:"

> (3) Personal Injury — [*11] means injury arising out of one or more of the following acts committed during the policy period:
>
>> (a) false arrest, detention or imprisonment, or malicious prose-

Case 1:04-cv-12260-GAO    Document 19-3    Filed 08/18/2005    Page 4 of 7

Page 4

2001 U.S. Dist. LEXIS 12019, *11; 2001-2 Trade Cas. (CCH) P73,425

cution, or

(b) the publication or utterance of a libel or slander or other defamatory or disparaging material or a publication or utterance in violation of an individual's right of privacy; except publications or utterances in the course of or related to advertising activities,

(c) wrongful entry or eviction, or other invasion of the rights of private occupancy or an occupant in possession, or

(d) discrimination based on race, religion, sex, age or national origin not committed by or at the direction of the Insured, provided insurance with respect thereto is permitted by law.

OSF/H–P Compl., Ex. 5, Sec. 2, Insuring Agreement, P 3.

The plaintiffs' argument is that the Addamax complaint could reasonably be understood to assert claims within this coverage because it asserted injury resulting, in the case of both the primary and excess policies, from the "publication or utterance" of "defamatory or disparaging material" about Addamax's security software. The Addamax complaint itself makes no reference **[*12]** to any "publication or utterance" by OSF or H–P about Addamax. The plaintiffs' theory is that the announcement that OSF had selected SecureWare over Addamax was an implicit disparagement of Addamax's product.

The logic of that argument is less than compelling, but more importantly, even if the mere announcement of the selection of one competitor over another could be understood as the "publication or utterance" of "defamatory or disparaging material" about the latter within the meaning of the policy, it is nonetheless plain that the Addamax complaint was not making any such claim for damages against OSF and H–P. The Addamax complaint did not claim, either explicitly or implicitly, that Addamax had been injured in its business because potential customers had been exposed to defamatory or disparaging information about Addamax issued by OSF or H–P and thus had been deterred from doing business with Addamax. There is not a word in the Addamax complaint even about the general topic of defamation or disparagement.

On the contrary, the Addamax complaint was that OSF, H–P and other Sponsors and Members themselves had combined illegally to deal only with the vendor they selected—SecureWare **[*13]**—and thus to fix prices, unlawfully "bundle" their security software with their main OSF/1 product, boycott Addamax, and otherwise conspire to shut off Addamax from business opportunities it would have had, but for their unlawful agreements in restraint of trade. For instance, the Addamax complaint alleged:

Addamax had a simple choice: to be the selected supplier and get a little money out of the market or not be selected and get no money out of the market.

Addamax Compl. P 24(a), at 8-9.

In other words, Addamax either had to deal with OSF on its terms or die. Because OSF, its Sponsors, and Members had the market power to implement their intent to make OSF/1 and its incorporated security technology the "industry standard," the selected trusted UNIX technology supplier and all other suppliers would be foreclosed from the market.

Id. P 24(b), at 9.

Moreover, Addamax alleged that its business injury was the consequence of the described unlawful combination in restraint of trade. For example, in the ninth cause of action, alleging interference with business relations, the Addamax complaint alleged:

As a result of the illegal agreements, acts, practices, **[*14]** and conduct of OSF and its Sponsors, including H–P and DEC, Addamax has been foreclosed from selling its B1st product to the more than 70 percent (70%) of the UNIX operating system market represented by OSF and its membership. Accordingly, Addamax has been injured in its business and property through the loss of millions of dollars in past, present, and future profits, by loss of customers and potential customers, by loss of goodwill, and by the prospective destruction of its business.

Id. P 107, at 30.

Apparently recognizing that the language of the complaint does not provide support for the argument for coverage, the plaintiffs urge that the complaint must be considered in conjunction with extrinsic information that was or

Case 1:04-cv-12260-GAO   Document 19-3   Filed 08/18/2005   Page 5 of 7

Page 5

2001 U.S. Dist. LEXIS 12019, *14; 2001-2 Trade Cas. (CCH) P73,425

could have been available to USF&G. However, the plaintiffs are unable to point to any extrinsic information available either as of the date of OSF's tender of the defense or as of the date of USF&G's declination that indicated that Addamax was making a claim for defamation or disparagement. The record does not indicate whether the April 1990 letter from Addamax's lawyer outlining its grievance was available to USF&G, but if it was, it would have confirmed [*15] the apparent gist of the complaint that was eventually filed: Addamax was making antitrust claims, not disparagement claims. The attorney's letter, like the complaint, contains not even a hint that Addamax was intending to pursue a defamation or product disparagement claim. In contrast, in Boston Symphony Orchestra, which OSF and H-P here want to rely on, the plaintiff in the underlying action had "adumbrated" a defamation claim in her demand letter, in which she identified damage to reputation as part of the injury she had suffered. See 545 N.E.2d at 1157-58.

