IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GREAT AMERICAN ALLIANCE INSURANCE COMPANY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>RISO, INC.<br><br>Defendant.<br><hr>RISO, INC.,<br><br>Plaintiff,<br><br>v.<br><br>GREAT AMERICAN INSURANCE COMPANY, et al.,<br><br>Defendants | Consolidated       04-12260-GAO<br>Civil Action Nos.   04-12397-GAO<br><br>Judge George A. O'Toole, Jr. |

**GREAT AMERICAN'S LOCAL RULE 56.1
STATEMENT OF MATERIAL UNDISPUTED FACTS**

Plaintiffs, Great American Alliance Insurance Company f/k/a American Alliance Insurance Company, Great American Assurance Company f/k/a Agricultural Insurance Company, Great American Insurance Company, and Great American Insurance Company of New York f/k/a American National Fire Insurance Company (collectively "Great American"), pursuant to Local Rule 56.1 for the District of Massachusetts, submit this

3971803v1

Statement of Undisputed Material Facts in support of their Motion for Summary Judgment against Defendant RISO, Inc. ("RISO").

### A. The Great American Policies

1. Great American issued certain commercial general liability and umbrella liability policies to RISO. True and correct copies of relevant parts of these policies are attached to the Affidavit of Richard H. Nicolaides, Jr. ("Nicolaides Aff.") as Tabs A through L, as indicated below.

2. Great American and RISO have agreed that the following primary commercial general liability policies ("the Primary Policies") are at issue in this dispute:

| Insurer | Policy Number | Policy Period | Nicolaides Aff., Tab |
|---|---|---|---|
| American National Fire Insurance Company | MAC 800-69-20-01 | 8/1/94 – 8/1/95 | A |
| Great American Insurance Company | MAC 800-69-20-02 | 8/1/95 – 8/1/96 | B |
| American National Fire Insurance Company | PAC 124-18-64-00 | 8/1/96 – 8/1/97 | C |
| American National Fire Insurance Company | PAC 124-18-64-01 | 8/1/97 – 8/1/98 | D |
| American National Fire Insurance Company | PAC 377-22-25-00 | 8/1/98 – 9/1/99[1] | E |
| American National Fire Insurance Company | PAC 377-22-25-02 | 9/1/99 – 9/1/00 | F |

3. Great American and RISO have agreed that the following umbrella liability policies ("the Umbrella Policies") are at issue in this dispute:

| Insurer | Policy Number | Policy Period | Nicolaides Aff., Tab |
|---|---|---|---|
| American National Fire Insurance Company | UMB 800-69-23-00 | 8/1/94 – 8/1/95 | G |
| Agricultural Insurance Company | UMB 800-69-23-01 | 8/1/95 – 8/1/96 | H |

---

[1] The policy period was extended from 8/1/99 to 9/1/99 by endorsement.

2

| Agricultural Insurance Company | UMB 124-18-67-00 | 8/1/96 – 8/1/97 | I |
| Agricultural Insurance Company | UMB 124-18-67-01 | 8/1/97 – 8/1/98 | J |
| American Alliance Insurance Company | UMB 377-22-28-02 | 8/1/98 – 9/1/99[2] | K |
| American Alliance Insurance Company | UMB 377-22-28-04 | 9/1/99 – 10/1/00[3] | L |

4. The Great American Policies reflect an address for RISO in Massachusetts and were issued through the broker, Marsh & McClennan, Inc., in Massachusetts. (Nicolaides Aff., Tabs A, B, C, D, E, F, G, H, I, J, K and L).

**B. The Personal Injury Insuring Agreements in the Great American Policies**

5. Only personal injury coverage is at issue in this action. A true and correct copy of RISO's Complaint in the instant action, without exhibits, is attached to Nicolaides Aff. as Tab M.

6. The only personal injury offense at issue is the offense of "publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." (Nicolaides Aff., Tab M).

