**FILED**

NOV 21 2000

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----ooOoo----

WESTERN DUPLICATING, INC.,

    Plaintiff,

    v.

RISO KAGAKU CORPORATION et
al.,

    Defendant.

NO. CIV. S 98-208 FCD GGH

MEMORANDUM AND ORDER

----ooOoo----

    This antitrust action is before the court on defendant Riso, Inc.'s ("Riso") motion to dismiss, or alternatively, for summary judgment,[1] and plaintiff **Western** Duplicating, Inc.'s ("Western") cross-motion for partial summary judgment.

**TIMING OF RISO'S MOTION FOR SUMMARY JUDGMENT**

    As a preliminary matter, Western contends that Riso's motion for summary judgment is premature since Riso has "stonewalled" discovery.  According to Western, (1) Riso supports its motion for summary judgment with documents Western requested, and Riso

---

    [1]   Defendant RPSI Enterprises dba Riso Products of Sacramento ("RPSI") joins in Riso's motion.

1

*345*

PL013679

1  refused to produce, and (2) on the date Western filed its
2  opposition, Riso had produced very few documents.  As a result,
3  Western contends that its ability to respond to Riso's motion is
4  greatly impaired.

5      Generally, summary judgment is not appropriate when the
6  nonmoving party has not had an adequate opportunity to conduct
7  any discovery.  "Rule 56(f) motions should be granted 'almost as
8  a matter of course' unless 'the nonmoving party has not
9  diligently pursued discovery of evidence.'"  _Wichita Falls Office_
10 _Assocs. v. Banc One Corp._, 978 F.2d 915, 919 n. 4 (5th Cir. 1992)
11 (quoting _International Shortstop, Inc. v. Rally's, Inc._, 939 F.2d
12 1257, 1267 (5th Cir. 1991)).  "Summary judgment is especially
13 inappropriate where the material sought is also the subject of
14 outstanding discovery requests."  _Visa Int'l Serv. Ass'n v._
15 _Bankcard Holders of Am._, 784 F.2d 1472, 1475 (9th Cir. 1986).

16     The court has reviewed the file and notes that Western has
17 been diligent in its pursuit of discovery.  Only limited
18 discovery was permitted prior to November 2, 1999.  Riso filed
19 the instant motion just two months later on January 14, 2000.
20 Since that time, Western and Riso have continued to do battle
21 over the production of documents.  In October 2000, however, Riso
22 produced 85 boxes of documents in response to Western's numerous
23 requests.  According to the magistrate judge's October 31, 2000
24 order on Western's motion regarding production of records and
25 other topics, that production was just the beginning.[2]

---

26
27    [2]    The court does not accept Western's accusation that
   Riso "stonewalled" discovery.  According to the magistrate
28 judge's order, Western propounded some 400 separate requests for
   production.  Order, filed Oct. 31, 2000, at 4.

2

PL 013680

1    Given the present state of discovery, and the need to
2  proceed with caution in summarily adjudicating a complex
3  antitrust action such as this, the court finds Riso's motion for
4  summary judgment premature, and denies the same without
5  prejudice.  The court likewise denies Western's motion for
6  partial summary judgment without prejudice.'  The parties' may
7  re-file their respective motions after the close of discovery.

8                         BACKGROUND

9    The facts set forth herein are drawn from Western's Second
10  Amended Complaint ("SAC").  Riso Kagaku Corporation ("RKC") is
11  one of three manufactures of digital duplicators in the world.
12  SAC ¶ 15.⁴  Its digital duplicators are known as "Risographs."
13  RKC also manufacturers parts and supplies, including ink and
14  masters, for use in Risographs, and markets these products in the
15  United States through its wholly-owned subsidiary Riso.  Id. ¶ 1.
16  Riso, in turn, markets the machines, parts, and supplies to end-
17  users primarily through a network of 240 authorized Riso dealers,
18  including defendant RPSI.  Id. ¶¶ 7, 8.  Riso also sells a
19  relatively small amount of product directly to end-users through
20  18 branch offices.  In addition to marketing Riso products, Riso
21  dealers also provide service, warranty and repair services to
22  Risograph owners.  Riso and its dealers enjoy a 65-75% share of
23  the digital duplicator market in the United States, and a 90%
24  share of the aftermarket for Risograph supplies.  Id. ¶¶ 24, 30,

25  ─────────────────────

26  [3]    The parties' respective objections to evidence are also
    denied without prejudice.
27
    [4]    RKC was dismissed as a defendant in this action for
28  lack of personal jurisdiction on July 23, 1999.