The plaintiffs push the matter further, arguing that beyond whatever information was available at the time of the decision to decline coverage, USF&G had a duty to "investigate" that obliged it affirmatively to pursue further information — beyond the complaint and what the insured had otherwise provided — about what claims not readily apparent might be lurking in the Addamax complaint. Massachusetts law does not impose such an expansive continuing duty to investigate. It is true that the insurer may not confine its decision to the four corners of the complaint where it knows, or reasonably should know, [*16] of other facts that are relevant to the coverage question. See Boston Symphony Orchestra, 545 N.E.2d at 1158. But no case imposes on the insurer the duty to monitor a case as it develops or to pursue its own discovery program in order to find what the third-party claimant has left unexpressed — and unadumbrated — in the complaint.

The reason the law does not impose a duty to conduct any such on-going investigation is not to be kind to insurers — something the law hardly ever is — but to preserve a rule that is easy to apply and easy to enforce. The universe of information is defined: the task is to compare the allegations of the complaint against the terms of the policy, aided in cases of ambiguity by other information known or reasonably available, such as facts asserted in a demand letter. See Boston Symphony Orchestra, 545 N.E.2d at 1158-59.

The arguments in this case are much like those in Terrio v. McDonough, 16 Mass. App. Ct. 163, 450 N.E.2d 190 (Mass. App. Ct. 1983). In Terrio, as here, the defendant in the underlying action attempted to recharacterize the plaintiff's allegations in the hope of invoking insurance coverage. [*17] The plaintiff alleged an intentional tort, for which the policy provided no coverage, and the defendant attempted, without success, to convince the court that, despite what the plaintiff claimed, the evidence might eventually support his version of events, which was that the plaintiff's injury was the result of negligence, rather than intention. So here, OSF and H-P try to argue that Addamax was asserting a claim that Addamax itself never presented, either in its demand letter, in its complaint, or, as things turned out, in the presentation of the case to both the trial and appellate courts. Addamax conceived its case against OSF as an antitrust case, pled it as an antitrust case, and tried it as an antitrust case, with no reliance at all on any theory of commercial defamation or disparagement. As in Terrio, the attempted recharacterization must be rejected.

B. Advertising Injury

The primary insurance policy in effect at the time of OSF's announcement of the selection of SecureWare defined a covered "advertising injury" as follows:

> "Advertising Injury" means injury arising out of an offense committed during the policy period occurring in the course of the named insured's [*18] advertising activities, if such injury arises out of libel, slander, defamation, violation of right of privacy, piracy, unfair competition, or infringement of copyright, title or slogan.

OSF/H-P Compl. Ex. 1, § II, Personal Injury and Advertising Injury Liability Coverage, P D.

Similarly, the excess policy for the same period defined the coverage for "advertising injury" as follows:

> Advertising injury — means injury arising out of one or more of the following acts committed during the policy period by or for the Named Insured in any advertisement, publicity article, broadcast or telecast:
>
> (a) libel, slander or defamation;
>
> (b) infringement of copyright or of title or of slogan;
>
> (c) piracy or unfair competition or idea misappropriation under an implied contract;
>
> (d) invasion of the right of privacy.

Case 1:04-cv-12260-GAO     Document 19-3     Filed 08/18/2005     Page 6 of 7

Page 6

2001 U.S. Dist. LEXIS 12019, *18; 2001-2 Trade Cas. (CCH) P73,425

OSF/H-P Compl. Ex. 5, Sec. 2, Insuring Agreement, P 1.

There are two theories advanced for invoking this coverage. The first rests on the coverage for advertising injury caused by "defamation." As discussed in the context of "personal injury," Addamax's complaint did not state or adumbrate a claim based on defamation.