7. The personal injury insuring agreement in the Primary Policies effective August 1, 1994 to August 1, 1996, provides in part:

> COVERAGE B. PERSONAL AND ADVERTISING
> INJURY LIABILITY
>
> 1. Insuring Agreement
>
>    a. We will pay those sums that the Insured becomes legally obligated to pay as damages because of

---

[2] The policy period was extended from 8/1/99 to 9/1/99 by endorsement.
[3] The policy period was extended from 9/1/00 to 10/1/00 by endorsement that reflects Policy No. UMB 377-22-28-05.

3

3971803v1

> "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages.
>
> \* \* \*

(Nicolaides Aff., Tabs A and B, p. 4).

8. The personal injury insuring agreement in the Primary Policies effective August 1, 1996 to September 1, 1999 is substantially similar to the personal injury insuring agreement in the Primary Policies effective August 1, 1994 to August 1, 1996, quoted above. (Nicolaides Aff., Tabs C, D and E, p. 5).

9. The Primary Policies effective August 1, 1994 to September 1, 1999 define "personal injury," in part, to mean:

> "Personal injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:
>
> \* \* \*
>
> d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; ...
>
> \* \* \*

(Nicolaides Aff., Tabs A and B, p. 13; Tabs C, D and E, pp. 14-15).

10. The personal injury insuring agreement in the Primary Policy effective September 1, 1999 to October 1, 2000 provides, in part:

> COVERAGE B. PERSONAL AND ADVERTISING
> INJURY LIABILITY
>
> 1. Insuring Agreement
> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. ...
>
> \* \* \*

4

3971803v1

(Nicolaides Aff., Tab F, p. 5-6).

11. The Primary Policy effective September 1, 1999 to September 1, 2000 defines "personal injury," in part, to mean:

> "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:
>
> * * *
>
> d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
>
> * * *

(Nicolaides Aff., Tab F, p. 15).

12. The personal injury insuring agreement in the Umbrella Policies effective August 1, 1994 to August 1, 1998 provides, in part:

> SECTION I – COVERAGE
>
> A. Insuring Agreement
>
> 1. We will pay those sums in excess of "underlying insurance" or the retained limit that the "Insured" becomes legally obligated to pay as damages because of "injury" caused by an "occurrence" to which this policy applies.
>
> 2. If there is no "underlying insurance" obligated to do so, we shall have the right and duty to defend any "suit" against the "Insured" seeking damages because of "injury," even if the allegations of the "suit" are groundless, false or fraudulent. …
>
> * * *

(Nicolaides Aff., Tabs G, H, I and J, p. 1).

13. The Umbrella Policies effective August 1, 1994 to August 1, 1998 define "injury" to include "personal injury," which is defined, in part, as:

> "Personal Injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

> \* \* \*
>
> 4. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
>
> \* \* \*

(Nicolaides Aff., Tabs G, H, I and J, p. 7).

14. The personal injury insuring agreement in the Umbrella Policies effective August 1, 1998 to October 1, 2000 provides, in part:

> INSURING AGREEMENTS
>
> I.  COVERAGE
>
> We will pay on behalf of the "Insured" those sums in excess of the "Retained Limit" that the "Insured" becomes legally obligated to pay by reason of liability imposed by law or assumed by the "Insured" under an "insured contract" because of "bodily injury," "property damage," "personal injury," or "advertising injury" that takes place during the Policy Period and is caused by an "occurrence" happening anywhere. ...
>
> \* \* \*

(Nicolaides Aff., Tabs K and L, p. 1).

15. The Umbrella Policies effective August 1, 1998 to October 1, 2000 define "personal injury," in part, to mean:

> "Personal injury" means injury other than "bodily injury" or "advertising injury" arising out of one or more of the following offenses during the policy period:
>
> \* \* \*
>
> 4. oral, written, televised, videotaped, or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
>
> \* \* \*

(Nicolaides Aff., Tabs K and L, p. 9).

### C. The Modesto Complaint

16. Modesto City Schools and Stockton Unified School District ("the Modesto Plaintiffs") filed a lawsuit against RISO, captioned *Modesto City Schools, et al. v. Riso Kagaku Corp., et al.*, Case No. CIV. S-99-2214, in the United States District Court for the Eastern District of California. A true and correct copy of the First Amended Complaint in the Modesto action is attached to Nicolaides Aff. as Tab N.