                              3

1  122.

2      Western sells ink and masters for use in digital
3  duplicators, including Risographs.  Id. ¶ 11.  Western sells ink
4  and masters directly to owners of digital duplicators, as well as
5  indirectly through distributors and dealers throughout the United
6  States.  Id.  Western began competing with Riso and its dealers
7  for sales of inks and masters sometime after January 30, 1994.
8  Id.

9      According to Western, Riso and its dealers unlawfully
10  conspired to exclude it from the aftermarket for ink and masters.
11  Id. ¶¶ 13, 14.  As detailed below, Western contends that Riso
12  uses its market power in the digital duplicator market to
13  prohibit its dealers from selling non-Riso supplies.  Id. ¶ 40.
14  Western further contends that Riso and its dealers leverage their
15  market power in the maintenance, service and repair aftermarket
16  to eliminate competition in the supplies aftermarket.  id. ¶¶ 14,
17  28, 30.

18      Following the entry of high quality competitive inks and
19  masters in late 1993 and 1994, Riso amended its dealer agreement
20  in April 1994 to prohibit its dealers from offering competitive
21  (non-Rise) inks and masters for use in Risographs, thereby
22  conditioning its dealers' ability to purchase Risographs upon
23  those dealers not offering competitive supplies.  Id. ¶ 34.  The
24  amended dealer agreement ("dealer agreement") likewise prohibits
25  terminated dealers from selling non-Riso products, thereby
26  conditioning terminated dealers' ability to purchase spare parts
27  necessary for service upon terminated dealers not offering
28  competitive supplies.  The dealer agreement further prohibits

4

1    Riso dealers from selling Riso products to anyone but end-users,
2    and provides that the warranty given to dealers does not cover
3    the cost of repairs or adjustments caused by parts, supplies,
4    repairs or maintenance services not authorized by Riso. Id.
5    Western contends that these restrictions threatened Riso dealers'
6    revenue streams because competitors could offer ink and masters
7    at prices significantly below Riso prices.  According to Western,
8    these restrictions provided Riso dealers with an incentive to
9    restrain trade and restrict competition in the sale of ink and
10   masters.

11       Western argues that once Riso provided its dealers with the
12   incentive, beginning in October 1994 and lasting to the present,
13   Riso and its dealers combined and conspired to eliminate
14   competition from "supply pirates" such as Western.  Id. ¶¶ 35,
15   52.  Specifically, Western alleges that Riso dealers agreed to
16   use "service threats" to coerce customers to use Riso ink and
17   masters and to spread fear, uncertainty and doubt (known as "FUD
18   marketing") in the minds of consumers in order to discourage them
19   from purchasing competitive ink and masters.  Id. ¶ 53.  Among
20   other things, Western contends that Riso produced "warnings"
21   concerning the use of non-Riso supplies and distributed them to
22   its dealers to pass-on to end-users.  Id. 86-89.  These warnings
23   state that use of non-Riso supplies may, among other things, harm
24   the Risograph, and damage caused by the use of non-Riso supplies
25   is not covered under the warranty.  Id. Western further alleges
26   that some Riso dealers, including RPSI, tell Risograph owners
27   that use of non-Rise supplies will void their warranties.  Id. ¶¶
28   72-74.

5

1    Western contends that these efforts have been, and continue
2  to be, successful because Riso and its dealers have monopoly
3  power over the service, maintenance and repair of Risographs.
4  Id. ¶ 55.   According to Western, this monopoly power exists
5  because Riso only sells spare parts to its dealers and terminated
6  dealers and prohibits them from selling the parts to anyone but
7  an end-users.   Thus, because of these restrictions, there are no
8  independent service organizations for Risographs, and because
9  there are no service options for most customers, "service
10 threats" and FUD marketing succeed in eliminating competition for
11 sales of ink and masters for use in Risographs.   Id. ¶ 55.

12    As a result of this conduct, Western alleges that it has
13 been excluded from selling competitive ink and masters for
14 Risographs.

15                    **ALLEGED VIOLATIONS**

16    Based on the above policies and practices, Western alleges
17 the following antitrust violations against Riso and RPSI: (1)
18 monopolization, attempting monopolization, and conspiracy to
19 monopolize the aftermarket for sales of ink and masters in
20 violation of § 2 of the Sherman Act; (2) illegal tying of
21 Risographs to dealer's agreement not to sell competitive ink and
22 masters in violation of §§ 1 and 3 of the Sherman Act; (3)
23 illegal tying of spare parts and service manuals to terminated
24 dealer's agreement not to sell competitive ink and masters in
25 violation of §§ 1 and 3; and (4) illegal group boycott in
26 violation of § 1.