The second theory **[*19]** relies on the policies' use of the term "unfair competition" in the definition of "advertising injury." In a general sense, antitrust violations might be thought of as a species of "unfair competition" because they entail methods of competition that are illegal and thus unfair. On the other hand, the term "unfair competition" when used to denote a business tort is ordinarily taken to refer to conduct that causes confusion on the part of consumers. See, e.g., Model Jury Instructions, Business Torts Litigation 151-52 (ABA Section on Litigation, 3d ed. 1996). n3 This is the sense in which Massachusetts law ordinarily employs the term. See Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 489 N.E.2d 185, 191 (Mass. 1986) (stating that "the gravamen of an unfair competition claim is the likelihood of consumer confusion as to the source of the goods or services"). Further, Massachusetts courts construe the term "unfair competition" in a liability insurance policy not only to signify that common law tort, but also to distinguish it from the statutory cause of action for unfair business practices under Chapter 93A. See Smartfoods, Inc. v. Northbrook Prop. & Cas. Co., 35 Mass. App. Ct. 239, 618 N.E.2d 1365, 1368 (Mass. App. Ct. 1993). **[*20]** Given these interpretations, the term "unfair competition" as used in the USF&G policies is not ambiguous, and there is no call to apply the rule of construction that doubtful terms be construed in favor of the insured. It is hardly unreasonable for a drafter of an insurance policy, or any other instrument, to expect that a legal term used in the policy will be accorded the meaning that the courts have given it.

> n3 "An unfair competition claim may be premised on, but is not limited to, the following:
> (1) the simulation of advertising methods . . . .
> (2) deceptive comparative advertising practice . . . .
> (3) the appearance of business facilities . . . .
> (4) [a] product's shape or configuration . . . .
> (5) the use of similar corporate, business, and professional names . . . .
> (6) "trade dress". . . .
> (7) the dilution of goodwill of a trademark . . . ."
> Section 4.01[3], Unfair Competition (citations omitted).

Plainly, the Addamax complaint did not expressly assert a claim about customer confusion. **[*21]** It did present a claim for unfair business acts or practices under Chapter 93A, but that is a different claim, as a general matter, according to Smartfoods. Moreover, the Chapter 93A claim actually presented by Addamax was expressly based on the same conduct relied upon to support the several antitrust claims. See Addamax Compl. P 100, at 29 ("By the acts, practices, and conduct alleged above, OSF, and its Sponsors, including H-P and DEC, have engaged in unfair methods of competition and unfair or deceptive acts or practices . . . ."). There is no doubt that the Chapter 93A claim did not in any way suggest, or adumbrate, that Addamax was making a common law unfair competition claim. It is clear that the Addamax complaint had no claim that fell within the scope of the policies' coverage for advertising injury resulting from events of "unfair competition."

There is a separate, simple, and independently sufficient, reason for concluding that there was no coverage under the "advertising injury" provisions of the policies: The injury claimed by Addamax did not arise out of any "advertising activities" of OSF, as required by the primary policy, nor out of any "advertisement, publicity **[*22]** article, broadcast, or telecast," as required by the excess policy. The injury claimed by Addamax stemmed from the price-fixing, market-limiting buyers' cartel allegedly formed by Sponsors and Members of OSF. As noted in the context of the defamation/disparagement theory, there was simply no claim by Addamax for what OSF *said*, but rather for what it *did*. See, e.g., Miller Aff., Ex. 30, Addamax Trial Brief on Damages, at 2 ("As set forth herein, defendants caused Addamax's financial injury as a direct consequence of their anticompetitive conduct which excluded Addamax from the operating system level security software market.").

3. Conclusion

For the foregoing reasons, it is evident that the policies issued by the defendant USF&G did not afford coverage for the claims made by Addamax against the plaintiffs in the underlying antitrust action. USF&G properly declined to accept the tendered defense of that action, and it is not liable for the costs of defense. The defendant is entitled to a declaratory judgment to that effect and to judgment in its favor on the coercive counts.

It is SO ORDERED.

2001 U.S. Dist. LEXIS 12019, *22; 2001-2 Trade Cas. (CCH) P73,425

| | |
|---|---|
| 8/16/01 | George A. O'Toole, Jr. |
| DATE | DISTRICT JUDGE |

Case 1:04-cv-12260-GAO  Document 19-3  Filed 08/18/2005  Page 7 of 7

2001 U.S. Dist. LEXIS 12019, *22; 2001-2 Trade Cas. (CCH) P73,425

8/16/01  George A. O'Toole, Jr.
DATE  DISTRICT JUDGE