17. The Modesto Plaintiffs are two school districts located in California. (Nicolaides Aff., Tab N, ¶¶ 4-5).

18. The Modesto Plaintiffs charged RISO with violations of the Sherman Act, the Wilson Tariff Act and the Massachusetts Consumer Protection Act, based on RISO's unlawful restraints of trade and anti-competitive activities. (Nicolaides Aff., Tab N, Introduction).

19. The Modesto Plaintiffs alleged that RISO engaged in multiple restraints of trade and unfair methods of competition in connection with RISO's sale of services and supplies for its digital duplicator product, marketed under the trade name Risograph. (Nicolaides Aff., Tab N, ¶ 17).

20. The Modesto Plaintiffs alleged that RISO and its dealers "dominate the original equipment market for digital duplicators, and possess monopoly power in the market for Risograph parts." (Nicolaides Aff., Tab N, ¶ 48).

21. RISO and its dealers, "by their predatory and anticompetitive business practices, used their monopoly power in Risograph parts to restrict or eliminate competition in the Risograph services market, creating…a second monopoly in the separate Risograph service market …." (Nicolaides Aff., Tab N, ¶ 48).

3971803v1

22.   As a result of these and other unlawful restraints of trade and anticompetitive practices, RISO was able to charge "supracompetitive prices in the retail markets for Risograph services and supplies." (Nicolaides Aff., Tab N, ¶ 50).

23.   The Modesto Plaintiffs asserted four causes of action against RISO:

- Count I - Violation of Section 1 of the Sherman Act – Restraints of Trade in the Risograph Service Market;

- Count II - Violation of Section 1 of the Sherman Act – Restraints of Trade in the Risograph Supply Market;

- Court III - Violation of the Wilson Tariff Act – Restraints of Items in Foreign Trade and Commerce; and

- Count IV - Violation of the Massachusetts Consumer Protection Act by RISO's Unfair Methods Of Competition And Unfair And Deceptive Acts Or Practices.

(Nicolaides Aff., Tab N, ¶¶ 68-124).

24.   In Count II of their complaint, the Modesto Plaintiffs alleged that RISO engaged in multiple restraints of trade in the Risograph supply market that fell within three "well-established categories of conduct" prohibited by Section I of the Sherman Act: (1) tying arrangements, (2) territorial division and (3) concerted refusals to deal. (Nicolaides Aff., Tab N, ¶ 90).

25.   To demonstrate a "tying arrangement" in the supply market, the Modesto Plaintiffs alleged that RISO and its dealers combined and issued original product warranties that were void if the purchaser used anything other than RISO authorized supplies. (Nicolaides Aff., Tab N, ¶ 91).

26.   RISO and its dealers further conspired to create service agreements that were void if the contractors used unauthorized supplies. (Nicolaides Aff., Tab N, ¶ 91).

27. The only supplies RISO ever authorized to be used in its Risographs were "its own" RISO supplies. (Nicolaides Aff., Tab N, ¶¶ 96-97).

28. As a result, the "only way for Plaintiffs to ensure the continuing validity of their warranty and maintenance agreements" was for the Modesto Plaintiffs to use only RISO Risograph supplies. (Nicolaides Aff., Tab N, ¶ 97).

29. Another "coercive tactic of RISO and its dealers" alleged by the Modesto Plaintiffs related to certain warning stickers on RISO Risographs. The Modesto Plaintiffs alleged:

- A further coercive tactic or strategy of RISO and its dealers, in support of the tie between warranty service and supplies, is to place warning stickers on all Risographs telling customers to use only RISO manufactured supplies. This strategy, indiscriminately disparaging all non-RISO supplies, is designed to bolster the coercive effect of the warranty and maintenance agreement bans on the use of "unauthorized supplies." With the distribution of the warning stickers RISO has adopted a uniform policy to reinforce the "unauthorized supplies" warranty provisions and further conditions the warranties on the requirement that RISO owners use only RISO supplies. RISO directly threatens its school customers with the warning that if they use "non-RISO manufactured inks or masters" they may "cause serious damage to the ink cylinder and the Risograph" and in turn cause "repair or service problems not covered by [the] warranty or service agreement."