27    In addition to violating antitrust laws, Western contends
28 that Riso and RPSI made misleading and false representations

6

1  concerning non-Riso products in violation of the Lanham Act, the
2  California Cartwright Act, Cal. Bus. & Prof. Code § 16600, and
3  the California Unfair Business Practices Act, Cal. Bus, & Prof.
4  Code § 17200, and intentionally interfered with Western's
5  contractual relations and prospective economic advantage.
6  Finally, Western contends that Riso violated Massachusetts
7  Protection Act, Mass. Gen. Laws ch. 93A.

8                            **STANDARD**

9      A complaint will not be dismissed under Fed. R. Civ. P.
10  12(b)(6) "unless it appears beyond doubt that plaintiff can prove
11  no set of facts in support of his [or her] claim that would
12  entitle him [or her] to relief." Yamaguchi v. Department of the
13  Air Force, 109 F.3d 1475, 1480 (9th Cir. 1997) (quoting Lewis v.
14  Tel. Employees Credit Union, 87 F.3d 1537, 1545 (9th Cir. 1996)).
15  "All allegations of material fact are taken as true and construed
16  in the light most favorable to the nonmoving party." Cahill v.
17  Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996).

18                            **ANALYSIS**

19  **1.   Market Power In Western's Proposed Product Markets**

20      In order to prevail on its conspiracy, monopolization,
21  attempted monopolization claims, and tying claims, Western must
22  show, among other things, that Riso possesses market power in the
23  relevant product markets.  Rebel Oil Co., Inc. v. Atlantic
24  Richfield Co., 51 F.3d 1421, 1444 (9th Cir. 1995) (market power
25  required for conspiracy to restrain trade); Eastman Kodak Co. v.
26  Image Technical Servs., Inc., 504 U.S. 451, 481 (1992)
27  (hereinafter "Kodak I") (quoting United States v. Grinnell Corp.,
28  384 U.S. 563, 570-71 (1966) (market power required for

PL013685

1  nonopolization); <u>Image Technical Servs., Inc. v. Eastman Kodak</u>
2  <u>Co.</u>, 125 F.3d 1195, 1202 (9th Cir. 1997) (hereinafter "Kodak II")
3  (market power required for attempted monopolization); <u>Datagate,</u>
4  <u>Inv. v. Hewlett-Packard Co.</u>, 60 F.3d 1421, 1423-24 (9th Cir.
5  1995) (market power in tying product required for tying claim[5]).
6        Monopoly power, commonly referred to as market power, is
7  "the power to control prices or exclude competition."  <u>Grinnell</u>
8  <u>Corp.</u>, 384 U.S. at 571 (quoting <u>United States v. E.I. du Pont de</u>
9  <u>Nemours & Co.</u>, 351 U.S. 377, 391 (1956)).  A plaintiff may
10 demonstrate market power either directly or circumstantially.
11 Direct evidence is "evidence of restricted output and
12 supracompetitive prices."  <u>Rebel Oil</u>, 51 F.3d at 1434.   "To
13 demonstrate monopoly power by circumstantial evidence, 'a
14 plaintiff must:  (1) define the relevant market, (2) show that the
15 defendant owns a dominant share of that market, and (3) show that
16 there are significant barriers to entry and show that existing
17 competitors lack the capacity to increase their output in the
18 short run."'  <u>Kodak II</u>, 125 F.3d at 1202 (quoting <u>Rebel Oil</u>, 51
19 F.3d at 1434).

20       Western claims that the relevant geographic market is the
21 United States, and the relevant product markets are:  (1) the
22 market for high speed digital duplicators ("original equipment
23 market");  (2) the market for warranty and maintenance service for
24 Risographs ("warranty and service aftermarket"); and (3) the
25 market for ink and masters ("supplies aftermarket").   SAC ¶ 14.
26

27        [5]      "A tying arrangement is a device used by a competitor
   with market power in one market (for the 'tying' product) to
28 extend its market power into an entirely distinct market (for the
   'tied' product)."  <u>Id.</u> at 1423.

8

PLO13686

1   Riso assumes, for purposes of its motion to dismiss only, that
2   Western's definitions of the relevant product markets and Riso's
3   share of the same, are correct.