- The purpose of the warning labels is explained in a "RISO News Flash." This "News Flash," which is sent to all RISO dealers, instructs that warnings be placed on all Risographs where anyone installing supplies into the machines will necessarily notice the warning. The "News Flash" explains the purpose and intent behind the warning stickers:

    The use of these warning labels on your installed base and new

3971803v1

> machines is a step toward fighting the supply pirates and protecting both of our revenue streams.

(Nicolaides Aff., Tab N, ¶¶ 98-99).

30. The warning stickers were but "one part of a concerted strategy by RISO and its dealers to falsely disparage non-RISO inks and masters suitable for use in Risographs and thereby reinforce the tying arrangement between Risograph warranty service and use of Risograph inks and masters." (Nicolaides Aff., Tab N, ¶ 100).

31. As result of the unlawful tying arrangements and other restraints of trade set out in Count II of the *Modesto* complaint, the Modesto Plaintiffs sought injunctive relief and money damages from RISO. (Nicolaides Aff., Tab N, "Wherefore" Clause).

32. The disparaging statements the Modesto Plaintiffs alleged concerned RISO's competitors, other Risograph part suppliers, not the Modesto Plaintiffs. (Nicolaides Aff., Tab N).

33. Nowhere in Count II, nor anywhere else in the complaint, do the Modesto Plaintiffs allege that RISO committed any libel, slander or disparagement as to the Modesto Plaintiffs or their goods, products or services. (Nicolaides Aff., Tab N).

D. **RISO's Admissions in the Consolidated Actions**

34. Great American served Requests to Admit on RISO in this consolidated action. In Response to Great American's Requests to Admit, RISO admits that the Modesto Plaintiffs did not seek damages from RISO because of disparagement of the Modesto Plaintiffs or their goods, products or services. A true and correct copy of RISO's Responses to Great American' First Set of Requests to Admit is attached to Nicolaides Aff. as Tab O.

3971803v1

35. RISO further admits that it did not pay any money in settlement of the Modesto action to resolve a claim against RISO for disparagement of the Modesto Plaintiffs or their goods, products or services. (Nicolaides Aff., Tab O, Response 10).

36. Specifically, RISO admits the following facts, among others:

- In any complaint in the *Modesto* litigation, the Plaintiffs in the *Modesto* litigation did not allege that they were individually or collectively disparaged by RISO, or that any Plaintiffs goods, products or services were disparaged by RISO.

- In any complaint in the *Modesto* litigation, the Plaintiffs in the *Modesto* litigation did not allege that RISO made any oral or written statement about any Plaintiff, individually or collectively.

- In any complaint in the *Modesto* litigation, the Plaintiffs in the *Modesto* litigation did not seek damages from RISO because any Plaintiff, or any Plaintiff's goods, products or services, were disparaged by RISO.

- In any complaint in the *Modesto* litigation, the Plaintiffs in the *Modesto* litigation did not seek damages from RISO because RISO made any oral or written statement about any Plaintiff.

- With respect to the settlement of the *Modesto* litigation, no money was paid to resolve a claim against RISO for disparagement of any Plaintiff, individually or collectively, or any Plaintiff's goods, products or services.

(Nicolaides Aff., Tab O, Responses 6, 7, 10, 11 and 14).

E. **The Western Duplicating Action**

37. Unlike in the Modesto action, where a complaint alleges that RISO made disparaging statements about the underlying plaintiff, Great American has agreed to defend RISO. Great American defended RISO in such a suit filed by one of its competitors, *Western Duplicating, Inc. v. RISO, Inc., et al.*, Case No. CIV S-98-0208,

3971803v1

filed in the United States District Court for the Eastern District of California ("the Western Duplicating action"). A copy of the Second Amended Complaint in the Western Duplication action is attached to Nicolaides Aff. as Tab P.