4       **A.    Market Power In The Digital Duplicator Market**

5       Riso contends that dismissal is proper because Western
6   admits in its SAC that at least nine competitors have entered the
7   "digital duplicator market." While Western does allege that
8   competitors entered the digital duplicator market after Riso, it
9   also alleges that, despite the increasing demand, the number of
10  competitors is decreasing, and there have been no new
11  manufacturers of digital duplicators *since 1990*. Id. ¶ 25. In
12  other words, no competitor has entered the market in the past
13  decade. Western's allegations do not preclude a finding of
14  market power in the digital duplicator market as a matter of law.

15      Riso further contends that dismissal is proper because
16  Western alleges that competitors have expanded. Riso bases its
17  contention on Western's allegations that (1) Ricoh and Duplo
18  entered the market after Riso, and (2) "[a]t present, only Ricoh
19  and its dealer networks exist as a substantial competitor to RISO
20  and its dealers in the original equipment market." Id. ¶ 26.
21  According to Riso, the only inference to be drawn from these
22  allegations is that Ricoh and Duplo have increased their market
23  share by expanding their output and sales.

24      As set forth above, Western alleges that Ricoh and Duplo
25  entered the market prior to 1990. Assuming, as Riso apparently
26  does, that their respective market shares were zero upon entry,
27  their output has expanded. However, the expansion of output at
28  some unknown point during the past decade does not defeat

PLO13687

1  Western's current claim of market power.  Indeed, expansion may
2  have contracted over the past several years.  Accordingly,
3  Western's allegations do not preclude a finding of market power
4  in the digital duplicator market as a matter of law.

5        B.   **Market Power In The Aftermarket For Supplies**

6        Riso contends that dismissal is proper because Western
7  admits in its SAC that (1) competitors have entered the supplies
8  aftermarket, and (2) existing competitors do not lack capacity to
9  expand.  The latest date on which a competitor is alleged to have
10 entered the supplies aftermarket is "early 1994."  **Id. ¶¶ 32-33.**
11 (Competitors entering the market before the alleged predatory
12 conduct is said to have begun, does not establish the absence of
13 entry barriers.  See Rebel Oil, **51** F.3d at 1434.

14       Moreover, Riso's motion is directed solely at Western's
15 circumstantial proof of market power in the aftermarket for
16 supplies.  However, Western has alleged direct proof of market
17 power in this market.  Seed .  Western alleges that Riso
18 restricts output via its dealer agreement and that it charges
19 supracompetitive prices for its ink and masters.  SAC ¶¶ 34, 111.
20 Thus, Western has adequately alleged market power in the supplies
21 aftermarket.[6]

22 2.   **Contract, Combination or Conspiracy To Restrain Trade**
23       Section 1 of the Sherman Act reads in relevant part:
24

25       [6]     Although it is not altogether clear, Riso also appears
26 to contend that Western's claim that Riso monopolizes or attempts
   to monopolize the aftermarket for warranty and maintenance
   service is defeated by Western's allegations concerning entry
27 barriers in the supplies aftermarket.  As set forth above,
   Western's allegations do not defeat its claim that Riso has
28 market power in the supplies aftermarket.

                               10

1
2
3
4

> Every contract, combination in the form of trust or
> otherwise, or conspiracy, in restraint of trade or
> commerce among the several States, or with foreign
> nations, is hereby declared to be illegal. Every
> person who shall make any contract or engage in any
> combination or conspiracy hereby declared to be illegal
> shall be deemed guilty of a felony . . . .

5
6
7
8
9
10
11

15 U.S.C. § 1. To establish a claim under Section 1, Western must: (1) demonstrate the existence of a conspiracy; (2) that the conspiracy unreasonably restrained trade under either a per se rule of illegality or under a rule of reason analysis; and (3) that the restraint on trade affected interstate commerce. See Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1410 (9th Cir. 1991).

12
13
14
15
16
17
18
19
20
21

The conspiracy element of Section 1 limits the "application of the Sherman Act to concerted conduct by more than one person or single entity." Oltz v. St. Peter's Cmty. Hosp., 861 F.2d 1440, 1449 (9th Cir. 1988). To survive a motion to dismiss, a plaintiff must "allege the essential element of conspiracy" between two or more parties. See Smilecare Dental Group v. Delta Dental Plan of Cal., Inc., 88 F.3d 780, 786 (9th Cir. 1996). Section 1 does not proscribe purely unilateral activity by a single entity. United States v. Colgate, 250 U.S. 300, 307 (1919).