38. Western Duplicating, Inc. ("Western Duplicating") sells ink and masters to owners of digital duplicators, including Risographs. (Nicolaides Aff., Tab P, ¶ 11).

39. Western Duplicating alleged that RISO violated the Lanham Act, which "prohibit[s] false and misleading statements and representations made by a defendant about the plaintiff's products or services." (Nicolaides Aff., Tab P, ¶¶ 136). Specifically, Western Duplicating alleged that:

> RISO, INC. and the dealer defendants have made false or misleading factual representations of the nature, characteristics, or qualities of plaintiffs' services and products. RISO, INC. and the dealer defendants used the false or misleading representations in commerce in order to sell aftermarket supplies and to impair Plaintiff's ability to sell aftermarket supplies. RISO, INC. and the dealer defendants made the false or misleading representations in the context of commercial advertising or commercial promotion.
>
> Plaintiff has been damaged by such false or misleading factual representations by RISO, INC. and the dealer defendants, which have cause plaintiff to lose sales of aftermarket supplies and to incur costs attempting to combat said misrepresentations.

(Nicolaides Aff., Tab P, ¶¶ 137-138).

40. Further, Western Duplicating alleged that RISO disparaged Western Duplicating's goods, products or services, stating that:

> ... service employees of RISO's branch offices in San Diego and Houston have falsely represented that use of Digifast supplies caused damage to Risographs and necessitated repairs and threatened to bill customers for any repairs if they continued to use Digifast products. Such representations cause the RISO maintenance agreements to

3971803v1

operate as *de facto* tying arrangement. As a result, plaintiff has been restrained from competing for sales of inks and masters.

\* \* \*

RISO and its dealers routinely disparage all non-RISO inks and masters, making blanket statements attributing any fault known to exist with any ink or master to all non-RISO inks and masters. These acts of product disparagement have a synergistic effect with the service threats used by RISO and its dealers.

The routine disparagement of all "generic" or "pirate" supplies include statements which are false and known to be false. ...

\* \* \*

Another strategy which RISO and its dealers employ is to place warning stickers in Risographs. These warning stickers from RISO, INC. lump all "generic" supplies together, intentionally failing to differentiate high quality aftermarket supplies from low quality supplies. These warning stickers falsely claim that the use of any non-RISO ink creates a risk of causing fires. ...

\* \* \*

Rather than being for the purpose of enhancing consumer welfare, the purpose and goal behind the most recent warning label is "fighting the supply pirates" and "protecting" the "revenue streams" of RISO and its dealers. The warning stickers have had their intended coercive effect. Plaintiff and other suppliers of aftermarket supplies have been disparaged and impaired in their ability to compete with RISO and its dealers in the supplies aftermarket as a result of these warnings stickers, which also enhance the effectiveness of explicit and implicit service threats.

(Nicolaides Aff., Tab P, ¶¶ 83, 85, 86, 88 and 90.)

                         Respectfully submitted,

                         GREAT AMERICAN INSURANCE COMPANY, GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, GREAT AMERICAN ASSURANCE COMPANY, and GREAT AMERICAN ALLIANCE INSURANCE COMPANY

                         By its attorneys,

                         /s/ [signature]

| | |
|---|---|
| Richard H. Nicolaides, Jr. | A. Hugh Scott (BBO#449160) |
| Mary F. Licari | Robert A. Kole (BBO#633269) |
| Sarah E. Eversman | CHOATE HALL & STEWART |
| BATES & CAREY LLP | 2 International Place |
| 191 N. Wacker Drive, Suite 2400 | Boston, MA 02110 |
| Chicago, IL 60606 | Tel: (617) 248-5000 |
| Tel: (312) 762-3210 | Fax: (617) 248-4000 |
| Fax: (312) 762-3200 | |

Date: August 18, 2005

v.3971803

I HEREBY CERTIFY THAT A TRUE COPY OF THE ABOVE DOCUMENT WAS SERVED UPON THE ATTORNEY OF RECORD FOR EACH OTHER PARTY BY MAIL/HAND ON: 8/18/05

/s/ [signature]

3971803v1