22
23
24
25
26

Riso moves to dismiss Western's claims brought pursuant to Section 1 on the ground that Western cannot rely on the restrictions contained in the Riso dealer agreement to support its conspiracy allegations because the dealer agreement was unilaterally amended by Riso to contain those claims.

27
28

"[A] contract between a buyer and a seller satisfies the concerted action element of section 1 of the Sherman Act where

11

the seller coerces a buyer's acquiescence in a tying arrangement imposed by the seller." Systemcare, Inc. v. Wang Laboratories Corp., 117 F.3d 1137, 1142 (10th Cir. 1997).  As the court reasoned in Systemcare, "[t]he essence of section 1's contract, combination, or conspiracy requirement in the tying context is the agreement, however reluctant, of a buyer to purchase from a seller a tied product or service along with a tying product or service.  To hold otherwise would be to read the words 'contract' and 'combination' out of section 1." Id. at 1142-43.'  As the Supreme Court noted in Perma Life Mufflers, Inc. v. International Parts Corp.:

> A plaintiff can clearly charge a combination between Midas and himself as of the day he unwillingly complied with the restrictive franchise agreements, or between Midas and other franchise dealers, whose acquiescence in Midas' firmly enforced restraints was induced by the communicated danger of termination.

392 U.S. 134, 142 (1968) (citations and quotation marks omitted), overruled on other grounds, Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984); see also Will v. Comprehensive Accounting Corp., 776 F.2d 665, 669-70 (7th Cir. 1985).

Western alleges, among other things, that Riso violated Section 1 of the Sherman Act by illegally tying (1) the sale of Risographs to its dealer's agreement not to sell competitive ink and masters, and (2) the sale of spare parts and service manuals to its terminated dealer's agreement not to sell competitive ink and masters.  SUF ¶¶ 40, 45.  According to Western, Riso coerces

---

[1]    Tying arrangements also include agreements in which the seller agrees to sell one product only on the condition that the buyer agrees not to purchase that product from any other supplier.  Image Technical Servs. v. Eastman Kodak Co., 903 F.2d 612, 615 (9th Cir. 1990).

12

1  its dealers to acquiesce in the agreement under threat of losing
2  their dealerships and its terminated dealers under threat of
3  losing their access to spare parts, and thus, the substantial
4  revenues they derive from servicing their installed equipment
5  base. Id. ¶¶ 40, 45, 51.  Western's allegations are sufficient
6  to allege a conspiracy under Section 1.

7      Moreover, Western does not limit its conspiracy allegations
8  to the restrictions contained in the dealer agreement.   Western
9  also alleges that Riso and its dealers conspired at the October
10 1994 Dealer Advisory Council Meeting to eliminate competition
11 from "supply pirates" such as Western.   Pursuant to that
12 conspiracy, Riso dealers allegedly agreed to use service threats
13 to coerce customers to use Riso inks and masters and to spread
14 fear, uncertainty and doubt in the minds of consumers to prevent
15 them from purchasing non-Riso inks and masters.   Id. ¶¶ 31-36.
16 Western's allegations concerning the agreements entered into at
17 the Dealer Advisory Council Meeting are sufficient to allege the
18 existence of a conspiracy to restrain trade.   Accordingly, Riso's
19 motion to dismiss Western's Section 1 claim is denied.

20 3.   **Restrictions In The Dealer Agreement**

21      A.   **Exclusive Dealing Arrangements**

22      Riso alternatively **moves** to dismiss Counts 1 and 3 on the
23 ground that the challenged restraints are not anticompetitive.
24 According to Riso, the challenged restraints are essentially
25 exclusive dealer arrangements.   While it is true that exclusive
26 distribution agreements, standing alone, do not violate the
27 antitrust laws, see A.H. Cox & Co. v. Star Machinery Co., 653
28 F.2d 1302, 1306-07 (9th Cir. 1981), Western contends that the

13

1   challenged provisions are not merely exclusive dealing
2   agreements, but illegal ties.[8]  Western also contends that the
3   restrictions are part of a scheme to restrain trade in the
4   aftermarket for supplies, and thus, constitute illegal exclusive
5   dealing arrangements.
6        An exclusive dealing contract involves a commitment by a
7   buyer to deal only with a particular seller, and is unlawful only
8   if it violates the rule of reason.  Morgan, Strand, Wheeler &
9   Biggs v. Radiology, Ltd., 924 F.2d 1484, 1488-90 (9th Cir. 1991).
10  "Only those arrangements whose 'probable' effect is to 'foreclose
11  competition in a substantial share of the line of commerce
12  affected' violate Section 3."  Omega Envtl., Inc. v. Gilbarco,
13  Inc., 127 F.3d 1157, 1162 (9th Cir. 1997) (quoting Tampa Elec.
14  Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961)).  In
15  assessing market foreclosure, the court must consider whether
16  competitors can reach the ultimate consumers of the product by
17  employing existing or potential alternative channels of
18  distribution.  Id. at 1163.  If so, the arrangements may not
19  actually foreclose competition.  Moreover, exclusive dealing
20  arrangements imposed on dealers rather than end users "are
21  generally less cause for anticompetitive concern." Id. at 1162-
22  63.  Relying on Omega, Riso argues that dismissal of Counts 1 and
23  3 is proper because alternative channels of distribution exist
24  and the challenged restrictions apply only to distributors, not
25  end-users.
26  _____

27       [8]     Tying and exclusive dealing are two distinct claims.
    See Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs., Inc., 637
28  F.2d 1376, 1388 (9th Cir. 1981).

14

PLO13692

1   Riso's argument fails to consider the additional alleged
2   restraints not present in Omega and their impact on Western's
3   ability to sell to ultimate consumers.  Even assuming Western can
4   reach ultimate consumers (Risograph owners), Western alleges that
5   the vast majority refuse to purchase its supplies for fear of
6   damaging their Risographs or invalidating their warranties.
7   Western contends that their refusal is the result of Riso's and
8   its dealers conspiracy to restrain trade in the supplies
9   aftermarket through the use of service threats and FUD marketing.
10  Riso's argument also fails to consider Western's allegation that
11  "[b]ecause RISO dealers control the servicing of Risographs,
12  selling through Riso dealers is a competitive necessity."  These
13  factors were present in in Omega.[9]  Accordingly,  Riso's motion to
14  dismiss Counts 1 and 3 is denied.

15      B.    Non-Price  Vertical  Restraints

16      Riso contends that the types of restraints contained in its
17  dealer agreement are routinely upheld because they have no
18  negative impact on competition.  Riso asks the court to review
19  the challenged restrictions in a vacuum, and to ignore the
20  remaining allegations contained in the Western's second amended
21  complaint.  As set forth above, Western contends that the
22  challenged restrictions motivate Riso dealers and terminated
23  dealers to engage in additional conduct aimed at eliminating
24  competition in the supplies aftermarket, including the use of
25  service threats and FUD marketing.  According to Western, it is
26  this entire scheme that damages competition.  Accordingly, Riso's

27

28      [9]    Western's allegation that it sells an undisclosed
        amount of ink and masters does not defeat its claims.

15

PLO13693

1  motion to dismiss Western's claims on the ground that Western

2  cannot establish that it has been harmed by any of Riso's dealer

3  restraints is denied.

4      C.   **Warranties**

5      To the extent that Western contends that Riso unlawfully

6  ties its warranty to the use of Riso parts, supplies and Riso-

7  authorized service, Riso moves to dismiss on the ground that

8  there is no tie.

9      Tying arrangements exist where the buyer is coerced into

10 buying the tied product, or at least agrees that he will not

11 purchase that product from any other supplier.   <u>Northern Pacific</u>

12 <u>Ry. Co. v. United States</u>, 356 U.S. 1, 5-6 (1958).

13          [T]he essential characteristic of an invalid tying
            arrangement lies in the seller's exploitation of its
14          control over the tying product to force the buyer into
            the purchase of a tied product the buyer either
15          did not want at all, or might have preferred to
            purchase elsewhere on different terms.   When such
16          "forcing" is present, competition on the merits in the
            market for the tied item is restrained and the Sherman
17          Act is violated.

18 <u>Jefferson Parish Hosp. Dist. No. 2 v. Hyde</u>, 466 U.S. 2, 12

19 (1984).

20     Western alleges, among other things, that the maintenance

21 agreements used by Riso's branch offices provide that customer's

22 will incur additional charges for "service made necessary by the

23 use of materials other than those approved by Riso, Inc. for use

24 in the Equipment." SAC ¶ 82.   Western also alleges that

25 employees of Riso's branch offices have "falsely represented that

26 use of [Western] supplies caused damage to Risographs and

27 necessitated repairs and threatened to bill customers for any

28 repairs if they continued to use [Western] supplies."   <u>Id.</u> ¶ 83.

16

PLO13694

1  According to Western, such representations cause the Riso
2  maintenance agreements to operate as de *facto* tying arrangements.
3  <u>Id.</u> A reasonable jury could conclude that the maintenance
4  agreement coupled with the alleged disparagement and threats
5  "forced" customers to purchase only Riso supplies.  Accordingly,
6  Riso's motion to dismiss plaintiff's tying claims insofar as they
7  involve Riso's warranty is denied.

8  3.    **Lanham Act**

9       Western claims that Riso violated the Lanhan Act by making
10 "false or misleading representations of the nature,
11 characteristics, or qualities of plaintiffs' [sic] services and
12 products." <u>Id.</u> ¶ 137.  Western identifies three allegedly false
13 or misleading statements in its second amended complaint.  First,
14 Western contends that Riso distributes a "WARNING" to its dealers
15 for distribution to Risograph owners which states that use of
16 generic supplies may (1) damage the "Riso Drum," (2) contaminate
17 the "Ink Drum Unit" or adjacent areas which house electronic
18 circuitry,  (3) cause premature failure of the "Thermal Head" and
19 related components,  (4) cause premature failure of the "Inking
20 System,"  (5) create a toxic environment, (6) result in fire, (7)
   result in termination of the 7 year/10 million copy warranty,  (8)
22 increase service contract pricing,  (9) result in termination of
23 any full coverage maintenance agreement,  (10) result in "High
24 User Hourly Service Rates," and (11) result in a "Complete Ink
25 Drum Cleanout Charge."  <u>Id.</u> ¶ 87.  Second, Western contends that
26 Riso distributes warning stickers to its dealers for placement
   inside Risographs that warn that use of non-Riso ink may result
28 fire.  <u>Id.</u> ¶ 88.  Finally, Western alleges that Riso recently

                                17

1  iistributed a warning sticker which reads:

2                           **WARNING**
        Be sure your masters and ink cartridges carry the
3       original RISO logo.  Use of non-RISO manufactured inks
        or masters may result in lower print quality, higher
4       cost per copy, significant increase in set off and may
        cause serious damage to the ink cylinder and the
5       Risograph.

6       **Use of non-RISO manufactured inks or masters may cause**
        **repair or service problems not covered by your warranty**
7       **or service agreement.**  Please consult your authorized
        RISO representative for further information.

8

9  id. ¶ 89.  Western alleges that the above claims are false and/or

10 nisleading, id. ¶¶ 86-87, 137 and that it has lost sales as a

11 result, id. ¶¶ 90, 138.

12      In order to state a claim under § 43(a) of the Lanham Act,

13 l5 U.S.C. § 1125(a), a plaintiff must allege: "(1) a false

14 statement of fact by the defendant in a commercial advertisement

15 sbout its own or another's product;  (2) the statement actually

16 deceived or has the tendency to deceive a substantial segment of

17 its audience;  (3) the deception is material, in that it is likely

18 to influence the purchasing decision;  (4) the defendant caused

19 its false statement to enter interstate commerce;  and (5) the

20 plaintiff has been or is likely to be injured as a result of the

21 false statement, either by direct diversion of sales from itself

22 to defendant or by a lessening of the goodwill associated with

23 its products."  Southland Sod Farms v. Sover Seed Co., 108 F.3d

24 1134, 1139 (9th Cir. 1997).

25      Riso moves to dismiss Western's Lanham Act claim on the

26 grounds that the statements relied on by Western are not specific

27 enough and are true.  Riso contends that the alleged

28 misrepresentations lack specificity because (1) they do not claim

                                    18

1  that use of non-Riso products will always lead to poor results or
2  cause damage, and (2) do not refer to any supplier, including
3  Western, by name.  Rather, according to Riso, they merely "state
4  that certain unnamed non-Riso supplies may present difficulties
5  for the Risograph user and/or damage the machine."

6      The Lanham Act does not reach claims of general superiority.
7  See Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection
8  Serv. Inc., 911 F.2d 242, 246 (9th Cir. 1990).  Where an
9  advertisement quantifies the superiority, however, a claim may
10 lie. Id. The issue in Cook was whether an advertisement which
11 implied that a collection agency offers the same collection
12 services as lawyers at lower or more competitive prices was mere
13 puffery, and thus, not actionable under the Lanham Act.  Id. at
14 245.  Although the court held that the advertisement was "merely
15 general in nature," and therefore nonactionable puffery, the
16 court noted that "misdescriptions of specific or absolute
17 characteristics of a product are actionable." Id. (quoting
18 Stiffel Co. v. Westwood Licrhtina Group, 658 F. Supp. 1103, 1115
19 (D. N.J. 1987)).  "[A]dvertising statements placed in an ad
20 knowing or intending that they are of the type that will affect
21 the consumer's judgment, are not puffery, but rather constitute
22 actionable representations within the meaning of the Lanham Act."
23 U-Haul Int'l, Inc. v. Jartran, 522 F. Supp. 1238, 1253 (D. Ariz.
24 1981), aff'd, 681 F.2d 1159 (1982).

25     The alleged misrepresenations at issue here far exceed
26 general statements of superiority.  To the contrary, the various
27 warnings allegedly produced by Riso warn of specific consequences
28 which may result from using non-Riso products, including fire,

19

1  severe equipment damage, exposure to toxic substances, and
2  termination of the 7 year/10 million copy warranty.
3      The court rejects Riso's assertion that its use of the term
4  "may" alone shields it from liability as a matter of law. In
5  Gillette Co. v. Norelco Consumer Prods. Co., 946 F. Supp. 115,
6  137 (D. Mass. 1996), relied on by Riso, the court held that the
7  defendant's representation that any product that provided a shave
8  closer than its own "Could be Too Close For Comfort," was not
9  actionable because it was not objectively capable of proof or
10  disproof. Id. at 137. The court observed that the plaintiff's
11  failure to offer any standards by which to measure the truth of
12  the statement was understandable, "because the conditional
13  'could' is denotative of only a possibility; and things that are
14  possible can occur, but they may not." Id. Riso argues that,
15  like the plaintiff in Gillette, Western complains of statements
16  that suggest a possibility. Riso is correct, none of the
17  warnings state that use of non-Riso products will cause an
18  untoward result. However, unlike the vague possibility suggested
19  in Gillette that a shave could be "too close," Riso warns of no
20  less than 11 specific occurrences of damages which may result
21  from use of non-Riso products, including fire, severe equipment
22  damage, exposure to toxic substances, and termination of the 7
23  year/10 million copy warranty. This is not the type of vague
24  puffery at issue in Gillette and the other cases relied on by
25  Riso.
26      Likewise, a plaintiff need not be specifically named in the
27  allegedly disparaging statement where the group named is small
28  enough that the statement can reasonably be understood to apply

20

1. **Intentional Interference With Contractual Relations And A Prospective Economic Advantage**

In order to state a claim for intentional interference with contractual relations or prospective economic advantage, Western must allege, among other things, a valid contract or economic relationship between itself and a third party, and Riso's knowledge of the same. See Pacific Gas & Electric Co. v. Bear Stearns & Co., 50 Cal. 3d 1118, 1126 (1990); Westside Ctr. Assocs. v. Safeway Stores 23. Inc., 42 Cal. App. 4th 507, 521-522 (1996). Riso moves to dismiss Western's intentional interference claims on the ground that Western failed to allege that Riso was aware of any relationship or contract between Western and a third party.

In its second amended complaint, Western alleges that: (1) it has been successful in obtaining some orders for ink and masters from school districts in the Bay Area; (2) upon learning of Western's success, two Riso dealers, including defendant RPSI, "engaged in threats and product disparagement toward those school districts;" (3) at the time the dealers did so, they knew that Western was the source of those districts' ink and masters and intended their threats and false statements be understood to refer to Western's products; and (4) the threats and disparagement undertaken the dealers were carried out in conspiracy with and with the assistance of Riso, specifically in connection with the contracts between Western and Stockton Unified School District and the Modesto City Schools. SAC ¶¶ 152-55. Western's allegation that Riso "specifically aid[ed] and assist[ed] [RPSI] in its interference with the contract between

22

PLO13700

1     4.   The parties' respective evidentiary motions are DENIED

2 WITHOUT PREJUDICE.

3     5.   No points and authorities submitted in this action

4 shall exceed 40 pages.  No accompanying pleadings, including

5 declarations, statements of fact and responses thereto, shall

6 exceed 20 pages.

7     IT IS SO ORDERED.

8 DATED: November 20, 2000.

9

10                                              FRANK C. DAMRELL, Jr.

11                                          UNITED   STATES DISTRICT  JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

2

2

24

PLO13702